UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

JEAN P. SIMON, M.D.,                          :   Civ. No.: 07-cv-11426 (SAS)
                                              :
                    Plaintiff,                :
                                              :
        -against-                             :
                                              :
UNUM, UNUM PROVIDENT, PROVIDENT LIFE          :
AND CASUALTY INSURANCE COMPANY, THE           :
PAUL REVERE LIFE INSURANCE COMPANY,           :
FIRST UNUM LIFE INSURANCE COMPANY,            :
PROVIDENT LIFE AND ACCIDENT                   :
INSURANCE COMPANY AND                         :
UNUMPROVIDENT CORPORATION,                    :
                                              :
                    Defendants.               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PARTIALLY DISMISS AMENDED COMPLAINT

White and Williams, LLP
One Penn Plaza
18th Floor, Suite 1801
New York, New York 10119
Phone: 212-244-9500
Fax: 212-244-6200
*Attorneys for Defendants Unum, Unum Provident, Provident Life and Casualty Insurance Company, The Paul Revere Life Insurance Company, First Unum Life Insurance Company, Provident Life and Accident Insurance Company and UnumProvident Corporation*

*On the brief:*
Andrew I. Hamelsky, Esq.

TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................... 1

STATEMENT OF FACTS ......................................................................... 2

ARGUMENT ........................................................................................... 4

    Point I.      The Uninvolved And Unrelated Defendants
                Must Be Dismissed ............................................................... 4

    Point II.     The Fraud Claim Must Be Dismissed ........................................ 7

    Point III.    The Consumer Fraud Claim Must Be Dismissed ......................... 9

    Point IV.    The Intentional Infliction of Emotional Distress Claim
                Must Be Dismissed ............................................................ 11

    Point V.     The Bad Faith Claim Must Be Dismissed .................................. 13

CONCLUSION ..................................................................................... 14

PHLDMS1 4168333v.2

TABLE OF AUTHORITIES

PAGE

*Alexander & Alexander of New York v. Fritzen,*
114 A.D.2d 814 (1st Dept. 1985) ...................................................................... 4

*Arbor Hills Concerned Citizens Neighborhood Association v. City of Albany,*
250 F.Supp.2d 48 (N.D.N.Y. 2003) ................................................................... 5

*Bd. 7 of Borough of Manhattan v. Schaffer,*
84 N.Y.2d 148 (N.Y. 1994) ............................................................................... 5

*Bono v. Monarch Life Insurance Co.,*
2006 WL 839412 (W.D.N.Y. 2006) .............................................................. 8, 9

*Briarpatch Ltd. L.P. v. Phoenix Pictures, Inc.,*
373 F.3d 296 (2d Cir 2004) ............................................................................... 6

*Continental U.K. Ltd. v. Anagel Confidence Compania Naviera, S.A.,*
658 F.Supp. 809 (S.D.N.Y. 1987) ..................................................................... 4

*Cunningham v. Security Mutual Ins. Co.,*
260 A.D.2d 983 (3rd Dept. 1999) .................................................................... 11

*Daniels v. Provident Life & Cas. Ins. Co.,*
2001 WL 877329 (W.D.N.Y. 2001) ................................................................... 9

*Dekel v. UnumProvident Corp,*
2007 WL 812968 (E.D.N.Y. 2007) .............................................................. 9, 13

*Hanft Byrne Raboy & Partners, Inc. v. Matsushita Elec. Corp. of America,*
2001 WL 456346 (S.D.N.Y. 2001) .................................................................... 8

*Harris v. Allstate Ins. Co.,*
83 F.Supp.2d 423 (S.D.N.Y. 2000) .................................................................. 11

*Howell v. New York Post Co.,*
81 N.Y.2d 122 (N.Y. 1993) .............................................................................. 11

*Lama Holding Co. v. Smith Barney, Inc.,*
88 N.Y.2d 413 (N.Y. 1996) ................................................................................ 7

*Lava Trading Inc. v. Hartford Fire Ins. Co.,*
326 F.Supp.2d 434 (S.D.N.Y. 2004) ................................................................ 10

*Lomaglio Assoc., Inc. v. LBK Mktg. Corp.,*
892 F.Supp. 89 (S.D.N.Y. 1995) ....................................................................... 8

PHLDMS1 4168333v.2

*MaGee v. Paul Revere Life Ins. Co.*,
    954 F.Supp. 582 (E.D.N.Y. 1997) ................................................... 9, 11

*Manning v. Utils. Mut. Ins. Co.*,
    2004 WL 235256 (S.D.N.Y. 2004) .................................................. 13

*Murphy v. American Home Prod. Corp.*,
    58 N.Y.2d 293 (N.Y. 1983) .......................................................... 11

*New York Univ. v. Cont'l Ins. Company*,
    87 N.Y.2d 308 (N.Y. 1995) .......................................................... 8, 9

*Pampillonia v. RJR Nabisco, Inc.*,
    138 F.3d 459 (2d Cir. 1998) ......................................................... 6

*Polidoro v. Chubb Corp.*,
    386 F.Supp.2d 334, 338-9 (S.D.N.Y. 2005) ..................................... 9, 13

*Rocanova v. Equitable Life Assurance Soc'y*,
    83 N.Y.2d 603 (N.Y. 1994) .......................................................... 8

*Shapiro v. Berkshire Life Ins. Co.*,
    212 F.3d 121 (2d Cir. 2000) ......................................................... 9

*Sichel v. UNUM Provident Corp.*,
    230 F.Supp.2d 325 (S.D.N.Y. 2002) ............................................... 8, 9, 13

*Town of Riverhead v. New York State Office of Real Property Services*,
    802 N.Y.S.2d 698 (2nd. Dept. 2005) .............................................. 5

*Wiener v. UnumProvident Corp.*,
    202 F.Supp.2d 116 (S.D.N.Y. 2002) ............................................... 11

## S<small>TATUTES AND</small> R<small>ULES</small>

Fed. R. Civ. P. 9 ........................................................................ 1, 7

Fed. R. Civ. P. 12(b)(6) .............................................................. 1

New York General Business Law § 349 ............................................ 9, 10

# PRELIMINARY STATEMENT

Defendants herein (collectively, the "Defendants") submit this memorandum of law pursuant to Rules 9(a) and 12(b)(6) of the Federal Rules of Civil Procedure in support of their motion to dismiss certain Defendants and claims from the amended complaint (the "Complaint", attached hereto as Exh. A) filed by Jean P. Simon, M.D. ("Plaintiff") on March 27, 2008. Not only has Plaintiff failed to name the correct Defendants in this action, but Plaintiff has not alleged, nor will he be able to allege, certain claims with the required particularity.

Plaintiff brings claims against the following Defendants that either have no corporate existence or have absolutely no involvement in this case: Unum, Unum Provident, The Paul Revere Life Insurance Company, First Unum Life Insurance Company and Provident Life and Accident Insurance Company.

Plaintiff brings the following claims that have no basis in fact and cannot be plead with the sufficient particularity required under New York law: Fraud, Consumer Fraud, Intentional Infliction of Emotional Distress and Breach of Good Faith and Fair Dealing.

Notwithstanding Plaintiff's misguided attempts to aggrandize this lawsuit, this dispute is merely a breach of contract claim against no more than two of the Defendants named herein. Plaintiff refused to amend the Complaint to include only the proper Defendants, despite Defendants' prior notice to Plaintiff detailing the fact that the Complaint names certain parties that are neither legal entities nor were involved in this matter. (See Letter from A. Hamelsky to J. Sack, dated March 14, 2008, attached as Exh. B, the "Notice"). Additionally, Plaintiff disregarded the Notice in refusing to amend the Complaint by withdrawing the claims of fraud, consumer fraud, intentional infliction of emotion distress and breach of good faith and fair dealing. Each of these claims lacks sufficiently clear allegations to overcome a motion to

dismiss.  Consequently, Plaintiff's insufficient claims and improper Defendants should be dismissed from this action in their entirety.

<strong><u>STATEMENT OF FACTS</u></strong>

Plaintiff claims that Defendants have wrongfully withheld disability benefits due to him from a disability insurance policy in an amount exceeding $20,000,000. (Complaint, ¶¶  4 and II).  Plaintiff is an obstetrician/gynecologist in New York.  (Complaint, ¶ 10).  Plaintiff alleges that he purchased two "standard form disability insurance policies from UNUM" in 1993 and 1995 (the "Policies"; Complaint, ¶ 19, attached as Exh. A thereto).

1.    The Policies were issued by Provident Life and Casualty Insurance Company ("Provident").  In addition to Provident, Plaintiff also includes as Defendants entities by the name of "Unum," "Unum Provident," "The Paul Revere Life Insurance Company," "First Unum Life Insurance Company," "Provident Life and Accident Insurance Company" and "UnumProvident Corporation" and defines such entities collectively as "Unum" or "Defendants" in the Complaint.  (Complaint, ¶ 1).

Plaintiff alleges that on or about November 23, 2003, he "suffered a massive abscess/cellulitis of the left hand" which to this day keeps him from performing "substantial and material duties of his occupation."  (Complaint, ¶¶  24, 32).  Accordingly, Plaintiff claims that he became "totally disabled," as defined in the Policies. (Complaint, ¶ 23).

Plaintiff applied for total disability benefits and was denied total disability benefits by Provident.  (Complaint, ¶ 38; see Exh. C, Letter from N. Algieri of Provident Life and Casualty Insurance Company, dated August 27, 2007).  He challenged the denial by means of an administrative appeal, and such appeal was also denied by Provident.  (Complaint, ¶¶  40-1; see Exh. D, Letter from S. Deraney of Provident Life and Casualty Insurance Company, dated

January 8, 2008).  The reason for the denials arises out of a disagreement over the interpretation of what constitutes "total disability" under the Policies.

In addition to alleging Breach of Contract (Complaint, ¶¶ 72-6), Plaintiff also brings claims for Breach of Covenant of Good Faith and Fair Dealing (Complaint, ¶¶ 77-80), Fraud (Complaint, ¶¶ 81-87), Consumer Fraud (Complaint, ¶¶ 88-97) and Intentional Infliction of Emotional Distress (Complaint, ¶¶ 98-104).

Defendants now move this Court to dismiss all extraneous Defendants and dismiss certain causes of action that have no legal basis.

## ARGUMENT

### POINT I

### THE UNINVOLVED AND UNRELATED DEFENDANTS MUST BE DISMISSED

The only relevant Defendant in this action is Provident, the entity that issued the Policies to Plaintiff.[1]  However, Plaintiff has named a number of additional entities and grouped them together in the Complaint as "Defendants" and "Unum".  Nowhere in the Complaint does Plaintiff distinguish between any of these entities or allege their specific roles in this dispute.  Additionally, Plaintiff does not allege any control relationship by and among these entities.

New York case law is clear that in terms of legal responsibility, parent, subsidiary, or affiliated corporations are treated separately and independently, and one will not be held liable for the contractual obligations of the other.  *Alexander & Alexander of New York v. Fritzen*, 114 AD2d 814 (1st Dept 1985), *order affd* 68 NY2d 968 (1986); *see also, Continental U.K. Ltd. v. Anagel Confidence Compania Naviera, S.A.*, 658 F.Supp. 809, 815-816 (S.D.N.Y. 1987) ("Subsidiaries of the same parent are not necessarily bound to each others' contractual obligations.").  To bind all subsidiaries to the same contractual obligations, one would have to prove that the subsidiaries have "no separate mind, will, or existence of its own." *Id.*  Therefore, the Complaint improperly names subsidiaries which have no relation to Plaintiff's cause of action.  Defendants attach as Exh. E, Unum Group's corporate chart of publicly held entities, as attached to its Fed.R.Civ.P. 7.1 Statement, to illustrate that Plaintiff has named extraneous parties to this action.

---

[1] Defendants have been willing to concede that Unum Group, formerly known as UnumProvident Corporation, might also be a relevant party to this action, although Plaintiff has not alleged any control relationship between Unum Group and Provident.

Plaintiff makes no allegation that any of the entities named in the Complaint are subsidiaries without a separate existence from the parent.  In fact, Plaintiff merely names a variety of defendants that may or may not be legal entities.  The only relevant party to this breach of contract action is Provident, the entity that issued the Policies.  Plaintiff names five additional Defendants, ostensibly related to "Unum", but does not so much as assert any direct or indirect involvement by those entities in this action or any possible control relationship between those entities and Provident.

The following entities that Plaintiff names as Defendants, "Unum" and "Unum Provident", are not corporate entities that have been duly organized under the law of any state.  As such, they have no legal capacity and cannot be sued.   Under Rule 17(b) of the Federal Rules of Civil Procedure, the "capacity of a corporation to sue or be sued shall be determined by the law under which it was organized."  The capacity to sue or be sued "'depends purely upon a litigant's status.'"  *Arbor Hills Concerned Citizens Neighborhood Association v. City of Albany,* 250 F.Supp.2d 48, 62 (N.D.N.Y. 2003) (quoting *Community Bd. 7 of Borough of Manhattan v. Schaffer,* 84 N.Y.2d 148, 155 (N.Y. 1994).  Corporations "are creatures of statue and, as such, require statutory authority to sue and be sued…unincorporated associations, which are voluntary congregate entities, are accorded the capacity to bring suit through their presidents or treasurers by statute."  *Schaffer,* 84 N.Y.2d at 155.  These two Defendants are neither corporations, partnerships or unincorporated associations.  As such, they are "artificial creatures" that lack any capacity to sue or be sued.  *Town of Riverhead v. New York State Office of Real Property Services,* 802 N.Y.S.2d 698, 699 (2d. Dept. 2005);  *see also Schaffer,* 84 N.Y.2d at 155 ("Being artificial creatures of statute, such entities have neither an inherent nor a common-law right to sue.").  Accordingly, each of Unum and Unum Provident must be dismissed from this action.

Further, the following corporations are existing corporate entities but are not in any way involved in this action: The Paul Revere Life Insurance Company, First Unum Life Insurance Company, and Provident Life and Accident Insurance Company. In fact, each of these entities, along with Unum and Unum Provident, cannot be a real party in interest as none of them were party to the Policies at issue in this action. As such, these parties were joined "fraudulently" by Plaintiff, as there is no possibility that Plaintiff can state a cause of action against them. *See Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459 (2d Cir. 1998); a*ccord Briarpatch Ltd. L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir 2004).

As set forth above, Plaintiff's disability contract is with Provident. Plaintiff does not have a disability contract with The Paul Revere Life Insurance Company, First Unum Life Insurance Company, Provident Life and Accident Insurance Company, Unum or Unum Provident. Clearly, Plaintiff cannot sustain a cause of action against any of those entities for breach of a nonexistent contract. Therefore, each of The Paul Revere Life Insurance Company, First Unum Life Insurance Company, Provident Life and Accident Insurance Company, Unum and Unum Provident must be dismissed from this action.

PHLDMS1 4168333v.2

## POINT II

### THE FRAUD CLAIM MUST BE DISMISSED

Count Three of the Complaint, alleging fraud, must be dismissed.   (Complaint, ¶¶ 81-87).  Under New York law, in order to claim fraud, Plaintiff must prove (i) a misrepresentation or material omission of fact which was false and known to be false to the Defendants, (ii) made for the purpose of inducing the plaintiff to rely on it, (iii) which reliance was justifiable, and (iv) injury as a result.  *Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 421 (N.Y. 1996).  Under Rule 9 (b) of the Federal Rules of Civil Procedure, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

In this case Plaintiff does not particularize any circumstances constituting the alleged fraud, merely stating that "Defendants have entered into a scheme to defraud the Plaintiff." (Complaint, ¶ 82).  Plaintiff attempts to evidence this statement with the absurdly general and wholly nonsensical statement that Defendants issue policies and "when the insured makes a legitimate claim" refuse to "make any payments at all."  (Complaint, ¶ 83).  Further, Plaintiff fails to allege any conditions of the Defendants' state of mind, such as malice or intent, which could possibly support any fraud claim.  Plaintiff also completely omits any allegations regarding his justifiable reliance on the alleged misrepresentation.  Accordingly, Plaintiff has failed to sufficiently plead the fraud claim with particularity under both New York law and Rule 9(b) of the Federal Rules of Civil Procedure.

Even if fraud was plead with specificity (which it was not), this cause of action necessarily fails as a matter of law. "New York law 'preclude[s] fraud actions where the only fraud charged relates to a breach of contract.'" *Sichel v. UNUM Provident Corp.*, 230 F.Supp.2d 325, 328 (S.D.N.Y. 2002) (quoting *Lomaglio Assoc., Inc. v. LBK Mktg. Corp.*, 892 F.Supp. 89, 94 (S.D.N.Y. 1995). Essentially, Plaintiff has attempted to create a new claim that is nothing more than a breach of contract action. "'[A] contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations.'" *Hanft Byrne Raboy & Partners, Inc. v. Matsushita Elec. Corp. of America*, No. 00 Civ. 2990, 2001 WL 456346, at *5 (S.D.N.Y. May 1, 2001) (quoting *Rocanova v. Equitable Life Assurance Soc'y*, 83 N.Y.2d 603, 614, (N.Y. 1994)); *see also Bono v. Monarch Life Insurance Co.,* 2006 WL 839412, at *3 (W.D.N.Y. 2006) ("It is well settled that New York law does not permit an insurance claimant to covert a breach of contract claim into a tort claim by alleging that the insurer handled his claims fraudulently or in bad faith.").

In sum, "'[g]eneral allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support' a claim for fraud." *Sichel,* 230 F.Supp.2d at 328 (quoting *New York Univ. v. Cont'l Ins. Company*, 87 N.Y.2d 308, 318, (N.Y. 1995)); *see also Bono,* 2006 WL 839412, at *3. In this case, Plaintiff has not even alleged that when Defendants issued the Policies they lacked any intent to perform as required under the Policies. Plaintiff merely provides a general and highly unsubstantiated statement that Defendants issue disability policies for which they "refuse to make any payments at all." This gross generalization cannot support a claim for fraud and must be dismissed.

## POINT III

### THE CONSUMER FRAUD CLAIM MUST BE DISMISSED

Count Four of the Complaint, alleging consumer fraud, must be dismissed.  (Complaint, ¶¶ 88-97).  Plaintiff's consumer fraud claim, governed by New York General Business Law § 349 ("GBL § 349"), which regulates deceptive acts or practices in conducting a business, is insufficient as this case solely involves a private contract dispute between Plaintiff and Defendants.  To state a claim under GBL § 349, Plaintiff must allege that (i) the practice is consumer-oriented and not a private contract dispute and (ii) the Defendants engaged in a deceptive practice likely to mislead the reasonable consumer, and Plaintiff was injured by such practice.  *Dekel v. UnumProvident Corp.,* 2007 WL 812968, at *2 (E.D.N.Y. 2007).

To state a claim under GBL § 349, "a deceptive act or practice that has a broader impact on consumers at large meets this threshold, but a private contract dispute as to policy coverage does not."  *Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 126 (2d Cir. 2000) (internal citations omitted); *see also,  Sichel,*  230 F.Supp.2d at 329-331; *MaGee v. Paul Revere Life Ins. Co.*, 954 F.Supp. 582, 586 (E.D.N.Y. 1997) ("[T]he injury must be to the public generally as distinguished from the plaintiff alone.").  As such, "private contract disputes unique to the parties…[do] not fall within the ambit of the statute."  *New York Univ. v. Cont'l Ins. Company,* 87 N.Y.2d 308, 320 (N.Y. 1995) (dismissing claim because a dispute over policy coverage is unique to the parties and does not affect the public at large); *see also Polidoro v. Chubb Corp.,* 386 F.Supp.2d 334, 338-9 (S.D.N.Y. 2005); *Bono,* 2006 WL 839412, at *2 ("It is well settled that G.B.L. § 349 does not apply to breach of contract disputes between private parties."); *Daniels v. Provident Life & Cas. Ins. Co.,* 2001 WL 877329, at *8 (W.D.N.Y. 2001) ("Private

-9-

contract disputes between the insured and the insurer over policy coverages or the processing of claims are not covered by [GBL § 349] because such disputes do not affect the consuming public at large.").

Additionally, Plaintiff's conclusory allegations of deception are baseless and cannot be sustained as a matter of law. Such allegations of deception must be supported by fact. *Lava Trading Inc. v. Hartford Fire Ins. Co.,* 326 F.Supp.2d 434, 438 (S.D.N.Y. 2004) ("Conclusory allegations, even of the existence of a claim settlement policy designed to deceive the public, are not sufficient to state a claim under Section 349 in the absence of factual allegation in support thereof."). Plaintiff has not provided sufficient factual allegations to substantiate any alleged deceptions.

In sum, New York law does not permit an action under GBL §349 if such action involves a private contract dispute. There can be no disagreement that this action solely involves a private contract dispute between Plaintiff and Provident, and the interpretation of whether Plaintiff is "totally disabled," as defined under the Policies, and is owed disability benefits as a result. Plaintiff sues Defendants solely for his own alleged damages arising out of these particular Policies, without joining any additional Plaintiffs or requesting relief on behalf of any other individuals. Clearly, this is a private contract action that has nothing to do with an injury to the general public and relates solely to Plaintiff. Additionally, Plaintiff provides absolutely no basis to support the general allegations that Defendants acted deceptively. As such, this claim cannot be permitted under GBL § 349.

<u>POINT IV</u>

**THE INTENTIONAL INFLICTION OF EMOTION DISTRESS CLAIM
MUST BE DISMISSED**

Count Five of the Complaint, alleging Intentional Infliction of Emotional Distress, must

fail as a cause of action in this case.  (Complaint, ¶¶ 98-104).  To state a claim for intentional

infliction of emotion distress, Plaintiff must allege (i) extreme and outrageous conduct by

Defendants, (ii) intent to cause severe emotional distress, (iii) causation and (iv) severe

emotional distress.  *Wiener v. UnumProvident Corp.,* 202 F.Supp.2d 116, 122 (S.D.N.Y. 2002).

The alleged conduct must be so "'outrageous in character and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in

a civilized community.'"  *Id.* (quoting *Murphy v. American Home Prod. Corp.,* 58 N.Y.2d 293,

303 (N.Y. 1983).  Plaintiff has not come close to alleging that this dispute over the definition of

"total disability" can be considered outrageous.  *See MaGee,* 954 F.Supp. 582 (finding that an

insurance company's wrongful termination of disability benefits after it contacted the plaintiff's

physicians to negatively influence their opinions on the disability was not outrageous).

New York courts have repeatedly found in similar disability benefit denial cases that

"such claims for intentional infliction of emotion distress [are] true contract cases recast in tort."

*Wiener,* 202 F.Supp.2d at 123; *see also, Harris v. Allstate Ins. Co.,* 83 F.Supp.2d 423 (S.D.N.Y.

2000); *Cunningham v. Security Mutual Ins. Co.,* 260 A.D.2d 983, 984, (3rd Dept. 1999); *Howell

v. New York Post Co.,* 81 N.Y.2d at 122, (N.Y. 1993) (noting that every claim of intentional

infliction of emotional distress ever heard by the New York Court of Appeals has failed because the conduct has not been sufficiently outrageous).

Clearly, New York law does not recognize an action for intentional infliction of emotional distress in a breach of contract action. This case is nothing more than a breach of contract action, with the sole issue being a dispute over the interpretation of language in the Policies. As such, this breach of contract action cannot be recast as a tort involving intentional infliction of emotional distress. Accordingly, Count Five of the Complaint must be dismissed.

## POINT V

## THE BAD FAITH CLAIM MUST BE DISMISSED

Count Two of the Complaint must be dismissed.  (Complaint, ¶¶ 77-80).  In Count Two, Plaintiff attempts to recast his claim for a bad faith denial of insurance claims as one for breach of good faith and fair dealing.  Notwithstanding Plaintiff's attempt to alter the language of the title, the substance of the claim remains the same.  As a matter of New York law, Plaintiff cannot maintain a claim that Defendants acted in bad faith in denying benefits under the Policies.  In fact, allegations of bad faith conduct in handling insurance claims are not cognizable under New York law.  *Polidoro,* 386 F.Supp.2d at 338.

To state a claim for bad faith denial of coverage, (i) Defendants' conduct must be actionable as an independent tort; (ii) the tort must be egregious; (iii) the conduct must be directed at Plaintiff; and (iv) the conduct must be part of a pattern directed at the general public.  *Sichel,* 230 F.Supp.2d at 328.  The only way "to meet the high standard necessary to enable the claim to go forward" is by sufficiently alleging egregious tortious conduct.  *Polidoro,* 386 F.Supp.2d at 338; *see also Manning v. Utils. Mut. Ins. Co.,* 2004 WL 235256 (S.D.N.Y. 2004).  In order to maintain this claim, Plaintiff must "establish a relationship or duty between himself and [Defendants] separate from the contractual obligation." *Dekel,* 2007 WL 812986, at *2 (finding that the complaint did not establish any separate obligation so no cause of action for bad faith existed).

Plaintiff claims that Defendants breached an "implied covenant of good faith and fair dealing", or acted in bad faith, by denying Plaintiff's benefits.  Plaintiff does not sufficiently allege any egregious tortious conduct on the part of Defendants to support this claim.  Nor does

-13-

Plaintiff establish that this particular obligation is separate and distinct from the contractual obligation. Accordingly, this count must be dismissed.

## **CONCLUSION**

As set forth above, the Complaint as currently constituted is deficient as a matter of law. Plaintiff sues certain Defendants that do not exist or have absolutely no connection to this action, without remotely alleging how they can be connected to this action. Further, Plaintiff brings four causes of action that either have no basis under New York law and have not been alleged with sufficient particularity as to merit their consideration. Plaintiff has refused to amend the Complaint, notwithstanding Defendants' Notice which detailed its deficiencies. Accordingly, Defendants hereby respectfully request that the Complaint be partially dismissed.

Dated: April 16, 2008                    Respectfully submitted,


                                         By: _/s/ Andrew I. Hamelsky_____
                                             Andrew I. Hamelsky
                                             WHITE AND WILLIAMS, LLP
                                             Attorneys for Defendants
                                             One Penn Plaza, 18th Floor, Suite 1801
                                             New York, New York 10119
                                             (212) 244-9500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

JEAN P. SIMON, M.D.,                                          :      Civ. No.: 07-cv-11426 (SAS)

                        Plaintiff,                     :

      -against-                                              :

UNUM, UNUM PROVIDENT, PROVIDENT LIFE :
AND CASUALTY INSURANCE COMPANY, THE:
PAUL REVERE LIFE INSURANCE COMPANY,  :
FIRST UNUM LIFE INSURANCE COMPANY,   :
PROVIDENT LIFE AND ACCIDENT          :
INSURANCE COMPANY AND                :
UNUMPROVIDENT CORPORATION,           :

                      Defendants.                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

# EXHIBIT A

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PARTIALLY DISMISS AMENDED COMPLAINT

---

White and Williams, LLP
One Penn Plaza
18th Floor, Suite 1801
New York, New York 10119
Phone: 212-244-9500
Fax: 212-244-6200
*Attorneys for Defendants Unum, Unum Provident, Provident Life and Casualty Insurance Company, The Paul Revere Life Insurance Company, First Unum Life Insurance Company, Provident Life and Accident Insurance Company and UnumProvident Corporation*

**SACK & SACK, ESQS.**
110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
*Attorneys for Plaintiff*

UNTIED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

JEAN P. SIMON, M.D.,

                                    Plaintiff,

         — against —

UNUM, UNUM PROVIDENT, PROVIDENT LIFE
AND CASUALTY INSURANCE COMPANY, THE
PAUL REVERE LIFE INSURANCE COMPANY,
FIRST UNUM  LIFE INSURANCE COMPANY,
PROVIDENT LIFE AND ACCIDENT INSURANCE
COMPANY AND UNUMPROVIDENT
CORPORATION,

                                  Defendants.

-------------------------------------------------------------------x

Civ. No.:  07-cv-11426  (SAS)

ECF CASE

**COMPLAINT**

**JURY TRIAL REQUESTED**

         Plaintiff, JEAN P. SIMON, M.D. ("*Dr. Simon*" or "*Plaintiff*") by his attorneys, Sack &

Sack, Esqs., as and for its complaint, alleges as follows:

<u>**NATURE OF ACTION**</u>

         1.     This action is brought by Dr. Simon against UNUM, UNUM PROVIDENT,

PROVIDENT LIFE AND CASUALTY INSURANCE COMPANY, THE PAUL REVERE LIFE

INSURANCE COMPANY, FIRST UNUM  LIFE INSURANCE COMPANY, PROVIDENT LIFE

AND ACCIDENT INSURANCE COMPANY AND UNUMPROVIDENT CORPORATION

(together hereinafter referred to as, "*UNUM*" or "*Defendants*").

1

2.     This action is brought in breach of contract by Defendants' based upon their failure to pay Dr. Simon accrued disability benefits pursuant to disability policies entered into between UNUM and Dr. Simon.

3.     This action is further grounded in fraud based upon UNUM's actions described herein.

4.     UNUM willfully and wrongfully breached the terms and conditions of the UNUM Policies issued to Plaintiff by: (i) wrongfully withholding Plaintiffs disability benefits; and (ii) otherwise failing to honor provisions of the UNUM Policies during the "period of total disability" that continues through this date.

## THE PARTIES

5.     At all times hereinafter mentioned, Plaintiff is a citizen of the County, City and State of New York.

6.     At all times hereinafter mentioned, UNUM is a foreign corporation, authorized to do business in the State of New York, and doing business in the State of New York.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(a).  The parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

8.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9.     Venue is properly placed in the United States District Court for the Southern District of New York since the Plaintiff resides herein, the Defendants do business here, the witnesses are located here, and this is the most convenient place for the trial of this action.

## FACTS COMMON TO ALL COUNTS

### DR. SIMON'S EDUCATIONAL AND EMPLOYMENT HISTORY

10.     Dr. Simon is a very well respected obstetrician / gynecologist and gynecological surgeon ("*OB/GYN*"), and had been highly-ranked consistently for 20 years prior to the incidents leading up to this Complaint, as one of the top OB/GYNs in New York.

11.     Dr. Simon graduated from the University of Paris in 1982, after five years of residency in France, specializing in OB/GYN surgery.

12.     In September 1982, Dr. Simon moved to the United States and began an OB/GYN residency, training at Columbia Presbyterian in 1982, St. Luke's Roosevelt Hospital in 1984 and Boston City Hospital from 1986 to 1988, before becoming a Board Certified OB/GYN.

13.     Beginning in 1988, Dr. Simon went into private practice on the Upper East Side of Manhattan, with admitting privileges at Beth Israel Hospital, Mount Sinai Hospital (since 1991) and New York Presbyterian Hospital (since 2000).

### DR. SIMON'S DUTIES AND RESPONSIBILITIES AS AN OB/GYN

14.     As a Board-certified OB/GYN, the substantial and material duties of his occupation required Dr. Simon to perform all the duties of his OB/GYN specialty, including, but not limited to, deliveries and surgical procedures in a hospital setting, ranging from normal vaginal delivery (where his left hand had to guide the fetal head down the vaginal canal, helping with the rotation, deflexion, extension of the fetal head, etc.) to more complicated deliveries such as forceps, vacuum extraction and cesarean sections.

15.     As a solo practitioner in his OB/GYN specialty, Dr. Simon personally delivered all the babies of all his patients as a substantial and material duty of his occupation.   The deliveries and other substantial and material duties of his occupation required Dr. Simon to be present at the

3

hospital, on the Labor and Delivery floor, with his parturient patient, as part of the process of delivering babies. All of the various baby-delivery-protocols require an extraordinarily high degree of strength, dexterity, mobility, control and sensitivity in order to prevent the risk of harm to the baby and the mother. These protocols ranged from normal vaginal delivery (where the left hand must guide the baby's head down the vaginal canal, then assist with the rotation, deflexion, and extension of the fetal head, etc.) to more complicated deliveries such as forceps, vacuum extraction and cesarean section.

16.    Oftentimes, in both emergency and non-emergency situations, as an OB/GYN specialist, Dr. Simon would be required to perform caesarian sections involving open abdominal surgery (requiring full participation of both of his hands, the left being inside the uterus, under the fetal head, with full wrist extension guiding the fetal head through the uterus).

17.    In addition to the Obstetrical care, Dr. Simon's practice of his OB/GYN specialty included a complete range of gynecological (non-obstetric) medical surgical procedures for non-pregnant women, including minor and major surgical procedures performed in the hospital setting. Because Dr. Simon received his first OB/GYN specialty training in France, he trained in the most sophisticated, complex, intricate microsurgical, laparoscopy, and vaginal hysterectomy procedures with the French pioneers who invented and developed the technology and protocols that are today the gold standard of gynecological surgery. These procedures, which require the highest degree of skill and training, also require the highest degree of fine dexterity and control, and were the mainstay of Dr. Simon's OB/GYN specialty practice.

| DR. SIMON'S CONTRACT WITH UNUM |
|---|

18.    On or about January 1, 1993, Dr. Simon purchased disability policies from Defendant UNUM for purposes of purchasing disability policies in the event he were to become disabled (or "totally disabled") by means of his occupation as an OB/GYN specialist.

19.    Dr. Simon, as an individual consumer, obtained two (2) standard form disability insurance policies from UNUM: (i) Policy Number 36-3376084608, effective January 1, 1993 ("*Policy 1*"); and (ii) Policy Number 36-1737-6122493, effective August 1, 1995 ( "*Policy 2*", together with Policy 1, the "*UNUM Policies*" or the "*Plan*"). (Exhibit "A")

20.    The UNUM Policies are standard form policies that are offered and are available to consumers at large.

21.    According to the UNUM Policies, Dr. Simon is entitled to disability proceeds in the event he suffers a "Total Disability" or becomes "totally disabled," which is defined in the UNUM policies as follows:

```
Total Disability or totally disabled
means that . . . due to Injuries or
Sickness you are not able to perform
the substantial and material duties of
your occupation . . .
```

22.    The UNUM Policies promise to pay benefits to Dr. Simon if he suffered a "total disability" that impaired his ability to perform the "the substantial and material duties of [his] occupation" as an OB/GYN specialist.

5

### DR. SIMON'S "TOTAL DISABILITY"

23.     On or about November 23, 2003, Dr. Simon became "Totally Disabled" in accordance with the terms defined in the UNUM Policies while performing the material and substantial duties of his occupation as an OB/GYN specialist on a regular basis according to the terms of the UNUM Policies.

24.     Specifically, on or about November 23, 2003, Dr. Simon suffered a massive abscess/cellulitis of the left hand.

25.     As a consequence of his injury, Dr. Simon was treated by Dr. Scott Wolfe, Chief, Hand & Upper Extremity Surgery, Hospital for Special Surgery, at Hospital for Special Surgery in New York City. Subsequently, Dr. Simon was diagnosed with acute septic tenosynovitis of the left hand and was immediately taken to the OR, where he underwent emergency surgery under general anesthesia.

26.     As part of the surgery, an approximately 7-inch vertical incision was performed to the palmar aspect Dr. Simon's left hand, wrist and lower forearm. The procedure was a three-hour procedure, which included debridement of deep space infection and horseshoe abscess, and lysis of adhesions.

27.     Dr. Simon was hospitalized at Hospital for Special Surgery in New York City. The incision was left open to allow for the drainage of the abscess. Dr. Simon also received intravenous antibiotics to treat the severe gram negative and positive infections.

28.     Dr. Simon also underwent two additional surgical procedures under general anesthesia, for a total of three surgical procedures under general anesthesia. The second procedure took place on or about November 28, 2003, to complete the debridement and irrigate the deep space

of the left hand. The initial incision was partially closed, but left open at the level of the wrist to allow for secondary healing. The third procedure took place in or around December 2003.

29.    On or about December 4, 2003, Dr. Simon was discharged from the hospital and allowed to return home with a 24-hour-a-day  peripherally inserted central catheter ("*PICC*") directly to his heart, in order to administer the massive antibiotics he required for one month.  A nurse visited Dr. Simon every day to change the antibiotic supply, check the dressing, ensure there was no infection at the PICC site, and to ensure that the pump of the PICC was functioning properly.

30.    Dr. Simon underwent significant hand therapy with an Occupational Therapist at the Hospital for Special Surgery in New York City.

31.    Following his injury and hospitalization, and the removal of his PICC, Dr. Simon underwent significant therapy and treatment by medicine's top specialists in the field, including Scott Wolfe, MD (Chief of Hand Surgery at the Hospital for Special Surgery) and a second opinion by Stephen Glickel, MD (Chief of Hand Surgery Department at St. Luke's Roosevelt Hospital) who confirmed Dr. Wolfe's diagnosis, but to no avail.

32.    Currently, Dr. Simon permanently suffers from sequellae from his massive abscess/cellulites of the left hand, which prevents him from performing "the substantial and material duties of his occupation," thereby rendering Dr. Simon "totally disabled" pursuant to the UNUM Policies.

33.    As a result of his injuries, Dr. Simon suffers a "total disability" as defined in the UNUM Policies.

34.    Dr. Simon is totally disabled from his occupation as an OB/GYN specialist based

7

upon definitions set forth in the UNUM Policies and pursuant to prevailing law.

35.    Dr. Simon has and continues to receive care by a Physician appropriate for the condition causing his disability.

36.    Dr. Simon's inability t[...] [...]rm the "the substantial and [...] duties of his occupation" thereby ren[...] [...]on "totally disabled" is supported t[...] [...]gnosis of top specialists in the fie[...] [...]and Surgery, Doctors Scott Wolfe and Stephen Glickel.

[...] of the foregoing agree that Dr. Simon's duties and responsibilities as an [...] [...]not be modified to accommodate his disability.

| UNUM HA[...] | [...] | [...]LIGAT[...] | [...]THE | [...] POLICIES |
|---|---|---|---|---|

38.    Despite that Dr. Simon suffers a "total disability" pursuant to the terms of UNUM [...] [...]ad faith and without reason, justification [...] [...] ay payments to Dr. Simon or otherwise honor the terms, c[...] [...]u privileges set forth in the UNUM Policies.

39.    Dr. Simon has [...] [...]nable requests for information from UNUM in a timely fashion.

40.    Dr. Simon timely submitted an adminis[...] [...] appeal challenging the decision to withhold his disability benefits.

41.    Dr. Simon's administrative [...] al was denied, thereby exh[...] [...]ministrative remedies.

42.    Dr. Simon has and continues to pay a[...] [...]s in order to maintain the UNUM Policies.  Furthermore, Dr. Simon has followed all conditions precedent and complied with

all policy requirements for receipt of payment of benefits under the UNUM Policies for being "totally disabled."

43.     UNUM has consistently and fraudulently denied Dr. Simon's disability benefits.

44.     In refusing to pay Dr. Simon's claims, UNUM, in bad faith, has engaged in a practice and pattern of inundating Dr. Simon with unduly burdensome, irrelevant and unreasonable requests for information in a disingenuous effort to find a reason not to pay Dr. Simon's disability claims, to which he is entitled.

45.     At all times herein, Defendants' conduct Dr. Simon has risen to the level of such an egregious nature it is extreme and outrageous conduct.

46.     Defendants intended to cause Plaintiff severe emotional distress.

47.     UNUM intended to defraud Dr. Simon by collecting and continuing to collect premiums with the intention that Dr. Simon believe that he is protected by UNUM's representations.

48.     Dr. Simon relied and continues to rely upon UNUM's material misrepresentations that Dr. Simon is entitled to disability benefits in the event he suffers a total disability.

49.     UNUM never had any intention of properly investigating Dr. Simon's injury.

50.     UNUM never had any intention of providing Dr. Simon with any protection in the event he became totally disabled.

51.     UNUM failed to properly investigate Dr. Simon's injury and, any purported investigation was biased only towards fraudulently finding or inventing a pretense to deny Dr. Simon's claims.

9

52.     UNUM demonstrated, through the acts, correspondence, telephone calls, internal memos and emails of its employees and their superiors that it had no intention of paying Dr. Simon's claims but continued to carry on conversations and correspondence with Dr. Simon pretending to be doing a purported investigation into Dr. Simon's injury

53.     It was only in or about September 2005, nearly two (2) years following his injury, that UNUM finally had its own doctor examine Dr. Simon's injury, after which there were no further follow-up consultations with any other independent medical examiners.

54.     Furthermore, UNUM failed to perform any ergonomic assessment or functional capacity evaluation to assist it in evaluating Dr. Simon's claim, nor were any second opinions by independent OB/GYNs performed for the purpose of assessing Dr. Simon's total disability.

55.     Unum intentionally, willfully and knowingly engaged in a pattern of harassing, belittling and intimidating Dr. Simon, accusing him of lying about whether he was performing surgery and insisting that he return to the subtantial and material duties of his occupation notwithstanding the obvious fact that, had Dr. Simon succumbed to their insults and insinuations and attempted to comply with their unreasonable and outrageous demands, the risk of harm to his patients would have been obvious, forseeable and self-evident.

56.     Unum willfully and knowingly engaged in a pattern of deception, subterfuge and deceit by corresponding with Dr. Simon on a variety of stationery, representing a variety of entities, all of whom are captioned Defendants, with the deliberate intent to obfuscate and confuse.

57.     UNUM intended that Dr. Simon rely to his detriment upon its material misrepresentations concerning any purported investigation or determination concerning Dr. Simon's injury and claim for benefits stemming therefrom.

58.    Unum pretended to process Dr. Simon's claim through its appeals process but never addressed the issues of whether or not Dr. Simon is able to perform the substantial and material duties of his occupation.

59.    Although Dr. Simon was paying for, and continues to pay high premiums towards his "own occupation" policy that he believed to his detriment would protect him and his family from exactly the kind of harm that befell him on November 23, 2003, UNUM has intentionally engaged in a "bait and switch" and with scienter and intention to willfully and knowingly defraud Dr. Simon, processed Dr. Simon's claim for benefits as if it were a cheaper "any occupation" policy.

60.    During the alleged appeal process UNUM pretended to enter into settlement discussions with Dr. Simon.

61.    In September 2006, three years following the injury, and two years after the elimination period, UNUM ceased the purported appeal of Dr. Simon's claims and "remanded" his claim to the initial claims review department in a further "bad faith" effort to withhold benefits, to which Dr. Simon is entitled.

62.    UNUM then made more irrelevant and unreasonable requests for information about Dr. Simon's injury, his occupation and even his wife's personal information in a disingenuous effort to find a reason not to pay Dr. Simon's claim for benefits.

63.    UNUM continues to fraudulently refuse to properly investigate whether or not Dr. Simon is able to perform the substantial and material duties of his occupation.

64.    UNUM's actions, apart from its obligations under the UNUM Policies, are morally reprehensible, and of such wanton dishonesty as to imply a criminal indifference to its civil

11

obligations.

65.    In addition, apart from the fraud and bad faith actions of UNUM, despite the provision contained in the UNUM Policies providing that benefits will be paid for "a period of total disability," UNUM willfully, wrongfully and uniformly breached and continue to breach the express terms and conditions of the UNUM Policies by refusing to pay benefits accumulated since November 23, 2003.

66.    As a result of Dr. Simon's injury, which has interfered with the substantial and material duties of his occupation, Dr. Simon's patients have departed the practice.

67.    Additionally, as a result of Dr. Simon's injury, which prevents him from performing the substantial and material duties of his occupation, Dr. Simon no longer receives referrals from, among others, general surgeons, internists, urologists, family practioners, nor from patient's family members, friends, colleagues and acquaintances.

68.    Defendant UNUM has made no meaningful attempt or effort to rehabilitate, negotiate or deal in good faith with Dr. Simon.

69.    Defendant UNUM has engaged in a variety of unethical and illegal activities forcing Dr. Simon to file a lawsuit.

70.    Dr. Simon asks this Court to order UNUM to honor the UNUM Policies immediately.

71.    UNUM has breached its contracts with the Dr. Simon by refusing to make payments to him under the terms of his disability policies.

72.    Dr. Simon has incurred significant losses as a consequence of UNUM's failure and refusal to make payments to him under the terms of his disability policies.

12

73.     By reason of the foregoing, Dr. Simon is entitled to recover all of his damages from the Defendants.

## CLAIMS AND DAMAGES

Based upon the above allegations, Plaintiff maintains the following legal claims against Defendants:

## COUNT ONE
### (Breach of Contract)

74.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

75.     UNUM has breached its contracts with the Dr. Simon by refusing and failing to make payments to him under the terms of his disability policies.

76.     By reason of UNUM's breach of contract, Dr. Simon is entitled to recover all of the proceeds due to him under the policies including past premiums paid under the UNUM Policies, to have future premiums waived, as well as to have the Court and a jury establish what future benefits are due and to have them paid to Plaintiff.

77.     Plaintiff is also entitled to recover all consequential damages suffered as a result of the Defendants' refusal and failure to pay Plaintiff pursuant to the terms of the policies, including his mental anguish, inconvenience, inability to proceed with his lifestyle, loss of business, and any other consequential damages cause by the Defendants' wrongful refusal to pay Plaintiff under the terms of the policies, that are legally permitted to be recovered by law.

78.     By reason of the foregoing, Plaintiff is entitled to recover all of his damages from the Defendants.

## COUNT TWO
### (Breach of Covenant of Good Faith and Fair Dealing)

79.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

80.     Implicit in the dealings, agreements and understandings between Dr. Simon and Defendants is a covenant of good faith and fair dealing.

81.     The covenant of good faith and fair dealing requires that Defendants not take any action which will have the effect of destroying Dr. Simon's rights to receive the promised financial benefits due him under the UNUM Policies.

82.     By failing to properly and fairly provide Dr. Simon with the benefits due him under the UNUM Policies, Defendants have breached the implied covenant of good faith and fair dealing.

## COUNT THREE
### (Fraud)

83.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

84.     The Defendants have entered into a scheme to defraud the Plaintiff with respect to the sale of disability insurance.

85.     The Defendants issue disability policies for which they collect substantial premiums, particularly those policies such as the ones sold to the Plaintiff, then, when the insured makes a legitimate claim under the terms of the UNUM Policies, the Defendants refuse to make any payments at all.

86.     The Defendants' conduct described herein amounts to fraud.

87.     By reason of the Defendants' fraudulent conduct, Plaintiff has been damaged as set forth above.

88.     By reason of the foregoing, Defendants are jointly and severally liable pursuant to the exceptions set forth in the CPLR.

89.     By reason of the Defendants' fraudulent conduct, Plaintiff is entitled to recover all of his damages from the Defendants, including actual damages, punitive damages, treble damages and attorney's fees.

## COUNT FOUR
### (Consumer Fraud)

90.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

91.     Plaintiff is an individual consumer.

92.     The UNUM Policies are standard form policies that are offered and are available to consumers at large.

93.     The Defendants have entered into a pattern and scheme to defraud the public and the Plaintiff with respect to the sale of disability insurance.

94.     Plaintiff and Defendants occupy disparate bargaining positions.

95.     Unum engaged in deceptive acts and practices by offering and issuing expensive disability policies with "own occupation" total disability provisions, thereby collecting costly premiums from a gullible, unsuspecting public who are talked into believing that such expensive "own occupation" policies offer superior protection in the event of injury or sickness. The, in "bait and switch" fashion, administer those consumer the claims on those policies as cheap "any occupation" policies, while continuing to con the claimant into continuing to pay ongoing high premiums by pretending to evaluate the claim, pretending to enter into settlement discussions,

pretending to appeal the claim, pretending to remand the claim, pretending to reevaluate the claim, then pretending to again appeal the claim in an ongoing process to collect costly premiums, as Unum did with Dr. Simon.

96.    The Defendants' conduct violates §349 of the General Business Law of the State of New York and constitutes a fraud upon the Plaintiff and the public.

97.    By reason of the Defendants' fraudulent conduct in violation of §349 of the General Business Law, Plaintiff has been damaged as set forth above.

98.    By reason of the foregoing, Defendants are jointly and severally liable pursuant to the exceptions set forth in the CPLR.

99.    By reason of the Defendants' fraudulent conduct, Plaintiff is entitled to recover all of his damages from the Defendants, including actual damages, punitive damages, treble damages and attorney's fees.

## COUNT FIVE
### (Intentional Infliction of Emotional Distress)

100.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

101.    At all times herein, Defendants' conduct Dr. Simon has risen to the level of such an egregious nature it is extreme and outrageous conduct.

102.    Defendants intended to cause Plaintiff severe emotional distress.

103.    Defendants' extreme and outrageous conduct, through word and deed, did indeed cause Dr. Simon severe emotional distress.

104.    Plaintiff has been injured by reason of Defendants intentional extreme and

outrageous conduct.

105.    Plaintiff has suffered damages as a result of the injury caused by Defendant's intentional extreme and outrageous conduct.

106.    By reason of the Defendants' intentional infliction of emotional distress, Plaintiff is entitled to recover all of his damages from the Defendants, including actual damages, punitive damages, treble damages and attorney's fees.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Honorable Court order the following relief in favor of Plaintiff by determining that:

I.      Plaintiff is "totally disabled" pursuant to the language and within the meaning of the UNUM Policies in that he cannot perform each of the material duties of his regular occupation;

II.     Defendants must pay all disability benefits in arrears due and owing since the termination of benefits, plus interest, less any applicable "other income benefits", in an amount not less than $20,000,000;

III.    Defendants' obligation to pay disability benefits to Plaintiff shall continue as long as he remains disabled, subject to the terms of and the applicable benefit period contained in the UNUM Policies;

IV.     Plaintiff shall be entitled to recoup his attorney's fees, as well as all other costs and disbursements of this action;

V.      Plaintiff may return to this Court, upon motion, to seek further relief in the event that it becomes necessary;

VI.     An award of prejudgment interest, costs, punitive damages (where applicable) and

attorneys' fees; and

VII.    Such other and further relief that this Honorable Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on

all questions of fact raised by the complaint.

Dated: New York, New York
       March 24, 2008

                                     Respectfully submitted,

                                     **SACK & SACK, ESQS.**


                                     _____
                        By:          Jonathan S. Sack, Esq.  (JS 1835)

                                     *Attorneys for Plaintiff*
                                     110 East 59th Street, 19th Floor
                                     New York, New York 10022
                                     Tel.: (212) 702-9000
                                     Fax: (212) 702-9702

18

Exhibit A

Page 1

In this policy, the words "you" and "your" mean you, the Insured named below; "we," "our" and "us" mean Provident Life and Casualty Insurance Company.

We will pay benefits for covered loss resulting from Injuries or Sickness subject to all of the provisions of this policy. Loss must begin while the policy is in force.

This policy is a legal contract between you and us. It is issued in consideration of the payment in advance of the required premium and of your statements and representations in the application. A copy of your application is attached and made a part of the policy.

**NON-CANCELLABLE AND GUARANTEED CONTINUABLE AT GUARANTEED PREMIUMS TO YOUR 65TH BIRTHDAY OR FOR FIVE YEARS, WHICHEVER IS LATER:** You can continue this policy to your 65th birthday or for five years, whichever is later, by paying premiums on time. The premiums shown in the Policy Schedule on Page 3 are guaranteed to your 65th birthday or for five years, whichever is later.

**CONDITIONAL RIGHT TO RENEW AFTER YOUR 65TH BIRTHDAY OR FIVE YEARS, WHICHEVER IS LATER; PREMIUMS ARE NOT GUARANTEED:** You can renew this policy as long as you are actively and gainfully working full time; there is no age limit. You must pay premiums on time at our premium rates then in effect at time of renewals. (For further conditions, see the page titled "Premiums and Renewals." See Page 7 for the benefit provisions that will be included in the continued policy.)

## DISABILITY INCOME POLICY

### JEAN P SIMON MD, the Insured
### Policy Number 36-337-6084608

**10 day right to examine your policy** - We want you to fully understand and be entirely satisfied with your policy. If you are not satisfied for any reason, you may return the policy to us, or to the agent through whom it was purchased, within 10 days of its receipt. We will refund any premiums you have paid within 10 days after we receive your notice of cancellation and the policy. It will be considered never to have been issued.

C-337-F

## GUIDE TO POLICY PROVISIONS

|  | Page |
|---|---|
| Renewal Conditions | 1 |
| Policy Schedule | 3 |
| UPDATE | 3 |
| Definitions (Injuries, Sickness, Transplant Surgery, Cosmetic Surgery, Policy Anniversary, Physician, Total Disability, your occupation, | |
| period of disability | 4 |
| Elimination Period | 5 |
| Exclusions | 5 |
| Pre-existing Condition Limitation | 5 |
| Benefits | |
| Total Disability | 6 |
| Presumptive Total Disability | 6 |
| Waiver of Premium | 6 |
| Rehabilitation | 7 |
| Benefits When Policy Renewed After Your 65th Birthday or Five Years, Whichever is Later | 7 |
| Payment for Part of Month | 7 |
| Additional Benefits | |
| Residual Disability/Recovery (includes revised Waiver of Premium provision) | 8 |
| Guaranteed Physical Insurability/Long Term Disability | 12 |
| Premiums and Renewals | |
| Policy Term | 14 |
| Grace Period | 14 |
| Conditional Right to Renew After Your 65th Birthday or Five Years Whichever is Later - Premiums Are Not Guaranteed | 14 |
| Reinstatement | 14 |
| Suspension During Military Service | 15 |
| Premium Adjustment at Death | 15 |
| Claims | |
| Notice of Claim | 15 |
| Claim Forms | 15 |
| Proof of Loss | 15 |
| Time of Payment of Claims | 16 |
| Payment of Claims | 16 |
| Physical Examinations | 16 |
| Misstatement of Age | 16 |
| Legal Actions | 16 |
| General Provisions | |
| Entire Contract | 16 |
| Time Limit on Certain Defenses | 16 |
| Conformity With State Statutes | 16 |
| Assignment | 16 |

## READ YOUR POLICY CAREFULLY

# P O L I C Y   S C H E D U L E

Insured – JEAN P SIMON MD               Policy Number – 36-337-6084608
Effective Date – January 1, 1993        First Renewal Date – February 1, 1993
Issue Date – January 14, 1993           Renewal Term – One Month

Monthly Policy Premium payable from January 1, 1993 until the first UPDATE Increase
Date (see Page 3 (cont.)):

Non-Smoker Gross Monthly Policy Premium  .....................................  $330.29
Smoker Surcharge  ...........................................................  $33.04
Policy Fee  .................................................................  $4.15
Volume Discount  ............................................................  -$18.68
Franchise Discount  .........................................................  -$51.27

Net Monthly Policy Premium  .................................................  $297.53

Other Premium Paying Methods  (Net Premiums):
        $3,571.98 Annually
        $1,785.99 Semi-Annually
          $893.00 Quarterly


------------------------MONTHLY BENEFIT FOR TOTAL DISABILITY------------------------

                            $10,000.00

--------------------------------ELIMINATION PERIOD--------------------------------

        365 days of Total and/or Residual Disability

        An Elimination Period starting after your 65th birthday
        must consist entirely of days of Total Disability

--------------------MAXIMUM BENEFIT PERIODS FOR TOTAL DISABILITY--------------------

Injuries:
    Total Disability starting before your 65th birthday  ...............   for Life
    Total Disability starting on or after your 65th birthday
      but before your 75th birthday  ...................................   24 months
    Total Disability starting on or after your 75th birthday  ..........   12 months




                    (Policy Schedule is continued on next page.)



337-F(L-L60)              JEAN P SIMON MD 36-337-6084608              Page 3

POLICY SCHEDULE (continued)

**Sickness:**
Total Disability starting before your 60th birthday ................ for Life
Total Disability starting on or after your 60th birthday
   but before your 61st birthday ........................ to your 65th birthday
Total Disability starting on or after your 61st birthday
   but before your 62nd birthday .......................................... 48 months
Total Disability starting on or after your 62nd birthday
   but before your 63rd birthday .......................................... 42 months
Total Disability starting on or after your 63rd birthday
   but before your 64th birthday .......................................... 36 months
Total Disability starting on or after your 64th birthday
   but before your 65th birthday .......................................... 30 months
Total Disability starting on or after your 65th birthday
   but before your 75th birthday .......................................... 24 months
Total Disability starting on or after your 75th birthday .......... 12 months

-------------------------------ADDITIONAL BENEFITS-----------------------------
(The premium for each benefit is included in the Net Policy Premium shown above.)

Residual Disability/Recovery ...........................Page 8      Premium $51.94

Maximum Benefit Periods For Residual Disability
**Injuries or Sickness:**
Residual Disability starting before
   your 61st birthday                          To your 65th birthday
Residual Disability starting on or after your 61st birthday
   but before your 62nd birthday                      48 months
Residual Disability starting on or after your 62nd birthday
   but before your 63rd birthday                      42 months
Residual Disability starting on or after your 63rd birthday
   but before your 64th birthday                      36 months
Residual Disability starting on or after your 64th birthday
   but before your 65th birthday                      30 months

Guaranteed Physical Insurability/Long Term Disability ...Page 12    Premium $3.05
   Total Maximum Increase is $1,000.00 Monthly Benefit for Total Disability. Premium
   for this option will reduce as stated on Page 12. The option will continue until
   its expiration date described on Page 12.

(Policy Schedule is continued on next page.)

337-F(L-L60)              JEAN P SIMON MD 36-337-6084608           Page 3(cont.)

POLICY SCHEDULE (continued)

------------------------------------UPDATE------------------------------------------

The benefits and premium named below will be automatically increased without evidence of insurability, as follows:

| UPDATE Increase Date | New Monthly Benefit for Total Disability | New Monthly Net Premium for this Policy |
|---|---|---|
| 1/01/94 | $10,700.00 | $318.54 |
| 1/01/95 | $11,450.00 | $342.12 |
| 1/01/96 | $12,260.00 | $369.38 |
| 1/01/97 | $13,120.00 | $400.22 |
| 1/01/98 | $14,000.00 | $433.71 |

UPDATE Benefit increases are effective on the UPDATE Increase Dates shown.  If an UPDATE Increase Date shown does not coincide with a renewal date for this policy, the increase will be effective on the next renewal date.

An UPDATE Benefit increase will apply only to a period of disability which starts after the effective date of the increase. It must qualify as a separate period of disability.  If the premium for the policy is being waived on the effective date of the increase, the premium for the increase will also be waived. When you resume paying premiums for the policy, you must also start paying the premium for the increase.

You are entitled to UPDATE Benefit increases on the dates shown above. If you do not accept an increase, your refusal:

1.  forfeits your right on that UPDATE Increase Date to the UPDATE Benefit increase;
2.  postpones the schedule of benefit increases to the next UPDATE Increase Date, if any;
3.  adjusts the premiums for the remaining increases, if any, since such premiums are based on your attained age at the time of an UPDATE Benefit increase; and
4.  in no way extends the last UPDATE Increase Date shown above.

Each refusal of an UPDATE Benefit increase reduces the number of UPDATE Benefit increases to which you were entitled by one.

If you have not reached your 60th birthday on the last UPDATE Increase Date, you may apply for an amendment providing additional UPDATE Benefit increases.  You can do this by making formal application within the period of 60 days prior to and 31 days after the last UPDATE Increase Date.  Approval will be subject to our underwriting guidelines then in effect.

337-F-UPDATE              JEAN P SIMON MD 36-337-6084608              Page 3(cont.)

## DEFINITIONS

Injuries means accidental bodily injuries occurring while your policy is in force.

Sickness means sickness or disease which is first manifested while your policy is in force.  It includes disability from transplant surgery or cosmetic surgery.

transplant surgery means the transplant of part of your body to another person.

cosmetic surgery means surgery to improve your appearance or to correct disfigurement.

Policy Anniversary means the renewal date falling on an anniversary of the Effective Date of the policy; except that when the Policy Anniversary does not coincide with a renewal date, it means the next renewal date thereafter.

Physician means any person other than you who is licensed by law, and is acting within the scope of the license, to treat Injuries or Sickness which results in covered loss.

Total Disability or totally disabled means that due to Injuries or Sickness:

1.  you are not able to perform the substantial and material duties of your occupation; and

2.  you are receiving care by a Physician which is appropriate for the condition causing the disability.  We will waive this requirement when continued care would be of no benefit to you.

your occupation means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled.  If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.

period of disability means a period of disability starting while this policy is in force.  Successive periods will be deemed to be the same period unless the later period:

1.  is due to a different or unrelated cause, or

2.  starts more than twelve months after the end of the previous period (six months after the end of the previous period if benefits are expressed as a number of months - see Maximum Benefit Periods on Page 3);

in which event, the later period will be a new or separate period of disability.  A new Elimination Period must then be met.  And, a new Maximum Benefit Period will apply.

Elimination Period means the number of days of disability that must elapse in a period of disability before benefits become payable.  The number of days is shown on Page 3.  These days need not be consecutive; they can be accumulated during a period of disability to satisfy an Elimination Period.  Benefits are not payable, nor do they accrue, during an Elimination Period.

If the Elimination Period is fulfilled during a period of disability, the first subsequent disability due to a different or unrelated cause will not require an Elimination Period, provided the first subsequent disability occurs within the twelve month period from the end of the prior disability, during, which the Elimination Period was satisfied.

### EXCLUSIONS

We will not pay benefits for loss caused by:

   1.  war or any act of war, whether war is declared or not; or
   2.  normal pregnancy or childbirth, except we will pay benefits for loss caused by:
       a.  complications of pregnancy; and
       b.  normal pregnancy or childbirth on the later of the 91st day of disability or the day of disability following the Elimination Period.

   Complications are physical conditions physicians consider distinct from pregnancy even though caused or worsened by pregnancy.  Examples of conditions that are not complications include false labor and morning sickness.

We will not pay benefits for loss we have excluded by name or specific description; any such exclusion will appear in the Policy Schedule.

### PRE-EXISTING CONDITION LIMITATION

We will not pay benefits for loss which is caused by a Pre-existing Condition.  Pre-existing Condition means a physical impairment, deformity or a medical condition that was not disclosed, or that was misrepresented, in answer to a question in the application for this policy.  A medical condition means a sickness or physical condition which, within the two year period prior to the Effective Date of this policy, either: 1) resulted in your receiving medical advice or treatment; or 2) caused symptoms for which an ordinarily prudent person would seek medical advice or treatment.

337-F-E-EP              JEAN P SIMON MD 36-337-6084608                    Page 5

## BENEFITS

**TOTAL DISABILITY**

We will pay the Monthly Benefit for Total Disability shown on Page 3 as follows:

1. Benefits start on the day of Total Disability following the Elimination Period.
2. Benefits will continue while you are totally disabled during the period of disability but not beyond the Maximum Benefit Period.

In no event will you be considered to have more than one disability at the same time. The fact that a disability is caused by more than one Injury or Sickness or from both will not matter. We will pay benefits for the disability which provides the greater benefit.

**PRESUMPTIVE TOTAL DISABILITY - LOSS OF SPEECH, HEARING, SIGHT OR THE USE OF TWO LIMBS**

You will be presumed totally disabled if Injuries or Sickness results in the entire and permanent loss of:

1. speech;
2. hearing in both ears;
3. the sight of both eyes; or
4. the use of both hands, or of both feet or of one hand and one foot.

You must present satisfactory proof of your loss. Your ability to work will not matter. Further medical care will not be required. Benefits will be paid according to the Total Disability provisions of this policy. But, benefits will start on the date of loss if earlier than the day benefits start as shown on Page 3. If loss occurs before your 65th birthday, the Monthly Benefit for Total Disability will be paid as long as you live regardless of the Maximum Benefit Period shown on Page 3.

**WAIVER OF PREMIUM**

After you have been totally disabled for 90 days during a period of disability, we will:

1. refund any premiums which became due and were paid while you were totally disabled; and
2. waive the payment of each premium which thereafter becomes due for as long as the period of disability lasts. After it ends, to keep this policy in force, you must again pay any premiums which become due.

For premiums to be waived, you must give us satisfactory proof of disability.

## REHABILITATION

Total Disability - Your participation in a program of occupational rehabilitation will not of itself be considered a recovery from Total Disability.

Expense - If, during a period of Total Disability, you notify us in writing that you want to participate in a program of occupational rehabilitation, we will consider paying for certain expenses you incur. The extent of our role will be determined by written agreement with you.  Generally, we will pay for the reasonable cost of training and education which is not otherwise covered under health care insurance, workers' compensation or any public fund or program except Medicaid.

A program of occupational rehabilitation must be designed to help you return to work and be:

1.  a formal program of rehabilitation at an accredited graduate school, college or business school, or at a licensed vocational school;
2.  a recognized program operated by the federal or a state government; or
3.  any other professionally planned rehabilitation program of training or educa- tion.

## BENEFITS WHEN POLICY RENEWED AFTER YOUR 65TH BIRTHDAY OR FIVE YEARS, WHICHEVER IS LATER

If this policy is continued in accordance with the "Conditional Right to Renew After Your 65th Birthday or Five Years, Whichever is Later" on Page 1, all of the benefit provisions on Pages 6 and 7 will be included in the continued policy. (If a Treatment of Injuries Benefit and/or a Preliminary Term Benefit is contained in this policy, it can be included in the continued policy. No other "Additional Benefits", if any, named on Page 3 will be included in the continued policy.)  The Maximum Benefit Period starting while this policy is so continued is shown on Page 3.  The Monthly Benefit for Total Disability will not change unless you choose to renew with a lesser amount.

## PAYMENT FOR PART OF MONTH

If any payment under this policy is for part of a month, the daily rate will be 1/30th of the payment which would have been made if disability had continued for the whole month.

**RESIDUAL DISABILITY/RECOVERY BENEFITS** with Cost of Living Indexing of Prior Monthly Income
(Nothing in this provision limits the policy definition of "Total Disability.")

## DEFINITIONS

**Monthly Income** means your monthly income from salary, wages, bonuses, commissions, fees or other payments for services which you render. Normal and usual business expenses are to be deducted; income taxes are not. Monthly Income must be earned. It does not include dividends, interest, rents, royalties, annuities, sick pay or benefits received for disability under a formal wage or salary continuation plan or other forms of unearned income.

Monthly Income can be credited to the period in which it is actually received or to the period in which it is earned. We allow either the cash or accrual accounting method. But, the same method must be used to determine the Prior Monthly Income and the Current Monthly Income during a period of disability. If you elect the cash accounting method we will not include income received for services rendered prior to the start of the period of disability in your current monthly income.

**Prior Monthly Income** means the greatest of:

1. your average Monthly Income for the 12 months just prior to the start of the period of disability for which claim is made;
2. your average Monthly Income for the year with the highest earnings of the last two years prior to the start of such period of disability; or
3. your highest average Monthly Income for any two successive years of the last five years prior to the start of such period of disability.

**Current Monthly Income** means your Monthly Income in your occupation for each month of Residual Disability being claimed.

**Loss of Monthly Income** means the difference between Prior Monthly Income and Current Monthly Income. Loss of Monthly Income must be caused by the Residual Disability for which claim is made. The amount of the loss must be at least 20% of Prior Monthly Income to be deemed Loss of Monthly Income. If your loss is more than 75% of Prior Monthly Income, we will deem the loss to be 100%.

**Residual Disability** or **residually disabled**, during the Elimination Period, means that due to Injuries or Sickness:

1. you are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take you to do them;
2. you have a Loss of Monthly Income in your occupation of at least 20%; and
3. you are receiving care by a Physician which is appropriate for the condition causing disability. We will waive this requirement when continued care would be of no benefit to you.

After the Elimination Period has been satisfied, you are no longer required to have a loss of duties or time. Residual Disability or residually disabled then means that as a result of the same Injuries or Sickness:

1. you have a Loss of Monthly Income in your occupation of at least 20%; and
2. you are receiving care by a Physician which is appropriate for the condition causing the Loss of Monthly Income. We will waive this requirement when continued care would be of no benefit to you.

**Monthly Benefit for Total Disability** is shown on Page 3. (It can be increased by certain other benefit provisions if they are included in your policy and are applicable. If included, they are titled "Cost of Living Adjustments" and "Social Insurance Substitute Benefit.")

**Residual Disability Monthly Benefit** is the benefit payable under this provision. It is determined monthly by this formula. Each month, it equals:

$$\frac{\text{Loss of Monthly Income}}{\text{Prior Monthly Income}} \times \text{Monthly Benefit for Total Disability}$$

### RESIDUAL DISABILITY/RECOVERY BENEFITS

We will pay Residual Disability Monthly Benefits as follows:

1. Benefits start on the day of Residual Disability following the Elimination Period or, if later, after the end of compensable Total Disability during the same period of disability.
2. Benefits will continue while you are residually disabled during a period of disability but the combined period for which benefits for Total and Residual Disability are payable can not exceed the Maximum Benefit Period shown on Page 3.
3. The first six monthly payments for Residual Disability will be the greater of:
   a. 50% of the Monthly Benefit for Total Disability; or
   b. the Residual Disability Monthly Benefit determined for each month.

Residual Disability benefits will not be paid for any days for which Total Disability benefits are paid.

In no event will you be considered to have more than one disability at the same time. The fact that a disability is caused by more than one Injury or Sickness or from both will not matter. We will pay benefits for the disability which provides the greater benefit.

We can require any proof which we consider necessary to determine your Current Monthly Income and Prior Monthly Income. Also, we or an independent accountant retained by us shall have the right to examine your financial records as often as we may reasonably require.

337-RS-NY          JEAN P SIMON MD 36-337-6084608          Page 9

## COST OF LIVING INDEXING OF PRIOR MONTHLY INCOME
### (Applicable to benefits paid after the 12th month of a period of disability)

### Definitions

CPI-U means the Consumer Price Index for All Urban Consumers. It is published by the United States Department of Labor. If the CPI-U is discontinued or if its method of computation is changed, we may, subject to the approval of the Superintendent of the New York Insurance Department, use another nationally published index. We will choose an index which is similar in scope and purpose to the CPI-U. The CPI-U will then mean the index which is chosen.

Review Date means each anniversary date of the start of a period of disability.

Review Period means a one year period ending on a Review Date.

Index Month means the calendar month three months prior to a Review Date. But, the first Index Month means the calendar month three months prior to the start of a period of disability. We will measure all changes in the CPI-U from the first Index Month.

Index Factor is used by us to determine your adjusted Prior Monthly Income for each Review Period. We will compute this factor by dividing the CPI-U for the latest Index Month by the CPI-U for the first Index Month. We will compute it on each Review Date during a period of disability.

### Adjusted Prior Monthly Income

If Injuries or Sickness results in a period of disability that lasts at least 12 months, we will compute Cost of Living Adjustments on each Review Date for Residual Disability Benefits. Monthly benefits which thereafter accrue during that period of disability will be adjusted by indexing your Prior Monthly Income as follows:

1. On each Review Date, your Prior Monthly Income will be multiplied by your Index Factor. The result is your adjusted Prior Monthly Income. It will be used to figure your Loss of Monthly Income during the Review Period that follows. It will also be used in the formula to compute each Residual Disability Monthly Benefit payable during that Review Period.

   An increase in your Prior Monthly Income can cause your Loss of Monthly Income to be greater. This in turn can result in an increase in your Residual Disability Monthly Benefit. Other than your Index Factor (which is computed by using actual CPI-U values), there is no limit on the percent of increase in your Prior Monthly Income for a Review Period. If the CPI-U should go down, your adjusted Prior Monthly Income can decrease. But, it can never reduce below your Prior Monthly Income at the start of the period of disability.

Case 1:07-cv-11426-SAS    Document 8    Filed 03/27/2008    Page 33 of 70

2. Indexing of your Prior Monthly Income will end on the earliest of:

    a.  the end of the period of disability (see Page 4);
    b.  the end of a benefit period; or
    c.  your 65th birthday.

If the computations end because of a or b above, disability benefits which can be paid for the first 12 months of a new period of disability will not include a Cost of Living Adjustment.  A new first Index Month and Review Date will apply to each new period of disability that lasts more than 12 months.

## WAIVER OF PREMIUM

For periods of disability which start before your 65th birthday, the Waiver of Premium provision on Page 6 is replaced by the following:

### "WAIVER OF PREMIUM - TOTAL DISABILITY AND RESIDUAL DISABILITY

If, during a period of disability, Injuries or Sickness results in more than 90 days of Total and/or Residual Disability, we will:

   ·1.  refund any premiums which became due and were paid while you were so disabled; and
   2.  waive the payment of each premium which thereafter becomes due for as long as the period of disability lasts.  After it ends, to keep your policy in force, you must again pay any premiums which become due.

For premiums to be waived, you must give us satisfactory proof of disability."

NOTE:  All portions of this Residual Disability/Recovery Benefit expire on your 65th birthday, and no further premiums for it will be due, even though the policy may be renewed after that date and benefits may continue to be payable past your 65th birthday, as shown on Page 3.

GUARANTEED PHYSICAL INSURABILITY/LONG TERM DISABILITY OPTION

### DEFINITIONS

**Option Date** means each anniversary of the Effective Date of the policy starting with the first and ending with the one which falls on or next follows your 55th birthday. If an Option Date does not coincide with a renewal date for this policy, it will change to coincide with the next renewal date thereafter.

**Option Period** means the period which begins 60 days before and ends 31 days after an Option Date.

**Special Option Date** means (a) the date you terminate your employment relationship with an employer which has a group long term disability insurance plan in force under which you are covered at the time of termination; or (b) the date the group long term disability insurance plan terminates.  This Option may be exercised only once under the Special Option Date.

**Special Option Period** means the period which begins on the Special Option Date and ends 91 days thereafter.

### BENEFIT

On each Option Date, or once on the Special Option Date, you have the right to increase the Monthly Benefit for Total Disability shown on Page 3.  You may do so, without submitting evidence of physical insurability, by following the rules set forth below.

Increases will be made only upon formal application by you and must be approved by us.  You must apply within an Option Period or within the Special Option Period.  The Effective Date of an increase will be shown on the Increased Benefit Amendment issued at the time of the increase.

The amount of an increase will be subject to each of the following:

1. An increase, when combined with all other loss of time benefits then in force with us and other insurers, may not exceed the amount we would issue to you as a new applicant.  This amount will be subject to our published issue and participation limits on the day you apply for an increase or on the Effective Date of the policy, whichever results in a higher amount.
2. After your 46th birthday, an increase can not exceed one-third of the Maximum Increase shown on Page 3 (rounded up to the next $10.00).
3. The sum of all increases can not exceed the Maximum Increase shown on Page 3.

If you do not qualify for an increase on an Option Date, you can still apply for an increase during a later Option Period or during the Special Option Period.

The first premium for an increase must be paid within 31 days; later premiums must be paid as part of the Policy Premium.  If the premium for the policy is being waived (see Waiver of Premium provision) on the effective date of the increase, you will not have to start paying the premium for the increase until the premium for your policy becomes payable again.

337-GPI/LTD          JEAN P SIMON MD 36-337-6084608                    Page 12

The premium for each increase will be based on your attained age on the date of your application for each increase.  It will also be based on:

1.  our premium rates in effect at the time of the increase or on the Effective Date of the policy, whichever is less; and
2.  your occupational class at the time of the increase or on the Effective Date of the policy, whichever will produce the lower premium.

When an increase is exercised, the premium for this Option will be reduced.  The reduced premium will be based on the Maximum Increase remaining.

**Increase During Disability:**  During any Option Period, you can apply for an increase even though you are disabled.  (This provision is not available during the Special Option Period).  Your annual rate of earned income will be considered that which you had when the period of disability began.  An increase of up to 10% of the original Maximum Increase shown on Page 3 (rounded up to the next $10.00) approved by us during a period of disability will apply to the benefits payable while that period of disability continues.  This increased Monthly Benefit for Total Disability, plus any excess of 10% approved during the same period of disability will apply to new, separate periods of disability (see Page 4).

**Note:**  This Option will expire, and no further premiums for it will be due, on the earlier of:  (a) the date when the Maximum Increase has been exercised; or (b) the end of the Option Period for the 55th birthday Option Date.

## PREMIUMS AND RENEWALS

**POLICY TERM**
The first term of this policy starts on the Effective Date shown on Page 3.  It ends
on the First Renewal Date also shown.  Later terms will be the periods for which you
pay renewal premiums when due.  All terms will begin and end at 12:01 A.M., Standard
Time, at your home.  The renewal premium for each term will be due on the day the
preceding term ends, subject to the grace period.

**GRACE PERIOD**
This policy has a 31 day grace period.  This means that if a renewal premium is not
paid on or before the date it is due, it may be paid during the next 31 days.  During
the grace period, the policy will stay in force.

If this policy is continued after your 65th birthday, the Grace Period provision is
changed to read as follows:

> "GRACE PERIOD
> This policy has a 31 day grace period.  This means that if a renewal premium is
> not paid on or before the date it is due, it may be paid during the next 31 days.
> The grace period will not apply if, at least 30 days before the premium due date,
> we have delivered or mailed to your last address shown in our records written
> notice of our intent not to renew this policy.  During the grace period, the
> policy will stay in force.  We may refuse renewal of the policy only on a Policy
> Anniversary and only when you become ineligible to continue it because you cease
> to be actively and gainfully employed full time."

**CONDITIONAL RIGHT TO RENEW AFTER YOUR 65TH BIRTHDAY OR FIVE YEARS, WHICHEVER IS LATER;
PREMIUMS ARE NOT GUARANTEED**
(Continued from Page 1)
You can renew this policy as long as you are actively and gainfully working full time.
From time to time, we can require proof that you are actively and gainfully working
full time.  If you stop working, (except by reason of Total Disability), this policy
will terminate on the next Policy Anniversary; except that coverage will continue to
the end of any period for which premium has been accepted.  All losses must occur while
your policy is in force; except if your policy terminates for any reason, loss from
Injuries may begin within 30 days from the date of the accident.

Premiums must be paid on time.  They will be based on our table of rates by attained
age in effect at time of renewals for persons in your same rate class who are insured
under policies of this form.  Other than your attained age, the factors used to de-
termine your rate class will be the same as those that applied to you on the Effective
Date of this policy.

The benefit provisions which will be included in the continued policy are described
on Page 7.

**REINSTATEMENT**
If a renewal premium is not paid before the grace period ends, the policy will lapse.
Later acceptance of the premium by us or by our agent authorized to accept payment
without requiring an application for reinstatement will reinstate this policy.

If we or our agent require an application, you will be given a conditional receipt
for the premium tendered.  If the application is approved, the policy will be rein-
stated as of the approval date.  Lacking such approval, the policy will be reinstated
on the 45th day after the date of the conditional receipt unless we have previously
written you of our disapproval.

337-F-PR                    JEAN P SIMON MD 36-337-6084608                    Page 14

The reinstated policy will cover only loss that results from Injuries which occur after the date of reinstatement or Sickness which is first manifested more than 10 days after such date. In all other respects, your rights and ours will remain the same, subject to any provisions noted on or attached to the reinstated policy.

## SUSPENSION DURING MILITARY SERVICE

If you enter full-time active duty in the military (land, sea or air) service of any nation or international authority, you may suspend your policy. But, you may not suspend the policy during active duty for training lasting 3 months or less. The policy will not be in force while it is suspended, and you will not be required to pay premiums. Upon receipt of your written request to suspend the policy, we will refund the pro-rata portion of any premium paid for a period beyond the date we receive your request.

If your full-time active duty in military service ends before your 65th birthday, you may place this policy back in force without evidence of insurability. Your coverage will start again when:

1. we have received your written request to place the policy back in force; and
2. you have paid the required pro-rata premium for coverage until the next premium due date.

However, your request and premium payment must be received by us within 90 days after the date your active duty in the military service ends. Premiums will be at the same rate that they would have been had your policy remained in force. You and we will have the same rights under the policy as before it was suspended.

## PREMIUM ADJUSTMENT AT DEATH

Any premium paid for a period beyond the date of your death will be refunded to your estate.

## CLAIMS

### NOTICE OF CLAIM

Written notice of claim must be given within 20 days after a covered loss starts or as soon as reasonably possible. The notice can be given to us at our home office, Chattanooga, Tennessee, or to our agent. Notice should include your name and the policy number.

### CLAIM FORMS

When we receive your notice of claim, we will send you claim forms for filing proof of loss. If these forms are not given to you within 15 days, you will meet the proof of loss requirements by giving us a written statement of the nature and extent of your loss. You must give us this proof within the time set forth in the Proof of Loss section.

### PROOF OF LOSS

If the policy provides for periodic payment for a continuing loss, you must give us written proof of loss within 90 days after the end of each period for which we are liable. For any other loss, written proof must be given within 90 days after such loss.

If it was not reasonably possible for you to give written proof in the time required, we will not reduce or deny the claim for this reason if the proof is filed as soon as reasonably possible. In any event, the proof required must be furnished no later than one year after the 90 days unless you are legally unable to do so.

TIME OF PAYMENT OF CLAIMS
After we receive written proof of loss, we will pay monthly all benefits then due you for disability.  Benefits for any other loss covered by this policy will be paid as soon as we receive proper written proof.

PAYMENT OF CLAIMS
Benefits will be paid to you.  Any benefits unpaid at death will be paid to your estate.

If benefits are payable to your estate, we can pay benefits up to $1000 to someone related to you by blood or marriage whom we consider to be entitled to the benefits. We will be discharged to the extent of any such payment made in good faith.

PHYSICAL EXAMINATIONS
We, at our expense, have the right to have you examined as often as is reasonable while a claim is pending.

MISSTATEMENT OF AGE
If your age has been misstated, the benefits will be those the premium paid would have bought at the correct age.

LEGAL ACTIONS
You may not start a legal action to recover on this policy within 60 days after you give us required proof of loss.  You may not start such action after three years from the time proof of loss is required.

## GENERAL PROVISIONS

ENTIRE CONTRACT
This policy with the application and attached papers is the entire contract between you and us.  No change in this policy will be effective until approved by one of our officers.  This approval must be noted on or attached to this policy.  No agent may change this policy or waive any of its provisions.

TIME LIMIT ON CERTAIN DEFENSES

   1.  After two years from the Effective Date of this policy, no misstatements, except fraudulent misstatements, made by you in the application for this policy will be used to void the policy or to deny a claim for loss incurred or disability that starts after the end of such two year period.

   2.  No claim for loss incurred or disability that starts after two years from the Effective Date of this policy will be reduced or denied on the ground that a sickness or physical condition not excluded by name or specific description had existed before the Effective Date of this policy.

CONFORMITY WITH STATE STATUTES
Any provision of this policy which, on its effective date, is in conflict with the laws of the state in which you reside on that date is changed to conform to the minimum requirements of those laws.

ASSIGNMENT
No assignment of interest in this policy will be binding on us until a copy is on file with us.  It must be approved by one of our officers.  We are not responsible for the validity of any assignment.

**PROVIDENT** **PART II**
**LIFE AND CASUALTY**
INSURANCE COMPANY

**ANSWERS MADE TO EXAMINER**
IN CONTINUATION OF AND FORMING PART OF APPLICATION FOR INSURANCE TO
PROVIDENT LIFE AND CASUALTY INSURANCE COMPANY, Chattanooga, Tennessee 37402

| Full Name of Person Examined (Last) | (First) | (Middle) | Date of Birth | Occupation |
|---|---|---|---|---|
| SIMON | JANE | PASCAL | 6/1/54 | PHYSICIAN |

1. a. Name and address
   of your personal physician (If none, ☐ Check)? LARRY EISEBERG, M.D.
   1049 5th AVE N.Y. N.Y.
   b. Date and reason last consulted? Routine Physical    92
   c. What treatment was given or medication prescribed?

| 2. Have you ever been treated for or ever had any known indication of: | Yes | No |
|---|---|---|
| a. Disorder of eyes, ears, nose, or throat? | ☐ | ☒ |
| b. Dizziness, fainting, convulsions, headache, speech defect, paralysis or stroke; mental or nervous disorder? | ☐ | ☒ |
| c. Shortness of breath, persistent hoarseness or cough, blood spitting; bronchitis, pleurisy, asthma, emphysema, tuberculosis or chronic respiratory disorder? | ☐ | ☒ |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart or blood vessels? | ☐ | ☒ |
| e. Jaundice, intestinal bleeding, ulcer, hernia, appendicitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion, or other disorder of the stomach, intestines, liver or gallbladder? | ☐ | ☒ |
| f. Sugar, albumin, blood or pus in urine; venereal disease; stone or other disorder of kidney, bladder, prostate or reproductive organs? | ☐ | ☒ |
| g. Diabetes; thyroid or other endocrine disorders? | ☐ | ☒ |
| h. Neuritis, sciatica, rheumatism, arthritis, gout, or disorder of the muscles or bones, including the spine, back, or joints? | ☐ | ☒ |
| i. Deformity, lameness or amputation? | ☐ | ☒ |
| j. Disorder of skin, lymph glands, cyst, tumor, or cancer? | ☐ | ☒ |
| k. Allergies; anemia, hemophilia or leukemia? | ☐ | ☒ |
| 3. Are you now under observation or taking treatment? | ☐ | ☒ |
| 4. Have you had any change in weight in the past year? | ☐ | ☒ |
| 5. Other than above, have you within the past 5 years: | | |
| a. Had any mental or physical disorder not listed above? | ☐ | ☒ |
| b. Had a checkup, consultation, illness, injury, surgery? | ☐ | ☒ |
| c. Been a patient in a hospital, clinic, sanatorium, or other medical facility? | ☐ | ☒ |
| d. Had electrocardiogram, X-ray, other diagnostic test? | ☐ | ☒ |
| e. Been advised to have any diagnostic test, hospitalization, or surgery which was not completed? | ☐ | ☒ |
| 6. Have you ever used barbiturates, narcotics, excitants or hallucinogens or ever sought treatment or been arrested for their use? | ☐ | ☒ |
| 7. Have you ever sought help or treatment for alcohol use? | ☐ | ☒ |
| 8. a. Have you ever had any disorder of menstruation, pregnancy or of the reproductive organs or breasts? NML | ☐ | ☐ |
| b. To the best of your knowledge and belief, are you now pregnant? N/A | ☐ | ☐ |
| 9. Have you ever had military service deferment, rejection or discharge because of a physical or mental condition? | ☐ | ☒ |
| 10. Have you ever requested or received a pension, benefits, or payment because of an injury, sickness or disability? | ☐ | ☒ |
| 11. Family History: (Father, Mother, Brothers, Sisters) Tuberculosis, diabetes, cancer, high blood pressure, heart or kidney disease, mental illness or suicide? | ☐ | ☒ |

DETAILS of "Yes" answers. (IDENTIFY QUESTION NUMBER, CIRCLE APPLICABLE ITEMS: Include diagnoses, dates, duration and names and addresses of all attending physicians and medical facilities.)

(For additional comments, use back side)

| a. | Age if Living? | Age at Death? | Cause of Death? | b. | Number Living? | Dead? | Age if Living? | Age at Death? | Cause of Death? |
|---|---|---|---|---|---|---|---|---|---|
| Father | 68 | | | Brothers | 1 | | 30 | | |
| Mother | 63 | | | Sisters | 1 | | 45 | | |

The foregoing statements are full, complete, and true to the best of my knowledge and belief.    Dated at 1049 5th AVE NY

this 23 day of December 19 92

PARAMEDICAL ORGANIZATION (Please stamp or type below)

**HEALTHMASTERS INC.**
450 - 7th AVENUE
NEW YORK, N.Y. 10001

(X) X Jane Simon MD
Signature of person examined

Witness (X) _____
Signature of Examiner    Degree

608 4608                                    № 157325

I hereby apply to Provident Life an[d] [Ca]sualty Insurance Company for insurance [bas]ed on the following representations:

**1.** (a) Full name? (Print) *Jean Pascal Simon*  (b) Sex? M ☑ F ☐
(c) Height? ft. *6* in. *0*  (d) Weight? lbs. *165*  (e) Date of Birth? *6/1/1954*  (f) Birthplace? *Paris*

**2.** (a) Occupation: *Surgeon*
(c) Employer? *Lifshitz, Obstetrics/Gynecology PC*  (b) Exact duties: *Surgery*
(d) Are you actively at work fulltime in the above occupation? Yes ☑ No ☐  (e) Length of Employment: *12 yrs*

**3.** (a) Annual Earned Income From Your Occupation for Fed- Current Annual Rate | Actual Prior Calendar Year | Actual Year Prior to Last Calendar Year
eral Tax Purposes (After Business Expenses, if any): of Earned Income
Salary  $ *740,000*  $ *632,000*  $ *150,000*
Other (Describe) *_____*  $ *35,000*  $ *50,000*
(b) Unearned Income Prior 2 Years (Interest, Dividends, etc.)  $ *7,000*  $ *2,000*

**4.** (a) Do you have or are you applying for other (1) Individual, (2) Association, (3) Group, or (4) Employer Sick Pay disability income coverage, or (5) Overhead Expense disability coverage? Yes ☐ No ☑ (If "Yes" give details below)

| Company or Source | Type (1, 2, 3, 4 or 5) | Monthly Disability Amount | Benefit Period Accident | Sickness |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

(b) Do you have Social Security substitute coverage? Yes ☐ No ☑ Amount $ _____ Company _____
(c) Is any coverage to be replaced by the coverage applied for? Yes ☐ No ☑ If "Yes", complete Form C-1336-Q4.
(d) Does your net worth exceed $4,000,000? Yes ☐ No ☑ If "Yes" complete Form C-1336-NW.
(e) Have you smoked cigarettes within the last 12 months? Yes ☑ No ☐

**5.** Have you ever been treated for or ever had any known indication of:                                              Yes No
(a) High blood pressure, diabetes, cancer, arthritis, asthma, emphysema, or emotional, nervous or mental disorder, or disease or disorder of the eyes, ears or speech? . . . . . . . . . . . . . . ☐ ☑
(b) Disease or disorder of the neck, back, spine, heart, lungs, breasts, or the circulatory, digestive, urinary or reproductive systems? . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ ☑

**6.** Have you ever been diagnosed by the medical profession as having Acquired Immune Deficiency Syndrome (AIDS) or Aids Related Complex (ARC)?. . . . . . . . . . . . . . . ☐ ☑

**7.** Have you ever used barbiturates, narcotics, excitants or hallucinogens, or ever sought help or treatment for their use or alcohol use?. . . . . . . . . . . . . . . . . . . . . . . . . ☐ ☑

**8.** Other than above, have you, within the past 5 years, had medical or surgical advice or treatment, had a physical examination, or been under observation for any disease or disorder? . . . . . . . . ☐ ☑

**9.** Have you ever made application for Disability, Health or Life Insurance which has been declined, modified or rated? (If "Yes", give names of organization, kinds of insurance, dates and reasons.). . . . . ☐ ☑

**10.** Do you have a physical impairment or deformity, or take any type of prescribed medication?. . . . . . ☐ ☑
(Give details of "Yes" answers to Q5-10. Include diagnoses, dates, physicians and addresses)

*Check-up - Dr Eisenburg - excellent health - July 1992 - 268th Hartford, NY*

**11.**(a) Will your employer pay for all disability coverage to be carried by you with no portion of the premium to be included in your taxable income? Yes ☐ No ☑ (b) How much premium is paid with this application? *_____*

To the best of my knowledge and belief, all of the foregoing statements and all of those in Part II, if any, of this Application are true, complete, and correctly stated. They are offered to Provident Life and Casualty Insurance Company as the basis for any insurance issued on this Application. I have received a disclosure concerning: (1) the Medical Information Bureau; and (2) an investigative consumer report which may be made for use with this Application.

I authorize any licensed physician, medical practitioner, hospital, clinic or other medical or medically related facility, insurance company, the Medical Information Bureau or other organizations, institution or person that has any records or knowledge of me or my health, to give to Provident Life and Casualty Insurance Company and/or its reinsurers any such information.

I authorize all said sources, except the Medical Information Bureau, to give such records or knowledge to Equifax, Inc. This agency is employed by Provident Life and Casualty Insurance Company to collect and send such information.

A copy of this authorization shall be as valid as the original.

Signed at *NY*  *NY*
                City    State
this *16* day of *Nov* 19*92*
Field Office *715-NYBO*
                *13-3591317*

Signature of Proposed Insured X *_____*
I certify that I have truly and accurately recorded on this appli- cation the information supplied by the Proposed Insured.

DUPLICATE *_____*
(Licensed Agent's or Broker's Signature)

Form C-1336

TH# 243703 2

# PROVIDENT
# LIFE AND CASUALTY
## INSURANCE COMPANY

1 FOUNTAIN SQUARE
CHATTANOOGA, TN 37402

(A STOCK COMPANY)

DIRECT LINE
(212) 735-8029

FAX
(212) 735-5800

ALL PROVISIONS ON THE
ATTACHED PAGES ARE A
PART OF YOUR POLICY

KATHERINE SAYER

Corpc

nt and
xecutive Officer

P.C. MANAGEMENT COMPANY

605 THIRD AVENUE, 14TH FLOOR
NEW YORK, NEW YORK 10158

"our" and "us" mean Provident Life and Casualty Insurance Company.

We will pay benefits for covered loss resulting from Injuries or Sickness subject to all of the provisions of this policy. Loss must begin while the policy is in force.

This policy is a legal contract between you and us. It is issued in consideration of the payment in advance of the required premium and of your statements and representations in the application. A copy of your application is attached and made a part of the policy.

**NON-CANCELLABLE AND GUARANTEED CONTINUABLE AT GUARANTEED PREMIUMS TO YOUR 65TH BIRTHDAY OR FOR FIVE YEARS, WHICHEVER IS LATER:** You can continue this policy to your 65th birthday or for five years, whichever is later, by paying premiums on time. The premiums shown in the Policy Schedule on Page 3 are guaranteed to your 65th birthday or for five years, whichever is later.

**CONDITIONAL RIGHT TO RENEW AFTER YOUR 65TH BIRTHDAY OR FIVE YEARS, WHICHEVER IS LATER; PREMIUMS ARE NOT GUARANTEED:** You can renew this policy as long as you are: 1) actively and gainfully working full time in operating your business or profession; and 2) still incurring Covered Overhead Expenses as defined on Page 5. There is no age limit. You must pay premiums on time at our premium rates then in effect at time of renewals. (For further conditions, see the page titled "Premiums and Renewals." See Page 7 for the benefit provisions that will be included in the continued policy.)

## O V E R H E A D    E X P E N S E    D I S A B I L I T Y    P O L I C Y

JEAN P SIMON MD, the Insured
Policy Number 36-1737-6122493

### SEE ADDITIONAL EXCLUSION(S) ON PAGE 3-A

**10 day right to examine your policy** -- We want you to fully understand and be entirely satisfied with your policy. If you are not satisfied for any reason, you may return the policy to us, or to the agent through whom it was purchased, within 10 days of its receipt. We will refund any premiums you have paid within 10 days after we receive your notice of cancellation and the policy. It will be considered never to have been issued.

C-1737-F



Page 1

In this policy, the words "you" and "your" mean you, the Insured named below; "we," "our" and "us" mean Provident Life and Casualty Insurance Company.

We will pay benefits for covered loss resulting from Injuries or Sickness subject to all of the provisions of this policy. Loss must begin while the policy is in force.

This policy is a legal contract between you and us. It is issued in consideration of the payment in advance of the required premium and of your statements and representations in the application. A copy of your application is attached and made a part of the policy.

**NON-CANCELLABLE AND GUARANTEED CONTINUABLE AT GUARANTEED PREMIUMS TO YOUR 65TH BIRTHDAY OR FOR FIVE YEARS, WHICHEVER IS LATER:** You can continue this policy to your 65th birthday or for five years, whichever is later, by paying premiums on time. The premiums shown in the Policy Schedule on Page 3 are guaranteed to your 65th birthday or for five years, whichever is later.

**CONDITIONAL RIGHT TO RENEW AFTER YOUR 65TH BIRTHDAY OR FIVE YEARS, WHICHEVER IS LATER; PREMIUMS ARE NOT GUARANTEED:** You can renew this policy as long as you are: 1) actively and gainfully working full time in operating your business or profession; and 2) still incurring Covered Overhead Expenses as defined on Page 5. There is no age limit. You must pay premiums on time at our premium rates then in effect at time of renewals. (For further conditions, see the page titled "Premiums and Renewals." See Page 7 for the benefit provisions that will be included in the continued policy.)

OVERHEAD   EXPENSE   DISABILITY   POLICY

JEAN P SIMON MD, the Insured
Policy Number 36-1737-6122493

SEE ADDITIONAL EXCLUSION(S) ON PAGE 3-A

10 day right to examine your policy – We want you to fully understand and be entirely satisfied with your policy. If you are not satisfied for any reason, you may return the policy to us, or to the agent through whom it was purchased, within 10 days of its receipt. We will refund any premiums you have paid within 10 days after we receive your notice of cancellation and the policy. It will be considered never to have been issued.

C-1737-F

|  | Page |
|---|---|
| Renewal Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| Policy Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 |
| UPDATE . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 |
| Definitions (Injuries, Sickness, Transplant Surgery, | |
| Cosmetic Surgery, Policy Anniversary, Physician, Total Disability, . . . . . | 4 |
| your occupation, period of disability, Elimination period) . . . . . . . | 4 |
| Covered Overhead Expenses . . . . . . . . . . . . . . . . | 5 |
| Exclusions . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
| Pre-existing Condition Limitation . . . . . . . . . . . . . . . . | 6 |
| Benefits | |
| Total Disability . . . . . . . . . . . . . . . . . . . . . | 6 |
| Accumulating Benefit . . . . . . . . . . . . . . . . . . | 7 |
| Presumptive Total Disability . . . . . . . . . . . . . . | 7 |
| Waiver of Premium . . . . . . . . . . . . . . . . . . | 7 |
| Payment for Part of Month . . . . . . . . . . . . . . . | 7 |
| Benefits When Policy Renewed After Your 65th Birthday | |
| or Five Years, Whichever Is Later . . . . . . . . . . . . . . | 7 |
| Conversion Privilege . . . . . . . . . . . . . . . . . . . . | 8 |
| Additional Benefits | |
| Residual Disability (Includes revised Waiver of Premium provision) . . . . . | 9 |
| Business Value Protector . . . . . . . . . . . . . . . . | 13 |
| Guaranteed Physical Insurability . . . . . . . . . . . . . . . . | 14 |
| Premiums and Renewals | |
| Policy Term . . . . . . . . . . . . . . . . . . . . . | 16 |
| Grace Period . . . . . . . . . . . . . . . . . . . . . | 16 |
| Conditional Right to Renew after Your 65th Birthday or Five Years, | |
| Whichever Is Later - Premiums Are not Guaranteed . . . . . . . . . | 16 |
| Reinstatement . . . . . . . . . . . . . . . . . . . . | 16 |
| Suspension During Military Service . . . . . . . . . . . . . . . . | 17 |
| Your Right to Cancel Policy Pro-rata . . . . . . . . . . . . . . . . | 17 |
| Premium Adjustment at Death . . . . . . . . . . . . . . . | 17 |
| Claims | |
| Notice of Claim . . . . . . . . . . . . . . . . . . . . | 17 |
| Claim Forms . . . . . . . . . . . . . . . . . . . . . | 17 |
| Proof of Loss . . . . . . . . . . . . . . . . . . . . . | 18 |
| Time of Payment of Claims . . . . . . . . . . . . . . . . | 18 |
| Payment of Claims . . . . . . . . . . . . . . . . . . | 18 |
| Physical Examinations . . . . . . . . . . . . . . . . . | 18 |
| Misstatement of Age . . . . . . . . . . . . . . . . . . | 18 |
| Legal Actions . . . . . . . . . . . . . . . . . . . . . | 18 |
| General Provisions | |
| Entire Contract . . . . . . . . . . . . . . . . . . . . | 18 |
| Time Limit on Certain Defenses . . . . . . . . . . . . . . | 18 |
| Conformity With State Laws . . . . . . . . . . . . . . . . | 18 |

READ YOUR POLICY CAREFULLY

1737 F G             JEAN P SIMON MD 36-BOE-6122493             Page 2

Insured - JEAN P SIMON MD                    Policy Number - 36-BOE-6122493
Effective Date - August 1, 1995             First Renewal Date - August 1, 1996
Issue Date - August 3, 1995                 Renewal Term - Twelve Months

Annual Normal Policy Premium payable from August 1, 1995 until the first UPDATE In-
crease Date (see Page 3 (cont.)) is $2,444.48 on a non smoking premium basis..

Annual Franchise Policy Premium payable from August 1, 1995 until the first UPDATE
Increase Date (see Page 3 (cont.)) is $2,077.80 on a non smoking premium basis..

In consideration of the franchise agreement between your Employer and us, we agree
to accept the Franchise Policy Premiums for this policy.

-------------------------------MONTHLY BENEFIT-------------------------------------

$10,000.00

-------------------------------ELIMINATION PERIOD----------------------------------

30 days of Total and/or Residual Disability

An Elimination Period starting after your 65th birthday
must consist entirely of days of Total Disability

-------------------------------MAXIMUM BENEFIT LIMIT-------------------------------

$120,000.00

The Maximum Benefit Limit will be reduced by one-half for a
period of disability that starts at or after your 75th birthday

-------------------------------ADDITIONAL BENEFITS--------------------------------
(The premium shown for an Option is included in the Policy Premium)

Residual Disability  ......................................Page 9      Premium $204.00

Business Value Protector  ................................Page 13     Premium $528.00
   BVP Monthly Benefit......................................................$7,500.00
   BVP Maximum Benefit Period..............................................12 Months
   BVP Elimination Period...........................30 Days of Total Disability

Guaranteed Physical Insurability  ........................Page 14     Premium $18.48
   Maximum Increase.....................$1,000.00 for the Monthly Benefit
                                       $12,000.00 for the Maximum Benefit Limit

(Policy Schedule is continued on next page.)



------------------------------UPDATE------------------------------

The benefits and premium named below will be automatically increased without evidence of insurability, as follows:

| UPDATE Increase Date | New Monthly Benefit | New Maximum Benefit Limit | New Annual Normal Premium for this Policy | New Annual Franchise Premium for this Policy |
|---|---|---|---|---|
| 8/01/96 | $10,700.00 | $128,400.00 | $2,588.12 | $2,199.90 |
| 8/01/97 | $11,450.00 | $137,400.00 | $2,749.52 | $2,337.09 |
| 8/01/98 | $12,260.00 | $147,120.00 | $2,932.08 | $2,492.26 |
| 8/01/99 | $13,120.00 | $157,440.00 | $3,134.68 | $2,664.47 |
| 8/01/00 | $14,040.00 | $168,480.00 | $3,362.74 | $2,858.32 |

UPDATE Benefit increases are effective on the UPDATE Increase Dates shown.  If an UPDATE Increase Date shown does not coincide with a renewal date for this policy, the increase will be effective on the next renewal date.

An UPDATE Benefit increase will apply only to a period of disability which starts after the effective date of the increase. It must qualify as a separate period of disability.  If the premium for the policy is being waived on the effective date of the increase, the premium for the increase will also be waived. When you resume paying premiums for the policy, you must also start paying the premium for the increase.

You are entitled to UPDATE Benefit increases on the dates shown above.  If you do not accept an increase, your refusal:

1.  forfeits your right on that UPDATE Increase Date to the UPDATE Benefit increase;
2.  postpones the schedule of benefit increases to the next UPDATE Increase Date, if any;
3.  adjusts the premiums for the remaining increases, if any, since such premiums are based on your attained age at the time of an UPDATE Benefit increase; and
4.  in no way extends the last UPDATE Increase Date shown above.

Each refusal of an UPDATE Benefit increase reduces the number of UPDATE Benefit increases to which you were entitled by one.

If you are under age 59 on the last UPDATE Increase Date, you may apply for an amendment providing additional UPDATE Benefit increases.  You can do this by making formal application within the period of 60 days prior to and 31 days after the last UPDATE Increase Date.  Approval will be subject to our underwriting guidelines then in effect.

(Policy Schedule is continued on next page.)

1737 F-UPDATE          JEAN P SIMON MD 36-1737-6122493          Page 3(cont.)



ADDITIONAL EXCLUSION(S)

In addition to the exclusions contained herein, this policy does not cover loss caused
by:

ANY INJURY TO OR DISEASE OF THE RIGHT SHOULDER.

1330                    JEAN P SIMON MD 36-1737-6122493                    Page 3-A

Injuries means accidental bodily injuries occurring

Sickness means sickness or disease which is first manifested while your policy is in force. It includes disability from transplant surgery or cosmetic surgery.

transplant surgery means the transplant of part of your body to another person.

cosmetic surgery means surgery to improve your appearance or to correct disfigurement.

Policy Anniversary means the renewal date falling on an anniversary of the Effective Date of the policy; except that when the Policy Anniversary does not coincide with a renewal date, it means the next renewal date thereafter.

Physician means any person other than you who is licensed by law, and is acting within the scope of the license, to treat Injuries or Sickness which results in covered loss.

Total Disability or totally disabled means that due to Injuries or Sickness:

1.  you are not able to perform the substantial and material duties of your occupation; and
2.  you are receiving care by a Physician which is appropriate for the condition causing the disability. We will waive this requirement when continued care would be of no benefit to you.

your occupation means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.

period of disability means a period of disability starting while this policy is in force. Successive periods will be deemed to be the same period unless the later period:

1.  is due to a different or unrelated cause, or
2.  starts more than six months after the end of the previous period;

in which event, the later period will be a new or separate period of disability. A new Elimination Period must then be met. And, a new Maximum Benefit Limit will apply.

Elimination Period means the number of days of disability that must elapse in a period of disability before benefits become payable. The number of days is shown on Page 3. These days need not be consecutive; they can be accumulated during a period of disability to satisfy an Elimination Period. Benefits are not payable, nor do they accrue, during an Elimination Period.

Monthly Benefit is shown on Page 3.

**Covered Overhead Expenses** means items of expense incurred by you which are usual and customary in the operation of your business or profession. They must be generally accepted as tax deductible business overhead expenses. They include but are not limited to items such as:

1. employees' salaries (except as excluded below);
2. charges for utilities such as electricity, telephone, heat and water;
3. either a) rent, or b) an equivalent rental cost for space which you occupy in a building you own and which space you use in the operation of your business or profession, consisting of taxes, maintenance and mortgage interest payments plus the greater of scheduled depreciation for tax purposes or scheduled mortgage principal payments;
4. for furniture, equipment and implements of your business or profession; either a) leasing cost, or b) an equivalent cost consisting of taxes, maintenance and interest payments plus the greater of scheduled depreciation for tax purposes or scheduled principal payments;
5. laundry, janitorial and maintenance services;
6. business insurance premiums (including professional liability insurance premiums); and
7. accounting, billing and collection service fees.

Covered Overhead Expenses do not include:

1. salaries, fees, drawing accounts, profits or other remuneration for:
   a. you;
   b. any person sharing your business expenses;
   c. any member of your profession or occupation; or
   d. any person employed to perform your duties;
2. additions to inventory or the costs of goods or merchandise purchased for sale;
3. any kind of expense for which you were not liable in the normal course of your business or profession prior to a covered disability; and
4. more than your share of expenses when they are shared with one or more persons.

An expense covering more than one month will be prorated to determine the expense for one month.



We will not pay benefits for loss caused by:

1.  war or any act of war, whether war is declared or not; or
2.  normal pregnancy or childbirth, except we will pay benefits for loss caused by:
    a.  complications of pregnancy; and
    b.  normal pregnancy or childbirth on the later of the 91st day of disability or the day of disability following the Elimination Period.

Complications are physical conditions physicians consider distinct from pregnancy even though caused or worsened by pregnancy. Complications of pregnancy shall include, but not be limited to, non-elective caesarean section, ectopic pregnancy which is terminated and spontaneous termination of pregnancy, which occurs during a period of gestation in which a viable birth is not possible. Examples of conditions that are not complications include false labor and morning sickness.

We will not pay benefits for loss we have excluded by name or specific description; any such exclusion will appear in the Policy Schedule.

### PRE-EXISTING CONDITION LIMITATION

We will not pay benefits for loss starting within two years of the Effective Date of this policy which is caused by a Pre-existing Condition. A claim for benefits for loss starting thereafter will not be reduced or denied on the ground it is caused by a pre-existing condition unless the condition is excluded by name or specific condition. Pre-existing Condition means a physical impairment, deformity or a medical condition that was not disclosed, or that was misrepresented, in answer to a question in the application for this policy. A medical condition means a sickness or physical condition which, within the two year period prior to the Effective Date of this Policy, either: 1) resulted in your receiving medical advice or treatment; or 2) caused symptoms for which an ordinarily prudent person would seek medical advice or treatment.

### BENEFITS

TOTAL DISABILITY

We will pay benefits during a period of disability for Covered Overhead Expenses which accrue while you are totally disabled after the Elimination Period, but:

1.  the amount of benefit paid for each month of Total Disability will not exceed the Monthly Benefit (except as set forth below); and
2.  the sum of all Total Disability benefits paid during a period of disability will not exceed the Maximum Benefit Limit shown on Page 3.

If you die during a period of disability and benefits are being paid, we will continue to pay benefits for your share of Covered Overhead Expenses which accrue during the two month period after your death, but:

1.  the amount of benefit paid for each month will not exceed the Monthly Benefit (except as set forth below); and
2.  no benefits will be paid for Covered Overhead Expenses which accrue after your business interests have been sold.

In no event will you be considered to have more than one disability at the same time. The fact that a disability is caused by more than one Injury or Sickness or from both will not matter. We will pay benefits for the disability which provides the greater benefit.

1737 F-E          JEAN P SIMON MD 36-1737 6122493          Page 6

If the Covered Overhead Expenses ... are less than the Monthly Benefit, the unpaid benefits ... forward and applied to expenses incurred in a later month during a period ... ty when the Monthly Benefit is less than the Covered Overhead Expenses.

If the Covered Overhead Expenses in one month during a period of disability are more than the benefits payable, the excess expenses may be carried forward and reimbursed in a later month during the period of disability when the Covered Overhead Expenses are less than the benefits which would have been payable.

In no event will the sum of all benefits paid during a period of disability exceed the Maximum Benefit Limit.

**PRESUMPTIVE TOTAL DISABILITY - LOSS OF SPEECH, HEARING, SIGHT OR THE USE OF TWO LIMBS**
You will be presumed totally disabled if Injuries or Sickness results in the entire and permanent loss of:

1. speech;
2. hearing in both ears;
3. the sight of both eyes; or
4. the use of both hands, or of both feet or of one hand and one foot.

You must present satisfactory proof of your loss.  Your ability to work will not matter.  Further medical care will not be required.  Benefits will be paid according to the Total Disability provisions of this policy.  But, benefits will start on the date of loss if earlier than the day benefits start as shown on Page 3.

**WAIVER OF PREMIUM  - TOTAL DISABILITY AND PARTIAL DISABILITY**
After you have been totally disabled for 90 days during a period of disability, we will:

1. refund any premiums which became due and were paid while you were totally disabled or receiving a Partial Disability Benefit; and
2. waive the payment of each premium which thereafter becomes due for as long as the period of disability lasts.  After it ends, to keep this policy in force, you must again pay any premiums which become due.

For premiums to be waived, you must give us satisfactory proof of disability.

**PAYMENT FOR PART OF MONTH**
If any payment under this policy is for part of a month, the daily rate will be 1/30th of the payment which would have been made if disability had continued for the whole month.

**BENEFITS WHEN POLICY RENEWED AFTER YOUR 65TH BIRTHDAY OR FIVE YEARS, WHICHEVER IS LATER**
If this policy is continued in accordance with the "Conditional Right to Renew After your 65th Birthday or Five Years, Whichever is Later" on Page 1, all of the benefit provisions on Pages 6 and 7 will be included in the continued policy.  If a Partial Disability Benefit is contained in this policy, it will be included in the continued policy.  No "Additional Benefits", if any, named on Page 3 will be included in the continued policy.  The Monthly Benefit will not change unless you choose to renew with a lesser amount.  If this policy is continued after your 75th Birthday, the Maximum Benefit Limit will be reduced by one-half.

### CONVERSION PRIVILEGE

While your policy remains in force prior to your 60th birthday, you may convert it to a disability income policy (herein called the "Conversion Policy"). You must apply for a Conversion Policy. You must not be disabled. You must be actively and gainfully working full time. The following conditions will apply to the Conversion Policy:

1. It will contain the same renewal guarantees as in this policy. It will provide disability benefits substantially equal to the benefits of this policy. But, the benefits will not be based on incurred Covered Overhead Expenses. The monthly benefit of the Conversion Policy will be the amount you choose as long as it does not exceed:

   a. the Monthly Benefit shown on Page 3; or
   b. an amount which, together with all other disability benefits then in force with us and other insurers, does not exceed the amount we would then offer to you as a new applicant or would have offered to you as a new applicant on the Effective Date of this policy, whichever results in the higher amount.

   If a Residual Disability Benefit, Business Value Protector Option or Guaranteed Physical Insurability Option is part of this policy, it will not become a part of the Conversion Policy. The Conversion Policy will, however, contain Partial Disability Benefits.

2. The Conversion Policy may contain any exclusion contained in this policy.

3. If a period of disability stops before this policy is converted and then, due to the same or a related cause, starts again within 6 months under the Conversion Policy; benefits will be payable under the Conversion Policy if the full Maximum Benefit Limit had not been paid under this policy. But, benefits payable under the Conversion Policy can not exceed an amount equal to the remainder of the Maximum Benefit Limit for this period of disability. Full maximum benefits will be applicable for new periods of disability which start while the Conversion Policy is in force.

4. The Conversion Policy will be effective on the date your formal written application for conversion is approved by us. The first premium must be paid within 31 days thereafter.

5. The premium for the Conversion Policy will be based on our rates in effect for your attained age on the Effective Date of this policy. It will be based on your occupation on the date of conversion. Any other rate classes will be the same as those which applied to you when this policy was issued.

1737 F-CP          JEAN P SIMON MD 36-1737-6122493                    Page 8

RESIDUAL DISABILITY
(Nothing in this provision

## DEFINITIONS

**Gross Income** means any monthly income received by you or your business for services performed by you.  Gross Income also includes monthly income generated by anyone employed in your business who performs the same duties as yours, to the extent that that person's income is attributable to you.

Gross Income can be credited to the period in which it is actually received or to the period in which it is earned.  We allow either the cash or accrual accounting method.  But, the same method must be used to determine the Prior Gross Income and the Current Gross Income during a period of disability.  If you elect the cash accounting method we will not include income received for services rendered prior to the start of the period of disability in your current monthly income.

**Prior Gross Income** means your Gross Income for the month immediately preceding a period of disability.

**Current Gross Income** means your Gross Income for each month of Residual Disability being claimed.

**Loss of Gross Income** means the difference between Prior Gross Income and Current Gross Income for the month for which benefits are payable.

**Net Income** means Gross Income minus your share of the usual and customary business expenses which you or your business incurs on a regular basis and are essential to your established business operation.

**Prior Net Income** means the greatest of:

1.  your average Net Income for the 12 months just prior to the start of the period of disability for which claim is made;
2.  your average Net Income for the year with the highest earnings of the last two years prior to the start of such period of disability; or
3.  your highest average Net Income for any two successive years of the last five years prior to the start of such period of disability.

**Current Net Income** means your Net Income for each month of Residual Disability being claimed.

**Loss of Net Income** means the difference between Prior Net Income and Current Net Income.  Loss of Net Income must be caused by the Residual Disability for which claim is made.  The amount of the loss must be at least 20% of Prior Net Income to be deemed Loss of Net Income.

1.  you are not able to do one or more of your substantial and material daily
    business duties or you are not able to do your usual daily business duties for
    as much time as it would normally take you to do them;
2.  you have a Loss of Net Income in your occupation of at least 20%; and
3.  you are receiving care by a Physician which is appropriate for the condition
    causing the disability.  We will waive this requirement when continued care
    would be of no benefit to you.

After the Elimin_____, you are no longer _____
a loss of duti_____
due to Injuries_____

    1.  you have ____
    2.  you are rec____
        causing the Loss____
        care would be of no____

Monthly Benefit and Maximum Benef___

Residual Disability Monthly Benefit is the ____
is determined monthly by this formula.  Each mont___

                  Loss of Gross Income
            --------------------------- X Monthly Benefit
                  Prior Gross Income

The Residual Disability Monthly Benefit will not exceed your Covered Overhead Expenses
minus 75% of your Current Gross Income for any month.

### RESIDUAL DISABILITY/RECOVERY BENEFITS

We will pay benefits during a period of disability for Covered Overhead Expenses which
accrue while you are residually disabled after the Elimination Period or, if later,
after the end of a period during which Total Disability benefits were payable during
the same period of disability, but:

    1.  The amount of benefit paid for each month of Residual Disability will not exceed
        the Residual Disability Monthly Benefit (except as stated in the Accumulating
        Benefit provision); and
    2.  The sum of all Total and Residual Disability benefits paid during a period of
        disability will not exceed the Maximum Benefit Limit shown on Page 3.  And,
        benefits will not be payable after your 65th birthday (or for longer than 12
        months if Residual Disability benefits start between your 64th and 65th birth-
        day).

The first six monthly payments while you are residually disabled will be the greater
of:

    1.  50% of the Monthly Benefit; or
    2.  the Residual Disability Monthly Benefit determined for each month.



benefits are paid.

In no event will you be considered to have more than one disability at the same time. The fact that a disability is caused by more than one Injury or Sickness or from both will not matter. We will pay benefits for the disability which provides the greater benefit.

We can require any proof which we consider necessary to determine your Current Gross Income, Prior Gross Income, Current Net Income and Prior Net Income. Also, we or an independent accountant retained by us shall have the right to examine your financial records as often as we may reasonably require.

### INDEXING OF PRIOR GROSS INCOME
(Applicable to benefits paid after the 12th month of a period of disability)

#### Definitions

CPI-U means the Consumer Price Index for All Urban Consumers. It is published by the United States Department of Labor. If the CPI-U is discontinued or if its method of computation is changed, we may use another nationally published index. We will choose an index which is similar in scope and purpose to the CPI-U. The CPI-U will then mean the index which is chosen.

Review Date means each anniversary date of the start of a period of disability.

Review Period means a one year period ending on a Review Date.

Index Month means the calendar month three months prior to a Review Date. But, the first Index Month means the calendar month three months prior to the start of a period of disability. We will measure all changes in the CPI-U from the first Index Month.

Index Factor is computed by dividing the CPI-U for the latest Index Month by the CPI-U for the first Index Month. We will compute it on each Review Date during a period of disability.



**Adjusted Prior**

If Injuries or Sickness results in a period of ████████████
months, we will index your Prior Gross Income as follows:

1. On each Review Date, your Prior Gross Income will be ████████████ **Index**
   **Factor**. The result is your adjusted Prior Gross Income ████████████ used to
   figure your Loss of Gross Income during the Review Period; ████████████ will
   also be used in the formula to compute each Residual Disabi████████████ Benefit
   during that Review Period.

   An increase in your Prior Gross Income can cause your Los████████████ Income to
   be greater. This in turn can result in an increase in the ████dual Disability
   Monthly Benefit. Other than your Index Factor (which is computed by using ac-
   tual CPI-U values), there is no limit on the percent of increase in your **Prior**
   **Gross Income** for a Review Period. If the CPI-U should go down, your **adjusted**
   **Prior Gross Income** can decrease. But, it can never reduce below your **Prior**
   **Gross Income** at the start of the period of disability.

2. Indexing of your Prior Gross Income will end on the earliest of:

   a. the end of the period of disability (see Page 4);
   b. the date the Maximum Benefit Limit is reached; or
   c. your 65th birthday.

Disabili████████████ which can be paid for the first 12 month████████████
disabili████████████ ████ djustment of Prior Gross I████████████
Month████████████
12 mon██████

For peri████████████
provision████████████

If, during a p█████████████████████████████████████ 0 days
of Total and/or R████████████

1. refund any pre████████████████████████████████████ disabled;
   and
2. waive the paymen████████████████████████████████ as long as
   the period of di████████████████████████████ policy in force,
   you must again pay████████████████████████████ ████████ an

For premiums to be waived████████████████████████ proof of disability.″

NOTE: All portions of this R█████████████████████covery Benefits expire on your 65th
      birthday, and no further████████████████████it will be due, even though the policy
      may be renewed after that d████████████



BUSINESS VALUE PROTECTOR OPTION


There is, on Page 5 of this policy, a list of expenses that are not to be included as Covered Overhead Expenses.  This Option modifies 1(c) and 1(d) on that list so that the following expenses will be included:

Expenses which you incur by paying the salary of a member of your profession or occupation who is employed to perform your duties because of your Total Disability. The person employed can not be your spouse or a member of your family or your spouse's family.  "Family" means parent, son, daughter, brother or sister.

After you have been totally disabled for the BVP Elimination Period shown on Page 3 during a period of disability which started before your 65th birthday, we will pay benefits for the above expenses which accrue while Total Disability continues during the period of disability, but:

1.  the amount of benefit paid for each month of Total Disability will not exceed the BVP Monthly Benefit shown on Page 3; and

2.  benefits will not be paid for longer than the BVP Maximum Benefit Period shown on Page 3.

This benefit is payable in addition to the Monthly Benefit and the Maximum Benefit Limit.  But, it will not be paid for any Partial Disability or Residual Disability Benefits that may be included in your policy.


NOTE:  All portions of this Business Value Protector Option expire on your 65th birthday, and no further premiums for it will be due, even though the policy may be renewed after that date.


1737 BVP                    JEAN P SIMON MD 36-1737-6122493                    Page 13



## GUARANTEED PHYSICAL INSURABILITY OPTION

### DEFINITIONS

**Option Date** means each anniversary of the Effective Date of the policy starting with the first and ending with the one which falls on or next follows your 52nd birthday. If an Option Date does not coincide with a renewal date for this policy, it will change to coincide with the next renewal date thereafter.

**Option Period** means the period which begins 60 days before and ends 31 days after an Option Date.

### BENEFIT

You have the right to increase the Monthly Benefit and, proportionately, the Maximum Benefit Limit shown on Page 3. You may do so, without submitting evidence of physical insurability, by following the rules set forth below.

Increases will be made only upon formal application by you. You must apply within an Option Period. An increase, if approved by us, will be effective on the date of your application.

The amount of an increase will be subject to each of the following:

1. An increase, when combined with all other overhead expense disability benefits then in force with us and other insurers, may not exceed the amount we would issue to you as a new applicant. This amount will be subject to our published issue and participation limits on the day you apply for an increase or on the Effective Date of this policy, whichever results in higher amount.

2. After your 46th birthday, an increase can not exceed one-third of the original Maximum Increase shown on Page 3 (rounded up to the next $10.00).

3. The sum of all increases can not exceed the original Maximum Increase shown on Page 3.

You can apply for an increase during any Option Period even though you are disabled. An increase of up to 10% of the original Monthly Benefit shown on Page 3 (rounded up to the next $10.00) approved by us during a period of disability will apply to the benefits payable while that period of disability continues. And, this increased Monthly Benefit, plus any excess of 10% approved during the same period of disability will be applicable to new, separate periods of disability (see Page 4.)

If you do not qualify for an increase on an Option Date, you can still apply for an increase during a later Option Period.

The first premium for an increase approved by us must be paid within 31 days; later premiums must be paid as part of the Policy Premium.  If the premium for the policy is being waived (see Waiver of Premium provision) on the effective date of the increase, you will not have to start paying the premium for the increase until the premium for your policy becomes payable again.

The premium for each increase will be based on your attained age on the date of your application for each increase.  It will also be based on:

1.  our premium rates in effect at the time of the increase or on the Effective Date of the policy, whichever is less; and

2.  your occupational class at the time of the increase or on the Effective Date of the policy, whichever will produce the lower premium.

When an increase is exercised, the premium for this Option will be reduced.  The reduced premium will be based on the Maximum Increase remaining.

This Option will expire, and no further premiums for it will be due, on the earlier of:  (a) the date when the Maximum Increase has been exercised; or (b) the date when the Option Period ends for the 52nd birthday Option Date described above.

**POLICY TERM**
The first term of this policy starts on the Effective Date shown on Page 3. It ⬛
on the First Renewal Date also shown. Later terms will be the periods for which ⬛
pay renewal premiums when due. All terms will begin and end at 12:01 A.M., Stand⬛
Time, at your home. The renewal premium for each term will be due on the day th⬛
preceding term ends, subject to the grace period.

**GRACE PERIOD**
This policy has a 31 day grace peri⬛
paid on or before the date it i⬛
the grace period, the policy⬛

If this policy is conti⬛
changed to read as follo⬛

   "**GRACE PERIOD**
   This policy has a 31 day gra⬛
   not paid on or before the date⬛
   The grace period will not apply ⬛
   we have delivered or mailed to your⬛
   notice of our intent not to renew thi⬛
   policy will stay in force. We may refuse⬛
   Anniversary and only when you become ineligible to contin⬛ ⬛ ⬛ you ce⬛
   to be actively and gainfully employed full time."

**CONDITIONAL RIGHT TO RENEW AFTER YOUR 65TH BIRTHDAY OR FIVE YEARS, WHICHEVER IS LATER;
PREMIUMS ARE NOT GUARANTEED**
(Continued from Page 1)
You can renew this policy as long as you are; 1) actively and gainfully working full
time in operating your business or profession; and 2) still incurring Covered Overhead
Expenses as defined on Page 5. From time to time, we can require proof that you are
actively and gainfully working full time. If you stop working, (except by reason of
Total Disability), this policy will terminate on the next Policy Anniversary; except
that coverage will continue to the end of any period for which premium has been ac-
cepted. All losses must occur while your policy is in force; except if your policy
terminates for any reason, loss from Injuries may begin within 30 days from the date
of the accident.

Premiums must be paid on time. They will be based on our table of rates by attained
age in effect at time of renewals for persons in your same rate class who are insured
under policies of this form. Other than your attained age, the factors used to de-
termine your rate class will be the same as those that applied to you on the Effective
Date of this policy. Notice of any increase in premium will be given to you by mail
at least 31 days prior to the renewal date upon which such increase is to be effective.

**REINSTATEMENT**
If a renewal premium is not paid before the grace period ends, the policy will lapse.
Later acceptance of the premium by us or by our agent authorized to accept payment
without requiring an application for reinstatement will reinstate this policy.

If we or our agent require an application, you will be given a conditional receipt
for the premium tendered. If the application is approved, the policy will be rein-
stated as of the approval date. Lacking such approval, the policy will be reinstated
on the 45th day after the date of the conditional receipt unless we have previously
written you of our disapproval.

1737-F-PR          JEAN P SIMON MD 36-1737-6122493          Page 16

the reinstated policy will [illegible]
after the date of reinstatement or Sickness which is first [illegible] more than
days after such date.  In all other respects, your rights and ours will remain the
same, subject to any provisions noted on or attached to the reinstated policy.

**SUSPENSION DURING MILITARY SERVICE**
If you enter full-time active duty in the military (land, sea or air) of any
nation or [illegible] authority, you may suspend this poli[illegible]
suspend [illegible]
pol[illegible]
pa[illegible]
re[illegible]
you[illegible]

If y[illegible]
may n[illegible]
will star[illegible]

    1.  we have[illegible]
    2.  you have paid[illegible]
        due date.

However, your request and premium payment[illegible]
the date your active duty in the military service[illegible]
rate that they would have been had your policy remained in force.  You and us will
have the same rights under the policy as before it was suspended.

**YOUR RIGHT TO CANCEL POLICY PRO-RATA**
If you cease to incur Covered Overhead Expenses, you may cancel this policy.  You will
receive a refund of the unearned portion of any premiums paid for any period beyond
the last day on which Covered Overhead Expenses were incurred.  To cancel and receive
a refund you must notify us in writing and verify the day you ceased to incur such
expenses.  No refund will be made for any period more than one year before the date
you give us notice.  Cancellation will be instead of:

    1.  any suspension under the "Suspension During Military Service" provision; and
    2.  your conversion right under the "Conversion Privilege".

**PREMIUM ADJUSTMENT AT DEATH**
Any premium paid for a period beyond the date of your death will be refunded to your
estate.

CLAIMS

**NOTICE OF CLAIM**
Written notice of claim must be given within 20 days after a covered loss starts or
as soon as reasonably possible.  The notice can be given to us at our home office,
Chattanooga, Tennessee, or to our agent.  Notice should include your name and the
policy number.

**CLAIM FORMS**
When we receive your notice of claim, we will send you claim forms for filing proof
of loss.  If these forms are not given to you within 15 days, you will meet the proof
of loss requirements by giving us a written statement of the nature and extent of your
loss.  You must give us this proof within the time set forth in the Proof of Loss
section.



**PROOF OF LOSS**
You must give us written proof of loss within 90 days after the end of ea—
for which we are liable. If that is not reasonably possible, we will
deny the claim for this reason if the proof is filed as soon a—
In any event, the proof required must be furnished no lat—
90 days un—

**TIME —**
After —
for dis—
of the cl—

**PAYMENT OF CL—**
Benefits will
tate.

**PHYSICAL EXAMINAT—**
We, at our expens—
a claim is pending.

**MISSTATEMENT —**
If your age has —                                    ... u—ld would have
bought at the —

**LEGAL ACTIONS** —
You may not start a legal action to recover on this policy within 60 days after you
give us required proof of loss. You may not start such action after three years from
the time proof of loss is required.

## GENERAL PROVISIONS

**ENTIRE CONTRACT**
This policy with the application and attached papers is the entire contract between
you and us. No change in this policy will be affective until approved by one of our
officers. This approval must be noted on or attached to this policy. No agent may
change this policy or waive any of its provisions.

**TIME LIMIT ON CERTAIN DEFENSES**

1. After two years from the Effective Date of this policy, no misstatements, except
   fraudulent misstatements, made by you in the application for this policy will
   be used to void the policy or to deny a claim for loss incurred or disability
   that starts after the end of such two year period.

2. No claim for loss incurred or disability that starts after two years from the
   Effective Date of this policy will be reduced or denied on the ground that a
   sickness or physical condition not excluded by name or specific description had
   existed before the Effective Date of this policy.

**CONFORMITY WITH STATE LAWS**
Any provision of this policy which, on its effective date, is in conflict with the
laws of the state in which you then reside is changed to meet the minimum requirements
of those laws.

1737 F-GP                    IFAN P SIMON MD 36-1737-6122493                    Page 18



PROVIDENT LIFE AND CASUALTY INSURANCE COMPANY


DISABILITY INCOME PROTECTION COVERAGE

REQUIRED DISCLOSURE STATEMENT

POLICY SERIES C-337-F


This policy provides disability income insurance. It does NOT provide basic hospital, basic medical, or major medical insurance as defined by the New York State Insurance Department. This policy provides as follows:


BENEFITS

General Definitions

Benefit Schedule means the schedule of benefits attached to this Disclosure Statement.

Elimination Period means the number of days of disability that must elapse in a period of disability before benefits become payable. The number of days is shown in this Disclosure Statement's Benefit Schedule. These days need not be consecutive; they can be accumulated during a period of disability to satisfy an Elimination Period. Benefits are not payable, nor do they accrue, during an Elimination Period.

If the Elimination Period is fulfilled during a period of disability, the first subsequent disability due to a different or unrelated cause will not require an Elimination Period, provided the first subsequent disability occurs within the twelve month period from the end of the prior disability, during which the Elimination Period was satisfied.

Total Disability or totally disabled means that due to Injuries or Sickness:

1. you are not able to perform the substantial and material duties of your occupation; and
2. you are receiving care by a Physician which is appropriate for the condition causing the disability. We will waive this requirment when continued care would be of no benefit to you.

your occupation means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you became disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.

Basic Benefits of Your Policy

The basic Monthly Benefit for Total Disability is shown in the Benefit Schedule. Benefits start on the day of Total Disability after the Elimination Period. Benefits are payable for as long as the applicable maximum benefit periods also shown in the Benefit Schedule.


Disclosure Statement for JEAN P SIMON MD 36-337-6084608

DUPLICATE

UPDATE - This benefit provides for automatic increases in your Monthly Benefit fo Total Disability. Refer to the policy schedule in your policy for details.

Presumptive Total Disability - You will be presumed totally disabled if Injuries or Sickness result in the entire and permanent loss of: 1) speech; 2) hearing in both ears; 3) sight of both eyes; or 4) use of both hands, both feet, or one hand and one foot.

The basic Monthly Benefit for Total Disability will be paid even if you can work. Further medical care will not be required. Benefits will be payable for the Benefit Period stated in the Benefit Schedule. If loss occurs before your 65th birthday, benefits will be payable for life.

Waiver of Premium - After you have been disabled for 90 days during a period of total and/or residual disability we will:

   1. refund any premiums which became due and were paid while you were totally and/or residually disabled; and
   2. waive the payment of each premium which thereafter becomes due for as long as the period of disability lasts. After it ends, to keep your policy in force, you must again pay any premiums which become due.

Transplant Surgery - If you are disabled because you donate a part of your body to another person, we will consider it to be the result of a Sickness.

Cosmetic Surgery - If you are disabled from surgery to improve your appearance or correct disfigurement, we will consider it to be the result of a Sickness.

Rehabilitation - You may participate in a program of occupational rehabilitation while disabled. This will not of itself affect Total Disability payments. If we approve the program we will pay certain training expenses that you incur.

Additional Benefits

The following optional benefits are also a part of your policy and are shown in the Benefit Schedule. Additional premium is required.

Residual Disability Benefits Disability/Recovery Benefits pay a percentage of the Total Disability Monthly Benefit when, due to Injuries or Sickness, you suffer a loss of earnings of 20% or more, and are receiving care by a physician. (During the Elimination Period only, you must not be able to work fully because of the Injuries or Sickness.) A loss of earnings over 75% is deemed a 100% loss and 100% of your Total Disability Monthly Benefit will be paid. Residual benefits are payable for as long as stated in the policy.

When a disability lasts more than one year, Cost of Living indexing (based on the Consumer Price Index) will be applied to your pre-disability earnings. As they increase, your loss of earnings becomes greater and this, in turn, produces increases in your Residual Disability Monthly Benefit.

Guaranteed Physical Insurability/Long Term Disability Option guarantees the option to purchase future coverage to your 55th birthday.

JEAN P SIMON MD 36-337-6084608

## EXCLUSIONS

This policy does not cover loss caused by:

1. war or any act of war; or
2. normal pregnancy or childbirth, except we will pay benefits for loss caused by normal pregnancy or childbirth on the later of ther 91st day of disability or the day of disability following the Elimination Period. Complications of pregnancy are covered. See your policy for details.

The policy will only cover a pre-existing condition if it is disclosed and not misrepresented in answer to a question in your application, and we do not specifically exclude it from coverage.

A pre-existing condition is defined in your policy.

If there are any additional exclusions, they will be referred to in the Policy Schedule. If there is an exclusion or limitation which applies only to a benefit rider added after the policy is issued, it will be included with the rider.

## RENEWABILITY OF YOUR POLICY

**Non-Cancellable and Guaranteed Continuable at Guaranteed Premiums to Your 65th Birthday or For Five Years, Whichever Is Later:** You can continue this policy to your 65th birthday or for five years, whichever is later, by paying the premiums on time.

**Conditional Right to Renew After Your 65th Birthday or Five Years, Whichever Is Later:** Premiums are not Guaranteed: You can renew this policy as long as you are actively and gainfully working full time; there is no age limit. You must pay premiums on time at our rates then in effect at time of renewal. The basic policy, if renewed before your 75th birthday, will provide a 24 month maximum benefit period for Total Disability and for Presumptive Total Disability, if this benefit is included in the policy. A 12 month maximum benefit period will be provided if the policy is renewed on or after your 75th birthday.

If the policy is continued, all of the basic benefit provisions will be included in the continued policy. Any additional benefit provision contained in the policy will not be included unless it is so named as one that will be included in the continued policy.

This Disclosure Statement is a very brief summary of your policy.

The policy itself sets forth the rights and obligations of both you and your insurance company. It is therefore important that you READ YOUR POLICY carefully.

The expected benefit ratio for this policy is 60%. This ratio is the portion of future premiums which the Company expects to return as benefits, when averaged over all people with this policy.

This Disclosure Statement was prepared on 01/09/2004 and replaces any previous description of coverage furnished you.

C-337-F-DS

JEAN P SIMON MD 36-337-6084608

BENEFIT SCHEDULE FOR THIS DISCLOSURE STATEMENT

---------------------------------------------------------------------------

Elimination Period                    365 days of Total and/or Residual Disability

Monthly Benefit for Total Disability                              $10,000.00

Maximum Benefit Periods:

Injuries:
    Total Disability starting before your 65th birthday ............... for Life
    Total Disability starting on or after your 65th birthday
        but before your 75th birthday .................................. 24 months
    Total Disability starting on or after your 75th birthday ........... 12 months

Sickness:
    Total Disability starting before your 60th birthday ............... for Life
    Total Disability starting on or after your 60th birthday
        but before your 61st birthday ....................... to your 65th birthday
    Total Disability starting on or after your 61st birthday
        but before your 62nd birthday .................................. 48 months
    Total Disability starting on or after your 62nd birthday
        but before your 63rd birthday .................................. 42 months
    Total Disability starting on or after your 63rd birthday
        but before your 64th birthday .................................. 36 months
    Total Disability starting on or after your 64th birthday
        but before your 65th birthday .................................. 30 months
    Total Disability starting on or after your 65th birthday
        but before your 75th birthday .................................. 24 months
    Total Disability starting on or after your 75th birthday ........... 12 months

------------------------------ADDITIONAL BENEFITS----------------------------------

Residual Disability/Recovery Benefit

Guaranteed Physical Insurability/Long Term Disability Option
    Total Maximum Increase is $1,000.00

Insured - JEAN P SIMON MD                          Policy Number 6084608

Insured – JEAN P SIMON MD

Policy Number 6084608

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civ. No.:  07-cv-11426  (SAS)

JEAN P. SIMON, M.D.

Plaintiff,

- against -

UNUM, UNUM PROVIDENT, PROVIDENT LIFE AND CASUALTY INSURANCE
COMPANY, THE PAUL REVERE LIFE INSURANCE COMPANY, FIRST UNUM LIFE
INSURANCE COMPANY, PROVIDENT LIFE AND ACCIDENT INSURANCE
COMPANY, AND UNUM PROVIDENT CORPORATION,

Defendants.

# COMPLAINT

**SACK & SACK, ESQS.**

**ATTORNEYS FOR PLAINTIFF**

110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JEAN P. SIMON, M.D.,                          :  Civ. No.: 07-cv-11426 (SAS)
                                              :
                              Plaintiff,       :
                                              :
        -against-                              :
                                              :
UNUM, UNUM PROVIDENT, PROVIDENT LIFE :
AND CASUALTY INSURANCE COMPANY, THE:
PAUL REVERE LIFE INSURANCE COMPANY,  :
FIRST UNUM LIFE INSURANCE COMPANY,   :
PROVIDENT LIFE AND ACCIDENT           :
INSURANCE COMPANY AND                 :
UNUMPROVIDENT CORPORATION,            :
                                              :
                              Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# EXHIBIT B

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
PARTIALLY DISMISS AMENDED COMPLAINT**

---

White and Williams, LLP
One Penn Plaza
18th Floor, Suite 1801
New York, New York 10119
Phone: 212-244-9500
Fax: 212-244-6200
*Attorneys for Defendants Unum, Unum Provident,
Provident Life and Casualty Insurance Company,
The Paul Revere Life Insurance Company, First
Unum Life Insurance Company, Provident Life and
Accident Insurance Company and UnumProvident
Corporation*

*One Penn Plaza*
*18th Floor, Suite 1801*
*New York, NY 10119*
*Phone: 212.244.9500*
*Fax: 212.244.6200*

*Andrew I. Hamelsky*
*Direct Dial: 212.631.4406*
*Direct Fax: 212.631.4426*
*hamelskya@whiteandwilliams.com*

March 14, 2008

<u>**Via Fax: 212-702-9702 and FedEx**</u>

Jonathan S. Sack, Esq.
Eric R. Stern, Esq.
Sack & Sack, Esqs.
110 East 59th Street, 19th Floor
New York, NY 10022

      **RE:  Jean P. Simon v. Unum Group, et al**
            **Our File No.: 0016931 - K0174**
            **Civ. No.: 07-cv-11426 (SAS)**

Dear Mr. Sack:

      I have received Plaintiff's amended Complaint for the above referenced case.  As I have discussed with Mr. Stern of your office I find the Complaint to be deficient for the reasons set forth below.  Please accept this as a good faith letter in an attempt to resolve this dispute without the necessity of judicial intervention.   In addition, this letter is being sent to you without prejudice to all of the rights of defendants as the amended Complaint that you sent to me has not been filed with the Court.

      As discussed during the Fed. R. Civ. P. 16 Conference, the Complaint names several parties that are either not legal entities and/or not proper parties. The proper legal name of my client, is Unum Group.  Further, your amended Complaint names all of Unum Group's subsidiaries even those entities that have no connection to your client whatsoever.  I believe that the proper party to this law suit is Provident Life and Casualty Insurance Company as this is the entity that issued the disability policy to your client.  Further, while not a proper party I would not move to dismiss, at this time, an action against Unum Group.  However, if not amended I will be forced to file a motion to dismiss all of the other non-related subsidiaries that you have named as defendants in this action.

      New York case law is clear that in terms of legal responsibility, parent, subsidiary, or affiliated corporations are treated separately and independently, and one will not be held liable for the contractual obligations of the other.  *Alexander & Alexander of New York v Fritzen*, 114 AD2d 814 [1st Dept 1985], *order affd* 68 NY2d 968 [1986].  *See also, Continental U.K. Ltd. v. Anagel Confidence Compania Naviera, S.A.*, 658 F.Supp. 809, 815-816 (S.D.N.Y. 1987) ("Subsidiaries of the same parent are not necessarily bound to each others' contractual

March 14, 2008
Page 2

obligations." To bind all subsidiaries to the same contractual obligations, one would have to prove that the subsidiaries have "no separate mind, will, or existence of its own.") Therefore, the Complaint improperly names subsidiaries which have no relation to Plaintiff's cause of action.

The Complaint is also deficient as to Count Three (Fraud). This count is in violation of Fed. R. Civ. P. 9. Rule 9 (b) states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." However, even if fraud was correctly plead with specificity (which it was not), this cause of action necessarily fails as a matter of law. "New York law 'preclude[s] fraud actions where the only fraud charged relates to a breach of contract.' " *Sichel v. UNUM Provident Corp.*, 230 F.Supp.2d 325, 328 (S.D.N.Y. 2002) (quoting *Lomaglio Assoc., Inc., v. LBK Mktg. Corp.*, 892 F.Supp. 89, 94 (S.D.N.Y.1995). " '[A] contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations.' " *Hanft Byrne Raboy & Partners, Inc. v. Matsushita Elec. Corp. of America*, No. 00 Civ. 2990, 2001 WL 456346, at *5 (S.D.N.Y. May 1, 2001) (quoting *Rocanova v. Equitable Life Assurance Soc'y*, 83 N.Y.2d 603, 614, (N.Y. 1994)). " 'General allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support' a claim for fraud." *Sichel v. UNUM Provident Corp.*, 230 F.Supp.2d 325, 328 (S.D.N.Y. 2002) (quoting *New York Univ. v. Cont'l Ins. Company*, 87 N.Y.2d 308, 318, (N.Y. 1995)). Therefore, if not dismissed I will be forced to file a motion to dismiss this count of the Complaint.

The Complaint is once again deficient with regard to Count Four (Consumer Fraud). Plaintiffs claim does not meet the threshold to invoke a violation under General Business Law § 349 for, "a deceptive act or practice that has a broader impact on consumers at large meets this threshold, but a private contract dispute as to policy coverage does not." *Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 126 (2d Cir. 2000) (internal citations omitted). *See also, Sichel v. UNUM Provident Corp.*, 230 F.Supp.2d 325, 329-331 (S.D.N.Y. 2002); *MaGee v. Paul Revere Life Ins. Co.*, 954 F.Supp. 582, 586 (E.D.N.Y. 1997) ("[T]he injury must be to the public generally as distinguished from the plaintiff alone."). Essentially, New York law does not recognize an action under GBL §349 in a matter involving a private contract dispute such as the one in this matter.

Additionally, Count Five (Intentional Tort) may not be brought against my client as there is no such cause of action. An intentional tort is a category of tort. You may allege a battery, assault, slander or libel, etc., but you may not allege a category of law as a cause of action. *See e.g.*, *Schneider v. State*, 6 Misc.3d 1006(A) (N.Y.Ct.Cl. 2004) (Court dismissed intentional tort cause of action, noting: "the claim suffers from the failure to have each distinct cause of action and its elements separately alleged.") Moreover, this Count must be removed for failure to state a cause of action and to meet the requisite notice and pleading requirements in accordance with

March 14, 2008
Page 3

Fed. R. Civ. P. 8(a)(2). The U.S. District Court for the Southern District of New York has found:

> The purpose of Rule 8 is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial. The complaint must disclose adequate information as to the basis of the claim to allow the court and the defendants to understand the charges and underlying theories of law, to allow the defendants to formulate a response, and so that issues may be identified for meaningful discovery and intelligible presentation to the trier of fact.

*Schoolfield v. Department of Correction*, 91 Civ. 1691, 1994 WL 119740 at *2 (S.D.N.Y. April 6, 1994). By alleging only a category of law, Count Five is in obvious violation of Fed. R. Civ. P. 8(a)(2).

Finally, Count Six (Intentional Infliction of Emotional Distress) must fail as a cause of action in this case, as courts have repeatedly found in cases brought for a denial of disability benefits "that such claims for intentional infliction of emotion distress [are] true contract cases recast in tort." *Wiener v. Unumprovident Corp.*, 202 F.Supp.2d 116, 123 (S.D.N.Y. 2002). *See also*, *MaGee v. Paul Revere Life Ins. Co.*, 954 F.Supp. 582 (E.D.N.Y. 1997); *Harris v. Allstate Ins. Co.*, 83 F.Supp.2d 423 (S.D.N.Y.2000); *Cunningham v. Security Mutual Ins. Co.*, 260 A.D.2d 983, 984, (3rd Dept.1999); *Howell v. New York Post Co.*, 81 N.Y.2d at 122, (NY 1993)(noting that every claim of intentional infliction of emotional distress ever heard by the New York Court of Appeals has failed because the conduct has not been sufficiently outrageous). Clearly, New York law does not recognize an action for emotional distress in a breach of contract action.

In light of the foregoing, the Complaint as currently constituted is deficient as a matter of law. As we discussed I would prefer to resolve this matter without having to file a motion to dismiss. In light of the fact that your complaint has not been filed with the Clerk of Court you can easily file a corrected complaint without leave of Court. However, since there is a scheduling order in place I would respectfully request that you amend your Complaint within five (5) days of receipt of this letter, otherwise I will be forced to contact the Court. I look forward to your earliest response.

Very truly yours,

WHITE AND WILLIAMS LLP

By:

Andrew I. Hamelsky

AIH:rjw

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
JEAN P. SIMON, M.D.,                    :    Civ. No.: 07-cv-11426 (SAS)
                                         :
                    Plaintiff,           :
                                         :
     -against-                           :
                                         :
UNUM, UNUM PROVIDENT, PROVIDENT LIFE     :
AND CASUALTY INSURANCE COMPANY, THE      :
PAUL REVERE LIFE INSURANCE COMPANY,      :
FIRST UNUM LIFE INSURANCE COMPANY,       :
PROVIDENT LIFE AND ACCIDENT             :
INSURANCE COMPANY AND                    :
UNUMPROVIDENT CORPORATION,               :
                                         :
                    Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# EXHIBIT C

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PARTIALLY DISMISS AMENDED COMPLAINT

White and Williams, LLP
One Penn Plaza
18th Floor, Suite 1801
New York, New York 10119
Phone: 212-244-9500
Fax: 212-244-6200
*Attorneys for Defendants Unum, Unum Provident, Provident Life and Casualty Insurance Company, The Paul Revere Life Insurance Company, First Unum Life Insurance Company, Provident Life and Accident Insurance Company and UnumProvident Corporation*



18 Chestnut Street
Worcester, MA 01608-1528
508 799 4441
www.unum.com

August 27, 2007

Jean Simon, MD
A Fifth Avenue Obstetrics & Gynecology P.C
36th East 70th Street
New York, NY 10021

Policy # 36-06084608-001

Dear Dr. Simon:

We are writing to outline our analysis of the information you submitted to our office since our December 22, 2005.

## CLAIM DECISION

We understand that you our claiming that you have been Total Disabled since November 21, 2003, as you have been unable to perform the substantial and material duties of your occupation.

Based upon our review of the additional information obtained regarding your medical condition; your pre- and post disability occupational duties; and the income generated for services provided; our prior determination that you are able and have continuously been performing many of the substantial and material duties of your occupation is unchanged. As a result, your claim will be considered under the Residual Disability provisions of your policy.  At this time, we would like to outline our basis for this decision.

## POLICY LANGUAGE

Under your policy:  Total Disability or totally disabled means that due to Injuries or Sickness:

1. you are not able to perform the substantial and material duties of you occupation; and
2. you are receiving care by a Physician which is appropriate for the condition causing the disability. We will waive this requirement when continued care would be of no benefit to you.

Jean Simon, MD                                                          August 27, 2007

Your occupation means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.

Under your policy: Residual Disability or residually disabled, during the elimination Period, means that due to Injuries or Sickness:

1. you are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take your to do them;
2. you have a Loss of Monthly income in your occupation of at least 20%; and
3. you are receiving care by a Physician which is appropriate for the condition causing disability.

After the elimination period has been satisfied, you are no longer required to have a loss of duties or time. Residual Disability or residually disabled then means that as a result of the same Injuries or Sickness:

1. you have a loss of Monthly Income in your occupation of at least 20%; and
2. you are receiving care by a Physician which is appropriate for the condition causing the Loss of Monthly Income.

In part, our assessment of your eligibility for benefits under the Total or Residual Disability provisions to your policy includes the following:

- The restrictions and limitations arising from your medical condition;
- The duties you performed in your occupation before your claimed disability began;
- The duties you cannot perform as a result of your claimed disability; and
- If you are currently working, we also need to understand what duties you are presently performing and how often you perform them.

## MEDICAL

We understand that you have been claiming Total Disability since November 21, 2003, due to an injury to your left hand in which you incurred an infection that required multiple debridements. To assist in understanding the extent of your condition medical records were requested from your treatment providers and reviewed. Following our review of this information, as we still had questions with regard to the extent of your

Jean Simon, MD                                                  August 27, 2007

condition, an Independent Medical Examination was obtained on September 27, 2005 with Dr. Gerald Grad. A review of this information was completed on December 5, 2005 by our Board Certified Orthopedic Surgeon. The summary of this review is as follows:

> *In summary, this 51-year-old OB/Gyn physician has had a potentially devastating infection of the left hand for which he has had a good result considering the underlying diagnosis. It is reasonable to expect some slight improvement in sensation in the left middle finger over the next year or so. At this time, there appears to be only mild sensory loss based on the 2-point discrimination test in the middle finger and sudomotor function was normal. Therefore it does not appear that the claimant has significant sensory loss in the left middle finger and again further improvement is to be expected with time. He is now two years subsequent to his surgery. It is reasonable to expect some loss of grip strength in the left hand in the future in view of the initial diagnosis and necessary surgeries and in view of the slight loss of joint space in the wrist as visualized on x-ray.*

> *It would seem reasonable at this time that the claimant is able to carry out the duties of a gynecologist and of an obstetrician based on the vocational rehabilitation consultation of 10/7/05. The records do not support the claimant's inability to carry out his obstetrics practice.*

> *The IME performed by Dr. Grad was very thorough and very clear and further consultation with that physician would seem therefore unnecessary.*
> *I have reviewed all medical and clinical evidence provided to me by company personnel bearing on the impairment[s] which I am by training and experience capable to assess.*

> *Addendum to above review: In my opinion the claimant is able to carry out the duties of a gynecologist and obstetrician on a full time basis.*

Since our December 2005 medical review, we understand that you have had one date of treatment with Dr. Wolfe. This information was recently forwarded to our board certified Orthopedic Surgeon for review and comment on whether there had been any changes from his previous analysis. This review was completed on May 14, 2007 and stated the following:

> *The insured was examined by Dr Wolfe 8/16.06 and was discharged from treatment at that time. There was found to be dysethesia to light touch. 2 point testing was 5mm [which is an improvement]. There was found to be permanent scarring around the flexor tendons, resulting in loss of hyperextension, but with full flexion. No further treatment is planned and would not predictably improve*

Jean Simon, MD                                                    August 27, 2007

*the situation. Dr Wolfe notes that the insured feels he is unsafe to perform operative gynecology and obstetrics and has an office practice.*

*The insured would reasonably be expected to have some loss of grip strength and loss of hyperextension of the fingers in the foreseeable future, as well as gradually improving dysesthesia in the finger. There appears to be some improvement in sensation. In my opinion the insured would probably reasonably be able to carry out the duties of an OB/GYN surgeon in a safe and professional manner at this time. However further information may be obtained from a hand FCE with emphasis on sensation, grip strength, and finger dexterity. After that an opinion may be obtained from 2 OB/GYN surgeons as to the insured's capability to perform the duties of his specialty.*

While we understand that an FCE could provide us with further clarification regarding your specific functional capacity, as you have demonstrated the ability to continuously perform a significant portion of the important duties of your pre-disability occupation since at least December 23, 2003, there is no need for this evaluation in our assessment of your eligibility for Residual Disability benefits at this time.

## OCCUPATIONAL

To assist in our review of your pre-disability occupation and occupational duties, we requested CPT coding for each year beginning January 1, 2002.  As your billing was done manually, you provided us with records regarding the Explanation of Benefits for services provided.

This information was reviewed by an outside Auditor, Callaghan & Nawrockii on August 16, 2005 and their analysis of your practice was as follows:

- Evaluation and Management comprised of 74% of your total units for 2002, 75% in 2003 and 82% in 2004.
- You delivered 29 babies in 2002 and 25 in 2003 which equates to between 2 to 2 ½ deliveries per month in the pre-disability period.
- In the post disability period (January through November 2004) you delivered 3 babies.
- Surgical, Female Genital Units indicate 18% of total units in 2002 and 19% in 2003.
- Post disability, this category declined to a monthly average of 12%, but remained the second largest source of units, second to Evaluation and Management.

Jean Simon, MD                                              August 27, 2007

With regard to the Charges generated per unit for Evaluation & Management, Gynecology and Obstetrics, this breakdown was as follows:

- Surgery Female Genital System charges comprised of 31% of your total charges for 2002; 34% for 2003; and 18% for 2004.
- Surgery Maternity Care & Delivery charges comprised of 19% of your total charges in 2002; 20% for 2003; and 11% for 2004.
- Evaluation & Management charges comprised of 42% of your total charges for 2002; 44% for 2003; and 70% for 2004.
- Surgery other and Radiology charges comprised of the remaining 8% for 2002; 2% for 2003; and 1% for 2004.

We have attached a copy of Callaghan & Nawrockii's analysis for your review. Please note, from our review of your 2002 & 2003 monthly/yearly billings, evaluation/management and gynecology accounted for 73-78%.

From the results of our vocational analysis, it was concluded that your pre-disability practice was more focused on Gynecology services rather than Obstetrical services.

According to the letter you forwarded to our office on August 22, 2006, you do not agree with our occupational analysis. To ensure our prior analysis of your pre-disability occupation was complete, a letter was written to you by Sharon Deraney on October 3, 2006 outlining the additional information we wished to assess. As no response was received to our October 3, 2006 request, a second letter was sent on November 6, 2006. The information that was requested at that time was as follows:

- A written account of your job duties at Midtown Medical;
- Clarification as to whether you continue to have privileges at New York Presbyterian Hospital and if you had or currently have privileges at any other hospitals;
- Clarification to any additional income generating activities besides Midtown Medical and A Fifth Avenue Obstetrics and Gynecology;
- A explanation of the duties of acupuncture as listed on your business card;
- A written account of all of the current job duties you are performing in your office, to include: The specific GYN office exams you are currently performing? What days/hours are you currently working? How many patients do you currently treat per day? What is the date you ceased performing obstetrics work?
- Copies of your billing records from November 2004 to present; and

Jean Simon, MD                                                    August 27, 2007

- Your file was forwarded to one of our local field claim representatives to follow up on our request for surgical schedules from New York Presbyterian & Beth Israel North Hospitals for the period beginning April 2003.

In response to our requests we would like to acknowledge to following:

- We understand that your job duties at Midtown Medical included conducting initial and follow up office visits; office consults; and wellness exams.
- In regard to your admitting privileges, we understand that you have maintained these privileges; however, have not used them since prior to November 21, 2003.
- You stated that you also work at another facility Medical Dental Associates and you did some work for the United States Government Department of Homeland Security.
- According to your explanation, we understand that your acupuncture duties, are for your personal use and you do not receive referrals for acupuncture treatment.
- In regard to your current job duties, we understand that you perform specific gynecologic exams; you conduct office (initial and follow-up) visits including history/physical, office consultations, well exams/annual and follow up, occasional colposcopy and colposcopy with biopsies, endometrial biopsies, transvaginal sonograms.
- Insurance billing records for the period November 2005 through October 2006.

On July 12, 2007 our vocational consultant reviewed and analyzed your reponses to the questions pertaining to your pre-disability employment activities and of your billing records for the period November 2005 to October 2006, and stated the following:

> *I have reviewed insurance billing records for the period from November 2005 through October 2006. Attached you will find two spreadsheets that identify by month and procedure the number of units and the percentages for each procedure per month. Many of the billing forms identify the CPT code but, also, there are some insurance companies that provide no such information. Thus, this review reflects those billing records that did provide CPT codes ....*

The following is a summary of units and averages:

**Venipuncture:**

- total annual units: 39          monthly average: 3.25

**Surgery- Female Genital System:**

- total annual units: 44          monthly average: 3.66

Jean Simon, MD                                                    August 27, 2007

**Pathology & Lab**:

- total annual units: 11          monthly average: 0.91

**Evaluation & Management**:

- total annual units: 475         monthly average: 39.5

**Other:**

- total annual units: 27          monthly average: 2.25

Average Annual Percentages:

- Venipuncture:                        5.9%        range: 0% to 17.1%

- Surgery, Female Genital System: 7.7%        range: 0% to 27.1%

- Pathology & Lab:                     1.4%        range: 0% to 6.3%

- Evaluation & Management:             81%         range: 70% to 96%

- Other:                               3.9%        range: 0% to 9%

*The CPT codes represent 100% of gynecological services. There are no codes
indicative of obstetrical services. Office procedures/visits are represented
under the category of Evaluation and Management. Dr. Simon performed a
total of 475 of these procedures during the specified 12-month period vs. 44
gynecology surgical procedures; or, 81% average of Evaluation and
Management services vs. 7.7% of surgical procedures.*

We would like to advise you that we have not been able to obtain your surgical schedules
from New York Presbyterian or Beth Israel; however, when comparing your 2002 &
2003 gross receipts to our occupational analysis of the billing information you initially
provided, evaluation/management and gynecology accounted for 73-78% of your total
monthly billings. As a result, even with this information, it is reasonable to conclude that
evaluation/management and gynecology were substantial and material duties of your pre-
and post disability occupations.

## CLAIM SUMMARY

While we understand that due to your medical condition you would reasonably be
expected to have some loss of grip strength and loss of hyperextension of the fingers in

the foreseeable future, as well as gradually improving dysesthesia in the finger; you have demonstrated the ability to perform many of the substantial and material duties in your pre-disability occupation, and your earnings on an annual basis appear to have increased. As such, your claim would most appropriately be handled under the Residual Disability provision of your policy.

## RESIDUAL ANALYSIS & INFORMATION NEEDED

With regard to assessing your claim under the Residual Disability provisions of your policy, we are in need of additional information to assess your Loss of Earnings and whether this loss is/was due to your disability. Please note the following:

- According to our review of your practices' annual gross receipts reported, we note that the year prior to the onset of your disability in 2002, your gross receipts were $435,059.
- In 2003 the year of disability we note that your gross receipts decreased by approximately 8.5% to $398,081.
- In 2004, the year after the onset of your claim, we note that your gross receipts increased to $454,690, which is approximately 4.5% higher than the year prior to your disability.
- In 2005, we note that your gross receipts increased to $532,056, which is approximately 22.5% higher than the year prior to the onset of your disability.
- In 2006, according to your profit and loss statements you provided, we note that your gross receipts have further increased to $545,230.

We would like to advise you that during a period of Residual Disability, we assess your eligibility for benefits monthly based upon your monthly proof of loss. To determine your financial Loss of Earnings, we assess your Monthly Earnings and compare this figure to your Prior Earnings figure. At year end, we then reconcile your monthly reported earnings to your annual tax returns.

From our analysis, we have concluded that you have been Residually Disabled in your pre-disability occupation since November 21, 2003 with the exception of a short period of Total Disability. From your initial notice of claim, you signed a Claimant's Statement on December 23, 2003 and indicated that you were working part-time 5-10 hours per week.

As you are aware, your policy contains a 365-day elimination period. During this period benefits are not payable nor do they accrue. Under your policy this period can be satisfied with either a period of Total or Residual Disability as defined by your policy.

Jean Simon, MD                                                                August 27, 2007

Using November 21, 2003 as your onset date of disability, the earliest this period could have been satisfied was November 21, 2004.

In December 2004, you forwarded to our office an 11-month profit and loss statement for the period ending November 30, 2004. There was not a month by month breakdown for this 11 month period of time. According to our review of this statement, your Monthly Earnings were averaged to be $10,516. Based upon our analysis it was determined that you did not incur a 20% Loss of Earnings. As a result, we were unable to apply any of these months towards the 365-day elimination period.

To determine if you had incurred a Loss of Earnings in any month for the period January 1, 2004 through November 30, 2004 or in any month going forward, we requested in our February 18, 2005 letter that you provide us with monthly profits and loss statements for the period beginning January 1, 2004 to date.

In April 2005, you provided our office with a 12-month profit and loss statement for 2004 not broken down month by month and monthly profit and loss statements for January, February and March 2005. From our review, we noted that you had incurred the 20% Loss of Earnings as required by your policy in December 2004; therefore, we were able to apply 31-days towards your 365-day elimination period.

As for the period January through March 2005, we noted that you did not incur the 20% Loss of Earnings required.

In our May 31, 2005 letter, we outlined this review and explained that in order to apply any months for the period January 2004 through November 2004 towards your 365-day elimination period, we would need a monthly breakdown.

As your policy contains a 365-day elimination period, as of March 31, 2005, we were only able to apply the initial 32-days of Total Disability for the period November 21, 2003 to December 23, 2003 and the 31-days of Residual Disability from December 2004 towards your elimination period, a total of 63-days towards your elimination period.

Since this time, we have been provided with monthly profit and loss statements for the period April 1, 2005 through December 2006. According to our review of your profit and loss statements for this period, we note that the only months in which you have incurred at least a 20% Loss of Earnings were in November & December 2005 & November & December 2006.

If we were to apply these four months towards your 365-day elimination period, as there are 30 days in November and 31 days in December, when adding these days to the 63-

Jean Simon, MD                                              August 27, 2007

days already applied towards your elimination period, you will have satisfied 185-days towards your 365-day elimination period.

We will need monthly profit and loss statements for the period January 1, 2004 to December 31, 2004, if these are available, in order to re-evaluate any loss of earnings in 2004. Based on our prior analysis of 2004, you had a 20% loss in December 2004 only.

In regard to assessing your loss of Earnings for November and December 2005 and November and December 2006 and whether your losses in these months were due to your claimed disability or to other factors, we will need clarification to the following:

- A breakdown of your work schedule for November & December of 2005 & 2006 and how your work schedule differs/changes from January through October.
- Clarification as to when your wife first began working for the practice which should include her title and the services she provided for the practice. We ask that you clarify what changed in her role and the services she provided for the practice from 2005 to 2006. Her compensation increased from $8,925.00 in 2005 to $40,000 along with a $10,000 pension contribution in 2006.
- We also are in need of a written explanation as to why your practice's gross receipts have been increasing when compared to your pre-disability gross receipts. Please clarify who is generating the practice's gross receipts.
- Copies of your monthly profit and loss statements for 2007, along with supported documentation.
- Lastly, we will need a copy of your 2006 personal and business tax returns with all schedules, attachments, 1099's & W-2's.

Dr. Simon thank you in advance for providing us with the additional information requested. We will determine your eligibility for Residual Disability benefits as soon as reasonably possible following receipt of all necessary documentation.

We would like to remind you that the opportunity to appeal our claim determination remains available to you. To assure that your concerns are addressed, your claim file will be forwarded to our Appeals area for review. A representative from the Appeals area will contact you shortly to follow up on this matter.

TO ALL NEW YORK RESIDENTS

The policy under which you were insured has a provision which states, in part, that no action in law or in equity shall be brought to recover on the policy after the expiration of three years after the time written proof of loss is required to be furnished.

Jean Simon, MD                                                    August 27, 2007

Dr. Simon, should you have any questions, or if I may be of any assistance, please
contact me toll-free at 1-888-226-7959, extension 75325.

                    Sincerely,


                    Natale Algieri, ALHC
                    Lead Disability Benefits Specialist
                    Provident Life and Casualty Insurance Company

NA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

JEAN P. SIMON, M.D.,                                 :    Civ. No.: 07-cv-11426 (SAS)

                    Plaintiff,                       :

                                :

  -against-                                              :

                                :

UNUM, UNUM PROVIDENT, PROVIDENT LIFE  :
AND CASUALTY INSURANCE COMPANY, THE:
PAUL REVERE LIFE INSURANCE COMPANY,    :
FIRST UNUM LIFE INSURANCE COMPANY,       :
PROVIDENT LIFE AND ACCIDENT                      :
INSURANCE COMPANY AND                               :
UNUMPROVIDENT CORPORATION,                     :

                                :

                Defendants.               :

- --- --- --- --- --- --- --- --- --- --- --- --- --- --- -- X


# EXHIBIT D


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PARTIALLY DISMISS AMENDED COMPLAINT


White and Williams, LLP
One Penn Plaza
18th Floor, Suite 1801
New York, New York 10119
Phone: 212-244-9500
Fax: 212-244-6200
*Attorneys for Defendants Unum, Unum Provident, Provident Life and Casualty Insurance Company, The Paul Revere Life Insurance Company, First Unum Life Insurance Company, Provident Life and Accident Insurance Company and UnumProvident Corporation*



18 Chestnut Street
Worcester, MA  C1608-1528
508 799 4441
www.unum.com

January 8, 2008

Sack & Sack
110 East 59th Street, 19th floor
New York, NY 10022
Attn: Jonathan S. Sack, Esquire

RE: Dr. Jean Simon
Claim #: 36-06084608-001

Dear Attorney Sack,

I am writing to you because it is my understanding that you now represent Dr. Simon in his claim for benefits under the terms of his Provident Life & Casualty Insurance Company disability policy.  As you may know, Dr. Simon requested an appeal of the company's August 27, 2007 decision that he was not Totally Disabled and was not eligible to receive Residual Disability benefits.  I am the appeals consultant to who the appeal had been assigned.  I have completed my review of the appeal and will outline my findings in this letter.

Mr. Natale Algieri's August 27, 2007 letter provides a detailed claim history and I will not repeat the history in this letter.  Mr. Algieri's letter should be considered along with this letter as it sets forth the basis for our conclusion.

Dr. Simon's Disability Income Policy was issued on January 14, 1993 in the state of New York.  His policy was issued to provide a monthly Total Disability benefit of $14,000.00 after a 365-day Elimination Period.  The Maximum Benefit Period for Total Disability starting before age 60 is life.

According to this policy, "**Total Disability** or **totally disabled** means that due to Injuries or Sickness:
    1. you are not able to perform the substantial and material duties of your occupation; and
    2. you are receiving care by a Physician which is appropriate for the condition causing the disability.  We will waive this requirement when continued care would be of no benefit to you."

"**Your Occupation** means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled.  If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation."

"**Residual Disability** or **residually disabled**, during the Elimination Period, means that due to Injuries or Sickness:
    1. you are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take you to do them;
    2. you have a Loss of Monthly Income in your occupation of at least 20%; and

3. you are receiving care by a Physician which is appropriate for the condition causing disability. We will waive this requirement when continued care would be of no benefit to you.

After the Elimination Period has been satisfied, you are no longer required to have a loss of duties or time. Residual Disability or residually disabled then means that as a result of the same Injuries or Sickness:

1. you have a Loss of Monthly Income in your occupation of at least 20%; and
2. you are receiving care by a Physician which is appropriate for the condition causing the Loss of Monthly Income. We will waive this requirement when continued care would be of no benefit to you."

Mr. Algieri's has advised Dr. Simon that we are not able to consider him Totally Disabled as he has been performing many of the substantial and material duties of his occupation. Therefore, Dr. Simon's claim has been considered under the Residual Disability provision of his policy. Based on my review of the file and the documentation we have, I agree with Mr. Algieri that Dr. Simon is not Totally Disabled but rather Residually Disabled.

As you know, In August 2005, we requested that an outside auditor, Callaghan & Nawrocki, analyze Dr. Simon's billing records (Explanation of Benefits) he submitted in lieu of CPT codes. A copy of the auditor's analysis is enclosed for your review.

From a review of Dr. Simon's 2002 and 2003 billing records, Evaluation & Management and Gynecology accounted for 73-78% of Dr. Simon's pre-disability production. Obstetrics and Surgeries accounted for 19-20% of Dr. Simon's pre-disability production.

Dr. Simon's billing records for the period of November 2005 to October 2006 were also analyzed. During this post disability period, Evaluation & Management accounted for 81% of Dr. Simon's production. These billing records also reflected that 7.7% of his production was due to Surgery. Obstetric services were not indicated.

Based on the analysis billing records Dr. Simon submitted, Evaluation & Management and Gynecology were the substantial and material duties of Dr. Simon's occupation prior to November 23, 2003.

I spoke with Dr. Simon on October 23, 2007. He reported that since November 21, 2003, he has not performed any deliveries or major surgeries. He reported that he continues to see about 10-15 gynecological patients/week and has done some minor surgeries in his office. He also submitted a letter to us on October 31, 2006 advising us that he also treats gynecological patients a few hours/week at another practice, Midtown Medical. He reported treating about 11 patients/week.

As Dr. Simon has continued to perform the substantial and material duties of his occupation, albeit in a reduced capacity, under the terms of the policy, he is not Totally Disabled.

In addition to reviewing Dr. Simon's occupational duties, we also exercised our contractual right to have him independently examined. On September 27, 2005, orthopedic hand surgeon, Dr. Joel Grad took a thorough history and performed a

2

physical examination of Dr. Simon's upper extremities. Dr. Simon reported tenderness in his scar but had a symmetric range of motion of both upper extremities. He was noted to have decreased two-point discrimination only in the tip of the left middle finger. It is Dr. Grad's opinion that the absolute values of the diminution in grip strength were sufficient to hold babies and these findings were not contraindicative to his performing obstetrics. No atrophy was measured and appropriate weakness of the non-dominant left hand person was noted. Dr. Grad opined that Dr. Simon has the physical mobility of his wrist and fingers to perform obstetrics.

Dr. Grad also noted that Dr. Simon complains of numbness in the middle finger of his left, non-dominant hand. He stated there is nothing radio-graphically to indicate articular changes or osteomyelitis. Dr. Grad stated that if Dr. Simon presented to him and said he wanted to perform Obstetrics or Surgery, he would allow him to do so.

In May 2007, our on-site orthopedic hand surgeon reviewed the available medical documentation in Dr. Simon's claim file. Our surgeon felt that it would be reasonable to expect that Dr. Simon would have some loss of grip strength and loss of hyperextension of the fingers. It is also reasonable to expect Dr. Simon would have a gradual improvement with the dysesthesia in the finger. Our surgeon opined that Dr. Simon would probably reasonably be able to carry out the duties of Gynecology and Obstetrics in a safe and professional manner.

During the appeal review, Dr. Simon reported that he treated with a new hand surgeon, Dr. Steven Glickel, and submitted an Attending Physician's Statement (APS) dated October 10, 2007. Subsequent to our receipt of Dr. Glickel's APS, we requested additional information. We asked Dr. Glickel to provide copies of all his medical records/notes, including any labs or tests, from Dr. Simon's first visit with you to the present. We also asked Dr. Glickel to respond to these questions:

1. On the APS, you [Dr. Glickel] noted that Dr. Simon is restricted from performing surgery and delivering babies using his left hand. You also noted that he is limited as he cannot use his left hand for strenuous or prolonged activities and is unable to pinch and grasp with his left hand. What objective findings are these restrictions and limitations based upon?

2. You noted that Dr. Simon's restrictions and limitations first began on November 24, 2003. What is your basis for stating his restrictions and limitations began on November 24, 2003, when you did not treat him until almost four years later (October 10, 2007)?

3. What is Dr. Simon's primary diagnosis? This was not provided on the APS.

We requested Dr. Glickel's response to the above requested information no later than December 9, 2007. To date, we have not received a response from Dr. Glickel.

Therefore, based on the available medical information, I also agree with Mr. Algieri that Dr. Simon's is not eligible for Total Disability benefits and his claim would best be considered under the Residual Disability provision of his policy.

When evaluating for Residual Disability benefits, the insured must be unable to do one or more of his substantial and material daily business duties or be unable to do his usual daily business duties for as much time as it would normally take to do them AND have a Loss of Monthly Income in his occupation of at least 20%.

According to Dr. Simon's policy, **"Residual Disability Monthly Benefit** is the benefit payable under this provision. It is determined monthly by this formula. Each month, it equals:

<u>Loss of Monthly Income</u>     X Monthly Benefit for Total Disability
Prior Monthly Income

**"Prior Monthly Income** means the greatest of:
    1. your average Monthly Income for the 12 months just prior to the start of the period of disability for which claim is made;
    2. your average Monthly Income for the year with the highest earnings of the last two years prior to the start of such period of disability; or
    3. your highest average Monthly Income for any two successive years of the last five years prior to the start of such period of disability."

**"Loss of Monthly Income** means the difference between Prior Monthly Income and Currently Monthly Income. Loss of Monthly Income must be caused by the Residual Disability for which claim is made. The amount of the loss must be at least 20% of Prior Monthly Income to be deemed Loss of Monthly Income. If your loss is more than 75% of Prior Monthly Income, we will deem the loss to be 100%."

**"Current Monthly Income** means your Monthly Income in your occupation for each month of Residual Disability being claimed."

After reviewing financial information presented by Dr. Simon, it appears the greatest Prior Monthly Income would be generated for him by looking at his average monthly income in 2002 (one of the two years prior to the start of his disability). Using 2002, Dr. Simon's Prior Monthly Income would be $11,696.00.

Dr. Simon's disability began as of November 21, 2003. He has a 365-day Elimination Period which must be satisfied before benefits are payable. Therefore, November 21, 2004 is when his Elimination Period would be satisfied. However, in order to be eligible for Residual Disability benefits, Dr. Simon must have a Loss of Monthly Income in his occupation of at least 20%, during the Elimination Period. In the 12 months after his disability began, Dr. Simon's average Monthly Income was $10,516.00, which is only a 10% Loss of Monthly Income. Therefore, Dr. Simon's Elimination Period was not satisfied as of November 21, 2004.

However, Dr. Simon did suffer a 100% Loss of Monthly Income in December 2004 and as such, 31 days were applied to his 365-day Elimination Period. Additionally, Dr. Simon was Totally Disabled from November 21, 2003 to December 23, 2003 for which 32 days were also applied to his Elimination Period.

The only months between December 2004 and December 2006 that Dr. Simon incurred at least a 20% Loss of Monthly Income were November and December 2005 (61 days at 100% loss) and November and December 2006 (61 days with 100% loss). Therefore, based on the available information, Dr. Simon has only satisfied 185 days of his 365-day Elimination Period.

It should be noted that from January 1, 2005 to November 1, 2005 and from January 1, 2006 to November 1, 2006, Dr. Simon's Current Monthly Income was higher than his Prior Monthly Income. This means that Dr. Simon's income actually increased after disability.

When I spoke with Dr. Simon, I asked if he could explain this increase in his monthly income. Dr. Simon reported that in 2004, he started receiving referrals from the Department of Homeland Security. He stated that he sees patient who are trying to legally be admitted into this country. For each patient he sees, he reported he draws their blood and tests it for HIV, TB, STDs and Syphilis and provides vaccinations. He provides the results to Homeland Security. He reported receiving $175/patient and sees about 25 patients/week for Homeland Security. He reported that these patients pay by cash or credit card, as their visits are not billable to an insurance company. Dr. Simon reported that due to his work for Homeland Security his income has not decreased and has actually increased.

On November 9, 2007, I sent Dr. Simon a letter and requested that he provide us with proof that he is working with/for the Department of Homeland Security. I asked for the following information:
- A copy of his employment contract or his partnership agreement with the Department of Homeland Security
- Copies of his 2004, 2005 and 2006 W-2 or 1099 from the Department of Homeland Security
- The name of the person/people at Homeland Security where he provides the blood test results
- A monthly breakdown of his income from performing Gynecology at Midtown Medical, his Gynecology practice and his patients seen for the Department of Homeland Security
- What laboratory does he send his patient's blood to be tested at or does he have his own laboratory?
- Do the patients he sees for the Department of Homeland Security come to his office where he practices Gynecology (36 East 70th St., New York) or does he maintain another office?
- Aside from performing blood tests, what other medical assessments does he perform for the Department of Homeland Security?

Additionally, we asked him to provide us with the date he hired his wife to be his office manager as well as:
- How have her duties changed/increased to explain the significant increase in her salary?
- His accountant has advised that her salary increased as she was spending more time in the office. What are all of her duties/job responsibilities and how much time/week does she spend at the practice?
- At what rate is she compensated?

The above information was necessary to evaluate Dr. Simon's Residual Disability claim. We asked that the above information be provided to us no later than December 9, 2007. To date, we have not received the requested information.

As Dr. Simon did not provide us with above information, we are unable to determine how much of his Current Monthly Income was derived from his occupation and how much was derived from his work with the Department of Homeland Security. Therefore, the financial information that has been provided to us reflects that Dr.

5

Simon only incurred a Loss of Income for five months between November 21, 2003 and January 1, 2007. As Dr. Simon has not yet satisfied his Elimination Period, I agree with Mr. Algieri's analysis that Residual Disability benefits are not payable at this time.

This completes my review of the appeal. As you are now involved in active litigation with the company, please contact Mr. Andrew Hamelsky of White & Williams in New York, New York if you have any questions or for future communications regarding Dr. Simon's claim.

Sincerely,


Sharon Deraney
Appeals Consultant – Benefit Center Compliance
Provident Life & Casualty Insurance Company

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JEAN P. SIMON, M.D.,                                    :    Civ. No.: 07-cv-11426 (SAS)

                        Plaintiff,           :

   -against-                                              :

UNUM, UNUM PROVIDENT, PROVIDENT LIFE  :
AND CASUALTY INSURANCE COMPANY, THE :
PAUL REVERE LIFE INSURANCE COMPANY,  :
FIRST UNUM LIFE INSURANCE COMPANY,    :
PROVIDENT LIFE AND ACCIDENT             :
INSURANCE COMPANY AND                     :
UNUMPROVIDENT CORPORATION,            :

                    Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# EXHIBIT E

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PARTIALLY DISMISS AMENDED COMPLAINT

White and Williams, LLP
One Penn Plaza
18th Floor, Suite 1801
New York, New York 10119
Phone: 212-244-9500
Fax: 212-244-6200
*Attorneys for Defendants Unum, Unum Provident,*
*Provident Life and Casualty Insurance Company,*
*The Paul Revere Life Insurance Company, First*
*Unum Life Insurance Company, Provident Life and*
*Accident Insurance Company and UnumProvident*
*Corporation*

**WHITE AND WILLIAMS LLP**
One Penn Plaza
Eighteenth Floor, Suite 1801
New York, New York 10119
(212) 244-9500
Attorneys for Defendants
Andrew I. Hamelsky (AH-6643)

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| Jean P. Simon, M.D., | Civil Action No.: |
| Plaintiff, | **LOCAL RULE 7.1 STATEMENT** |
| v. | |
| Unum, Unum Provident, Provident Life and Casualty Insurance Company, The Paul Revere Life Insurance Company, First Unum Life Insurance Company, Provident Life and Accident Insurance Company and UnumProvident Corporation, | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Pursuant to Rule 7.1 of the General Rules of the Southern District of New York, the

undersigned attorneys of record for the Defendants certify that annexed hereto as **Exhibit 1** is a

schedule showing defendant's corporate parents, subsidiaries or affiliates that are publicly held.

Dated: December 19, 2007

Respectfully submitted,

By: _____
Andrew I. Hamelsky (AH-6643)
WHITE AND WILLIAMS LLP
Attorneys for Defendants
One Penn Plaza, 18th Floor, Suite 1801
New York, New York 10119
(212) 244-9500

