**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------ X

**JEAN P. SIMON, M.D.,**

                **Plaintiff,**

      **- against -**

**UNUM GROUP F/K/A**
**UNUMPROVIDENT CORPORATION**
**and PROVIDENT LIFE AND**
**CASUALTY INSURANCE COMPANY,**

           **Defendants.**

------------------------------------------------ X

**OPINION AND ORDER**

**07 Civ. 11426 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

        Dr. Jean P. Simon – an obstetrician/gynecologist ("OB/GYN") –

brings this action against defendants[1] alleging that he is entitled to residual

disability payments due to an injury that left him unable to perform surgeries and

---

      [1]      Provident Life and Casualty Insurance Company ("Provident") is a
subsidiary of Unum Group. *See* Simon's Second Amended Complaint ¶ 1.
Although Simon's disability income protection policy was issued by Provident
only, defendants do not challenge this issue for purposes of this motion. *See*
Defendants' Memorandum of Law in Support of Their Motion for Summary
Judgment With Regard to All of Plaintiff's Remaining Causes of Action Within
the Second Amended Complaint ("Def. Mem.") at 1.

deliver babies.  Defendants now move for summary judgment on Simon's

remaining residual disability and consequential damages claims.  For the reasons

that follow, their motion is granted in part and denied in part.

## II.    BACKGROUND

### A.    Facts[2]

#### 1.    The Policy

In January 1993, Simon purchased a Disability Income Protection

Policy from Provident (the "Policy").[3]  Under the Policy, Simon was eligible for

coverage in the case of residual disability.[4]  To be deemed residually disabled, the

policyholder must incur a twenty percent loss of Monthly Income in his or her

Occupation during an Elimination Period.[5]  The other two requirements for

---

[2]      The facts in this section are not in dispute and are drawn from
Defendants' Rule 56.1 Statement ("Def. 56.1"), Plaintiff's Counterstatement
Pursuant to Rule 56.1 ("Pl. Counter. 56.1"), and from evidence submitted to the
Court by the parties that was not included in the 56.1 statements.

[3]      *See* Def. 56.1 ¶ 1; Pl. Counter. 56.1 ¶ 1.

[4]      *See* Policy, Ex. 1 to Def. Mem., at 8-9.

[5]      The Policy defines "Occupation" as "the occupation[(s)] in which [the
policyholder] was *regularly engaged* at the time [he] became disabled.  If [his]
occupation is limited to a recognized specialty within the scope of [his] degree or
license, [Provident] will deem that specialty to be [the policyholder's
occupation]."  Def. 56.1 ¶ 2; Pl. Counter. 56.1 ¶ 2; Policy at 4 (emphasis added).

2

residual disability are that the policyholder must:  (1) not be able to do one or

more substantial and material daily business duties or not be able to do usual daily

---

The "Elimination Period" is defined as "the number of days of disability that must elapse in a period of disability before benefits become payable . . . .  These days need not be consecutive; they can be accumulated during a period of disability to satisfy an Elimination Period.  Benefits are not payable, nor do they accrue, during an Elimination Period."  Def. 56.1 ¶ 2; Pl. Counter. 56.1 ¶ 2; Policy at 5.  According to the Policy, Simon's Elimination Period is 365 days. *See* Policy at 3.

The Policy defines "Monthly Income" as "monthly income from salary, wages, bonuses, commissions, fees or other payments for services rendered.  Normal and unusual business expenses are to be deducted; income taxes are not.  Monthly income must be earned, and does not include dividends, interest, rents, royalties, annuities, sick pay or benefits received for disability under a formal wage or salary continuation plan or other forms of unearned income."  Def. 56.1 ¶ 2; Pl. Counter. 56.1 ¶ 2; Policy at 8.

"Loss of Monthly Income" is defined as the "difference between Prior Monthly Income and Current Monthly Income.  Loss of Monthly Income must be caused by the Residual Disability for which the claim is made.  The amount of the loss must be at least 20% of Prior Monthly Income to be deemed Loss of Monthly Income."  Def. 56.1 ¶ 2; Pl. Counter. 56.1 ¶ 2; Policy at 8.  The Policy defines "Current Monthly Income" as "Monthly Income in [the policyholder's] occupation for each month of Residual Disability being claimed."  Def. 56.1 ¶ 2; Pl. Counter. 56.1 ¶ 2; Policy at 8.

Finally, the Policy defines "Prior Monthly Income" as "the greatest of: (1) *average* Monthly Income for the 12 months just prior to the start of the period of disability for which claim is made; (2) *average* Monthly Income for the year with the highest earnings of the last two years prior to the start of such period of disability; *or* (3) highest *average* Monthly Income for any two successive years of the last 5 years prior to the start of such period of disability."  Def. 56.1 ¶ 2; Pl. Counter. 56.1 ¶ 2; Policy at 8 (emphasis added).

3

business duties for such time as it would normally take to do them; and (2) be receiving care by a physician that is appropriate for the condition causing the disability.[6]

Under the Policy, "[Provident] can require any proof . . . necessary [] to determine [] Current Monthly Income and Prior Monthly Income."[7] Although the Policy explains that Monthly Income is derived from earnings on services rendered by the policyholder minus expenses, the Policy does not otherwise advise the policyholder that average Monthly Income derived from annualized income figures is inappropriate. The Policy also does not require a policyholder to maintain monthly income statements as proof nor does it specify that Monthly Income may only be determined from monthly income statements.

### 2. Simon's Work for the Immigration and Naturalization Service ("INS")

In 2002, the INS[8] authorized Simon to conduct medical examinations of applicants for temporary and permanent residence status in his private practice

---

[6]     *See* Policy at 8.

[7]     *Id.* at 9.

[8]     The INS is a division of the United States Department of Homeland Security.

4

office, A Park Avenue Obstetrics & Gynecology P.C. ("Park Avenue OB/GYN").[9]

These examinations consisted primarily of administering various vaccinations

required for obtaining a green card and were not OB/GYN-related.[10]  That same

year, Simon began examining INS patients.[11]  Pre-injury, Simon did not profit

from these examinations, and performed them only "to help . . . the international

community."[12]  He did not establish a separate corporation for the INS

examinations, and the payments he received from those clients were deposited into

his practice, Park Avenue OB/GYN.[13]  After his injury, however, Simon changed

the fee structure so that his INS work would become profitable in order to make up

---

[9]        *See* 10/23/98 Letter from Dennis L. Graham, United States
Department of Justice INS District Adjudications Officer/Medical Coordinator, to
Simon, Ex. 13, Part IV to Def. Mem.

[10]        *See* 4/30/09 Deposition Transcript of Jean Simon ("Simon Dep."), Ex.
4 to Def. Mem. at 71:20-73:24 (testifying that the medical examinations were
performed according to INS regulations and that few, if any, gynecological
examinations were performed); 76:6-17 (testifying that the examinations often
included the administering of various vaccinations in accordance with INS
protocol).

[11]        *See id*. at 103:5-9.

[12]        *See id.* at 74:20-75:9 (testifying that at $175 per patient visit, he was
"not making any money"); 103:5-9 (testifying that he conducted INS examinations
to "help . . . the international community").

[13]        *Id.* at 102:19-25.

for revenue lost from his OB/GYN work.[14]

### 3.    Simon's Claims Process

Simon claims a disability date of November 24, 2003, for an injury that rendered him "unable to perform deliveries, cesarean sections, [and] surgery."[15]  In December 2003, Simon filed an Income Protection Claim (the "Claim Form"), seeking residual disability benefits.[16]  In the "Employment Section" of the Claim Form, Simon stated that he worked part-time for Park Avenue OB/GYN, but did not mention his INS work.[17]  He did not mention the INS work in a subsequent phone interview with a representative of Provident.[18] Simon later submitted a Supplemental Statement, which similarly failed to reference his work for the INS.[19]  As part of Provident's investigation of Simon's

---

[14]    Although he reduced the per-examination fee, he began charging additional fees for each vaccination performed on each patient. *See id.* at 75:6-77:7.

[15]    Def. 56.1 ¶¶ 6, 7; Pl. Counter. 56.1 ¶¶ 6, 7.

[16]    *See* Def. 56.1 ¶ 7; Pl. Counter. 56.1 ¶ 7.

[17]    *See* Def. 56.1 ¶¶ 7, 8; Pl. Counter. 56.1 ¶¶ 7, 8.

[18]    *See* Def. 56.1 ¶ 9; Pl. Counter. 56.1 ¶ 9.

[19]    *See* Def. 56.1 ¶ 10; Pl. Counter. 56.1 ¶ 10.

insurance claim, a Provident representative interviewed Simon at his office.[20]  The

representative's subsequent field report described Simon's "occupation as a self-

employed OB/GYN physician[] and surgeon."[21]

In December 2004, Simon forwarded to Provident an eleven-month

profit and loss statement for the period ending November 30, 2004.[22]  Although

the statement did not break down Simon's profit and loss on a monthly basis,

Provident calculated Simon's average monthly income to be $10,516 for that

period and determined that he had not incurred a twenty percent loss of Monthly

Income.[23]  In April 2005, Simon provided Provident with a twelve-month profit

and loss statement for 2004, which was not broken down monthly, and monthly

profit and loss statements for the months of January to March 2005.[24]  By

subtracting the eleven-month income from the twelve-month income, Provident

---

[20]    *See* 5/25/05 Report from Mike Kunkin, Provident's Field Services
Representative, to Carolyn E. Semon, Provident Lead Disability Benefits
Specialist ("Kunkin Letter"), Ex. 9, Part I to Def. Mem. *See* 8/31/05 Letter from
Semon to Simon, Ex. 9, Part II to Def. Mem. ("Semon Letter").

[21]    Kunkin Letter at 1.  Kunkin also described Simon's "occupational
duties" as that of "a physician with a specialty as an OB/GYN doctor." *Id.* at 3.

[22]    *See* 8/27/07 Letter from Natale Algieri, Provident Lead Disability
Benefits Specialist, to Simon ("Algieri Letter"), Ex. 11, Part III to Def. Mem. at 9.

[23]    *See id.*

[24]    *See id.*

7

was able to determine that Simon had incurred a twenty percent loss of Monthly
Income for the month of December 2004 and applied thirty-one days towards the
365-day Elimination Period.[25]  Provident refused to assess the period from January
to November 2004, informing Simon that his policy required monthly statements.[26]
Provident also determined that Simon had failed to demonstrate a twenty-percent
loss of Monthly Income for January to March 2005.[27]

In August 2005, Provident requested that Simon provide detailed
financial information and copies of appointment books since January 2004.[28]  In
response, Simon sent a handwritten note of the monthly income amounts
generated by Park Avenue OB/GYN and included the average monthly income
derived from his work at Midtown Medical, another facility where he worked.[29]
He did not mention the INS work or attribute any portion of his income to that

---

[25]    *See id.*

[26]    *See id.*

[27]    *See id.*

[28]    *See* Def. 56.1 ¶ 13; Pl. Counter. 56.1 ¶ 13. *See also* Semon Letter at
1.

[29]    *See* Def. 56.1 ¶ 14; Pl. Counter. 56.1 ¶ 14. *See* 10/25/05 Simon Letter
to Semon, Ex. 9, Part III to Def. Mem. ("Simon Letter").

work.[30]  Simon subsequently submitted a letter stating that "[he] do[es] some work

for the [INS]," but provided no further details.[31]

Some time in 2007, Simon provided monthly profit and loss

statements for the period April 2005 through December 2006.[32]  Provident

determined from this information that Simon had incurred a twenty percent loss of

Monthly Income for November and December 2005 and November and December

2006.[33]  In February 2007, Provident again requested that Simon provide detailed

financial information and copies of his monthly profit and loss statements for the

period beginning October 31, 2006 to the present.[34]  In August 2007, Provident

determined that Simon had satisfied 185 days of the 365-day Elimination Period[35]

---

[30]      *See* Simon Letter.

[31]      *See* Def. 56.1 ¶ 16; Pl. Counter. 56.1 ¶ 16.  *See also* 10/31/06 Letter
from Simon to Sharon Deraney, Provident Appeals Consultant, Ex. 10, Part I to
Def. Mem.

[32]      *See* Def. 56.1 ¶ 21; Pl. Counter. 56.1 ¶ 21; Algieri Letter at 9 (noting
that Provident had been provided with monthly profit and loss statements for the
period April 2005 through December 2006).  *See also* Sample Monthly Profit and
Loss Statements for Park Avenue OB/GYN, Ex. 18, Part II to Def. Mem.

[33]      *See* Algieri Letter at 9.

[34]      *See* Def. 56.1 ¶ 18; Pl. Counter. 56.1 ¶ 18.  *See also* 2/28/07 Letter
from Algieri to Simon, Ex. 11, Part I to Def Mem. at 1.

[35]      This includes the months of December 2004, November and
December 2005, November and December 2006, and the period from November

9

and further requested that Simon provide monthly profit and loss statements for
the period January 2004 through December 2004 and for 2007.[36]

In November 2007, Provident requested a breakout of Simon's
monthly income from his work at Park Avenue OB/GYN and his monthly income
from his INS work.[37]  Provident directed that he provide this information no later
than December 9, 2007.[38]

In January 2008, Provident advised Simon's attorney that because
Simon had failed to provide the information requested in its November 2007 letter,
Provident was unable to determine how much of his Current Monthly Income was
derived from Park Avenue OB/GYN and how much was derived from his work
with the INS.[39]  Provident therefore affirmed its August 2007 determination that

---

21, 2003 to December 23, 2003, a period that Provident had credited to the
Elimination Period for total disability. *See* Algieri Letter at 9.

[36]     *See* Def. 56.1 ¶ 20; Pl. Counter. 56.1 ¶ 20. *See also* Algieri Letter, at
8-10.

[37]     *See* Def. 56.1 ¶ 23; Pl. Counter. 56.1 ¶ 23. *See also* 11/9/07 Letter
from Deraney to Simon ("11/9/07 Deraney Letter"), Ex. 11, Part V to Def. Mem.
at 2.

[38]     *See* 11/9/07 Deraney Letter at 2.

[39]     *See* Def. 56.1 ¶ 25; Pl. Counter. 56.1 ¶ 25. *See also* 1/8/08 Deraney
Letter to Sack & Sack, Simon's former attorney, Ex. 12 to Def. Mem. at 5 ("1/8/08
Deraney Letter").

10

Simon had only satisfied twenty percent loss of Monthly Income for 185 days out of the 365-day Elimination Period and concluded that "Residual Disability benefits are not payable at this time."[40]

### 4.    Documents Produced in this Lawsuit

In November 2008, while in the discovery stage of the instant litigation, Provident again requested all documents breaking down the monthly income generated by the INS examinations versus Park Avenue OB/GYN from January 2002 to the present.[41]  In February 2009, Simon produced several hundred handwritten pages that reflect the names of each INS patient referred to him, the code that corresponded to each procedure he conducted with respect to each patient, the amount he charged for each such procedure, the amount of payment he actually received, and the date that each said payment was issued, for each day of the years from 2002 to 2007 (the "Books").[42]  Simon testified at his deposition that the entries in the Books were "pretty accurate."[43]  He also testified that the increase in the volume of his INS work between 2002 and the present reflected his

---

[40]     1/8/08 Deraney Letter at 4, 6.

[41]     *See* 1/21/08 Defendants' Second Request for Production of Documents, Ex. 14, Part I to Def. Mem. at 3.

[42]     *See* Def. 56.1 ¶ 46; Pl. Counter. 56.1 ¶ 46.

[43]     *See* Simon Dep. at 20:16-23.

need to replace the revenue he lost in his OB/GYN practice.[44]

In March 2009, defendants served a third request for production of documents, seeking – in part – monthly profit and loss statements, copies of every bank statement Simon ever received, and copies of all expenses Simon's practice paid on a monthly basis from 2001 through the present.[45]   On June 1, 2009, the date of the discovery deadline, Simon produced Statements of Annual Revenues and Expenses from 2002 to 2007, a breakdown of monthly revenues from 2002 to 2007 for Simon's OB/GYN practice and INS work, prepared by his accountant and derived from his Books ("the Spreadsheets"), and "Contemporaneous Visit and Revenue Entries for Midtown Medical" from November 2000 to June 2005.[46] According to the Spreadsheets, Simon conducted 70 INS examinations in 2002, 147 in 2003, 491 in 2004, 1,519 in 2005, 1,580 in 2006, and 1,697 in 2007.[47]

### 5.     Simon's Loss of Monthly Income

Simon's corporate tax returns report the following gross annual

---

[44]     *See id.* at 110:8-15.

[45]     *See* 3/23/09 Defendants' Third Request for Production of Documents, Ex. 14, Part II to Def. Mem. at 3.

[46]     *See* Def. 56.1 ¶ 64; Pl. Counter. 56.1 ¶ 64.

[47]     *See* Def. 56.1 ¶¶ 52, 53; Pl. Counter. 56.1 ¶¶ 52, 53; Gross Revenues - INS, Ex. B. to Declaration of Jeffrey E. Glen, Simon's attorney ("Glen Decl.").

receipts before expenses: $435,059 in 2002 (the year prior to disability); $398,081 in 2003 (an 8.5% decrease from year prior to disability); $454,690 in 2004 (a 4.5% increase from year prior to disability); $532,056 in 2005 (a 22.5% increase from year prior to disability); $545,229 in 2006 (a 25% increase from year prior to disability); and $611,122 in 2007 (a 40% increase from the year prior to disability).[48]  However, after corporate expenses are deducted, Simon's earned income is as follows: $140,348 in 2002; $92,947 in 2003 (a 33.8% decrease from the year prior to disability); $104,336 in 2004 (a 25.7% decrease); $136,448 in 2005 (a 2.8% decrease); $142,197 in 2006 (a 1.3% increase); and $206,311 in 2007 (a 47% increase).[49]

Also, according to Simon's Statements of Annual Revenues and Expenses, his post-disability monthly income generated *solely* from his OB/GYN practice dropped twenty percent below his pre-disability income in each of the years from 2004 to 2007.  These statements report the following average monthly income generated solely from his OB/GYN work:  $13,693 in 2002 (year prior to

---

[48]     *See* 2002-2007 Earnings and Business Analysis Report, Ex. 18, Part I to Def. Mem.  These gross receipts do not indicate which portion of gross income is associated with Simon's OB/GYN practice and which portion is associated with INS examinations.

[49]     *See id.*

13

disability); $9,083 in 2003 (year of disability); $7,168 in 2004 (a 21.08% decrease from year of disability); $1,668 in 2005 (an 81.63% decrease); $2,660 in 2006 (a 70.71% decrease); and $2,715 in 2007 (a 70.11% decrease).[50]

## B. Procedural History

On March 30, 2009, this Court granted defendants' motion for summary judgment on both Simon's total disability benefits and consumer fraud claims.[51] Fact discovery was completed on June 1, 2009. On June 29, 2009, defendants moved for summary judgment on the grounds that: (1) Simon is not residually disabled within the meaning of the Policy; and (2) Simon has failed to

---

[50]    See 2002-2007 Statement of Annual Revenues and Expenses, Ex. 17, Part II to Def. Mem. Simon calculates his post-disability monthly income by apportioning annual revenues and expenses evenly across twelve months. It should be noted that these decreases are compared to Simon's monthly income in all of 2003 rather than to the twelve months prior to his disability. Nevertheless, Prior Monthly Income may also be defined as the "average Monthly Income for the year with the highest earnings of the last two years prior to the start of such period of disability." See Policy at 8. In this case, Simon's OB/GYN income for 2002 was higher than his income for 2003. Decreases in his monthly income would thus be even greater if compared to 2002 figures.

[51]    See Simon v. Unum Group, No. 06 Civ. 170, 2009 WL 857635, at *5 (S.D.N.Y. Mar. 30, 2009) (ruling, as a matter of law, that Simon is not totally disabled because he is still able to perform one or more of the substantial and material duties of his occupation and that Simon had also failed to show that he has a viable consumer fraud claim).

14

demonstrate that he is entitled to consequential damages.[52]

## III.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[53]  An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[54]  A fact is material when it "'might affect the outcome of the suit under the governing law.'"[55]  "It is the movant's burden to show that no genuine factual dispute exists."[56]

In turn, to defeat a motion for summary judgment, the non-moving

---

[52]    *See* Def. Mem. at 3.

[53]    Fed. R. Civ. P. 56(c).

[54]    *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[55]    *Ricci v. DeStefano*, 530 F.3d 88, 109 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

[56]    *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

15

party must raise a genuine issue of material fact.[57]  "Summary judgment is

properly granted when the non-moving party 'fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial.'"[58]  To do so, the non-moving party

must do more than show that there is "'some metaphysical doubt as to the material

facts,'"[59] and it "'may not rely on conclusory allegations or unsubstantiated

speculation.'"[60]  However, "'all that is required [from a non-moving party] is that

sufficient evidence supporting the claimed factual dispute be shown to require a

jury or judge to resolve the parties' differing versions of the truth at trial.'"[61]

    In determining whether a genuine issue of material fact exists, the

---

[57]    *See* Fed. R. Civ. P. 56(c).

[58]    *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  *Accord In re September 11
Litig.*, No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug. 15, 2007) ("Where
the nonmoving party bears the burden of proof at trial, the burden on the moving
party may be discharged by showing – that is, pointing out to the district court –
that there is an absence of evidence to support the nonmoving party's case.")
(quotation omitted).

[59]    *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting
*Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[60]    *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005)
(quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[61]    *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199,
206 (2d Cir. 2006) (quoting *Anderson*, 477 U.S. at 248-49).

16

court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[62] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[63] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law."[64]

## B. Breach of Contract Claim

The elements of a breach of contract claim under New York law are: "'(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"[65] "'In determining a dispute over insurance coverage, [a court must] first look to the

---

[62]     *See Mathirampuzha v. Potter*, 548 F.3d 70, 74 (2d Cir. 2008).

[63]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson*, 477 U.S. at 249.

[64]     *Karpova v. Snow*, 497 F.3d 262, 270 (2d Cir. 2007) (citing *Tocker v. Philip Morris Cos.*, 470 F.3d 481, 486-87 (2d Cir. 2006)).

[65]     *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). Following New York choice of law principles, the Policy is interpreted according to the laws of New York, which is the "principal location of the insured risk" and Simon's state of residence. *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 152 (2d Cir. 2008).

17

language of the policy.'"⁶⁶ A "'policy [must be construed] in a way that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect.'"⁶⁷

Under New York law, "'an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract.'"⁶⁸ "'[T]he initial interpretation of a contract is a matter of law for the court to decide.'"⁶⁹ "Part of this threshold interpretation is the question of whether the terms of the insurance contract are ambiguous."⁷⁰ "An ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when

---

⁶⁶    *Raymond Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 5 N.Y.3d 157, 162 (2005) (quoting *Consolidated Edison Co. of N.Y. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 221 (2002)).

⁶⁷    *Id.* (quoting *Consolidated Edison*, 98 N.Y.2d at 221-22). *Accord Chapman v. New York State Div. for Youth*, 546 F.3d 230, 236 (2d Cir. 2008) (quoting *American Express Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (1st Dep't 1990) ("'A contract should be construed so as to give full meaning and effect to all of its provisions.'") (citation omitted).

⁶⁸    *Morgan Stanley v. New England*, 225 F.3d 270, 275 (2d Cir. 2000) (quoting *Village of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995)).

⁶⁹    *Id.* (quoting *K. Bell & Assocs. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996)) (internal quotations marks omitted).

⁷⁰    *Id.* (citing *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998)).

18

viewed objectively by a reasonably intelligent person.'"[71] "Once a court concludes that an insurance provision is ambiguous, 'the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'"[72] "'If the extrinsic evidence does not yield a conclusive answer as to the parties' intent,' a court may apply other rules of contract construction, including the rule of *contra profenterem*, which generally provides that where an insurer drafts a policy 'any ambiguity in [the] . . . policy should be resolved in favor of the insured.'"[73]

Although courts have not yet precisely defined what constitutes being "regularly engaged" for disability policy purposes, case law suggests that this question is an issue of fact for the jury.[74] Furthermore, "[i]t is well-settled in New

---

[71]     *Id.* (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)) (internal quotation marks omitted).

[72]     *Id.* at 275-76 (quoting *Alexander & Alexander*, 136 F.3d at 86).

[73]     *Id.* at 276 (quoting *McCostis v. Home Ins. Co.*, 31 F.3d 110, 113 (2d Cir. 1994)).

[74]     *See, e.g. Soll v. Provident Life & Accident Ins. Co.*, No. 00 Civ. 3670, 2002 WL 1379183, at *10 (E.D. La. June 26, 2002) (holding that whether spending fifteen percent of a doctor's time on marketing for medical supply companies qualifies as being "regularly engaged" in a separate "occupation" is a question of fact for the jury ). Other courts have noted that when a physician performs some limited work that falls outside the occupational duties of his predominant medical occupation pre-disability, such work will not constitute an important duty or part of the physician's occupation. *See Shapiro v. Berkshire*

19

York that 'occupational disability policies are designed to indemnify against loss of capacity to work, not against loss of income.'"[75] "'[R]ecovery, will not, therefore, be precluded even if [a policyholder] were to earn a larger income from his new occupation.'"[76]

### C.    Consequential Damages

Under New York law, "consequential damages *resulting from a breach of the covenant of good faith and fair dealing* may be asserted in an insurance contract context, so long as [such] damages were 'within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting.'"[77] "To determine whether consequential damages were

---

*Life Ins. Co.*, 212 F.3d 121, 124 (2d Cir. 2000) (holding that the policyholder's occupation under the disability policy was that of a dentist, and not also an administrator/manager, because he devoted ninety percent of his pre-disability full-time working hours to performing dentistry work and the remaining time to administrative work); *Gross v. UnumProvident Life Ins. Co.*, 319 F. Supp. 2d 1129, 1151 (C.D. Cal. 2004) (noting that an orthopedic surgeon's income from performing medical legal evaluations comprised less than five percent of his total income for each of the three years prior to his disability and concluding that his "medical-legal duties were not important duties of his occupation prior to his becoming disabled").

[75]    *Shapiro*, 212 F.3d at 125 (quoting *Blasbalg v. Massachusetts Cas. Ins. Co.*, 962 F. Supp. 362, 368 (E.D.N.Y. 1997)).

[76]    *Id.* (quoting *Blasbalg*, 962 F. Supp. at 368).

[77]    *Panasia Estates v. Hudson Ins. Co.*, 856 N.Y.S.2d 513, 515 (2008) (quoting *Bi-Economy Mkt. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 192

reasonably contemplated by the parties, courts must look to 'the nature, purpose

and particular circumstances of the contract known by the parties . . . as well as

what liability the [insurer] fairly may be supposed to have assumed consciously, or

to have warranted the [insured] reasonably to suppose that it assumed, when the

contract was made.'"[78]

## IV.   DISCUSSION

### A.   Breach of Contract – Residual Disability

Defendants contend that Simon has failed to demonstrate that he

suffered a twenty percent loss of Monthly Income as a result of his disability and

that he is therefore not entitled to residual disability benefits. *First*, they argue

that because Simon has primarily submitted documents regarding his *annual*

revenue and expenses, he has failed to provide sufficient evidence of his loss of

Monthly Income for the requisite 365-day Elimination Period.[79]  *Second*,

defendants contend that at the time of his disability, Simon's occupation was "that

of a doctor who performed obstetrical work, who performed gynecological work,

---

(2008)) (emphasis added).

[78]     *Bi-Economy*, 856 N.Y.S.2d at 508 (quoting *Kenford Co. v. County of
Erie*, 73 N.Y.2d 312, 319 (1989)).

[79]     *See* Def. Mem. at 2.

21

*and* who performed examinations on behalf of the INS."[80]  Defendants assert that

Simon cannot show a twenty percent loss in Monthly Income if income from his

INS work is included in the calculations.

Simon argues that the Policy does not expressly require monthly

income statements to calculate Monthly Income.[81]  He notes that even though he

produced daily information of his revenues through his Books and monthly

information through the Spreadsheets, defendants failed to determine his Monthly

Income.[82]  He also argues that defendants nevertheless could have calculated his

loss of Monthly Income using the Statements of Annual Revenues and Expenses

that he produced.[83]  *Second*, he argues that whether his INS work was part of his

"occupation" is a question of fact for the jury.[84]  He contends that his pre-disability

INS work was not an activity in which he "regularly engaged" such that it should

---

[80]     *Id.* at 1 (emphasis added).

[81]     *See* Plaintiff's Memorandum of Law in Opposition to Defendants'
Motion for Summary Judgment with Regard to All of Plaintiff's Remaining
Causes of Action within the Second Amended Complaint ("Pl. Mem.") at 5.

[82]     *See id.* at 6.

[83]     *See id.* at 6-7.

[84]     *See id.* at 3.

22

be considered part of his pre-disability "occupation."[85]  He further notes that he

suffered a loss in Monthly Income from his OB/GYN practice greater than twenty

percent for each of the years from 2004 to 2007.[86]  I agree.

      *First*, the Policy does not expressly contain language specifying the

type of financial statements necessary to calculate a policyholder's Monthly

Income.[87]  Defendants have also failed to submit extrinsic evidence showing that

Monthly Income must be calculated by monthly revenue and expense figures.[88]

The Policy itself defines Prior Monthly Income as *average* monthly income.[89]

And, on at least one occasion, Provident appears to have assessed Simon's claim

---

[85]    *See id.* at 13.

[86]    *See id*. at 10 (calculating Simon's OB/GYN Monthly Income and
corresponding post-disability loss of Monthly Income based on gross annual
revenues between 2004 and 2007).

[87]    Defendants cite to the definition for Monthly Income, *see* Def. Mem.
at 15, but nowhere in that definition is it stated that the policyholder must maintain
and provide monthly income statements.  In fact, the definition seems only to
explain what types of earnings may be considered as income – *i.e.*, salary, wages,
bonuses, but not dividends, interest, royalties. *See* Policy at 8.

[88]    Defendants rely on the deposition testimony of Natale Algieri to
explain that monthly proof of loss is required in order for defendants to accurately
calculate Simon's loss of earnings on a monthly basis, *see* Def. Mem. at 5, but
such testimony cannot serve as extrinsic evidence of the parties' intent at the time
the Policy was offered to and purchased by Simon.

[89]    *See* Policy at 8.

23

based upon *average* Monthly Income calculated from an eleven-month statement.[90]  Construing the Policy in favor of Simon, I find that loss of Monthly Income may be determined using average monthly income numbers based on annual income figures.  Thus, failure to produce monthly records is not fatal to Simon's residual disability claim.[91]

---

[90]    *See* Algieri Letter at 9 ("In December 2004, you forwarded to our office an 11-month profit and loss statement for the period ending November 30, 2004.  There was not a month by month breakdown for this 11 month period of time.  According to our review of this statement, your Monthly Earnings were averaged to be $10,516.").

[91]    Defendants appear to argue that they may deny benefits based on Simon's failure to timely file proof of loss.  *See* Def. Mem. at 13-14.  Indeed, the Policy provides that written proof of loss must be received by Provident within ninety days after the end of each period for which Provident is liable for loss.  *See* Policy at 15.  Also, under New York law, failure to timely file proof of loss is a complete defense to a breach of contract action against an insurer unless there has been a waiver by the insurer or conduct on its part estopping its assertion of the defense.  *See Turkow v. Erie Ins.* Co., 798 N.Y.S.2d 768 (3d Dep't 2005) (citing *Igbara Realty Corp. v. New York Prop. Ins. Underwriting Assn.*, 63 N.Y.2d 201, 209-10 (1984)).  *See also Paul Revere Life Ins. Co. v. Cahn*, No. 06 Civ. 4866, 2008 WL 612727 (S.D.N.Y. 2008) (citing *Rosenthal v. Prudential Prop. & Cas. Co.*, 928 F.2d 493, 494-95 (2d Cir. 1991)) ("Where an insured willfully fails to comply with the disclosure obligations of its insurance policy, an insurer may disclaim coverage for material breach of the policy.").
    However, the Policy's proof of loss clause does not explicitly bar a claim if the policyholder fails to comply with the timely notice requirement.  For instance, the clause provides that a claim will not be denied "[i]f it was not reasonably possible for [the policyholder] to give written proof in the time required, so long as proof is filed as soon as reasonably practicable."  Policy at 15.  It also states that "[i]n any event, the proof required must be furnished no later than one year after the 90 days *unless you are legally unable to do so*."  *Id.*  The

24

        *Second*, whether Simon was "regularly engaged" in INS work prior to

his injury such that it can be considered a part of his occupation is properly a

question for the jury. Defendants point to the second part of the definition of

"occupation" in the Policy, arguing that because Simon's work was not "limited

to" that of an OB/GYN, his specialty cannot be deemed his occupation.[92]

However, that part of the definition merely states that if a policyholder's

occupation is limited to his specialty, then his specialty will be considered his

occupation; it says nothing about how "occupation" will be defined if the

---

evidence shows that Simon submitted periodic financial information within, at
most, a year after the period for which he was seeking benefits. *See* Algieri Letter
at 9 (acknowledging receipt of 2004 information at the end of 2004, January to
March 2005 information in April 2005, and April 2005 to December 2006
information in 2007). Provident itself failed to raise Simon's lack of timely notice
as a basis for its denial of his claim. *See* Algieri Letter; 1/8/08 Deraney Letter. In
fact, Provident merely informed Simon and his attorney that he was not entitled to
residual disability benefits based on the information provided up to January 2008,
but nevertheless requested further information. *See* Algieri Letter; 1/8/08 Deraney
Letter. And although Provident asserted the defense in its answer to plaintiff's
Second Amended Complaint, it failed to do so with particularity. *See* Defendants'
Answer, Affirmative Defenses, and Jury Demand to Plaintiff's Second Amended
Complaint at 18. *See Igbara*, 63 N.Y.2d at 218 ("An insurer who answers after
expiration of the insured's time to respond to [notice to provide timely proof of
loss] and fails to deny "specifically and with particularity" the insured's failure to
perform the condition precedent of filing proof of loss may [] be held to have
waived the defense."). I therefore find that Simon's failure to timely file proof of
loss does not bar his recovery.

[92]    *See* Def. Mem. at 19.

policyholder performs work outside of his specialty. Indeed, defendants' reading

of the definition would unreasonably include within a specialist's occupation

general physician work performed in the specialist's spare time. The only logical

reading of the definition is that if a policyholder performs work outside of his

specialty, then that work will only be considered a part of his occupation if he is

"regularly engaged" in that work.

      While the Second Circuit has not precisely defined the term

"regularly engaged," it has provided some guidance. In *Shapiro v. Berkshire Life

Insurance Co.*, the Circuit considered whether a dentist who also spent a few hours

per week managing other dentistry practices held two occupations: that of a dentist

and that of a medical administrator.[93] The court – affirming the district court's

judgment as a matter of law that the dentist was entitled to total disability benefits

by virtue of being unable to perform chair dentistry as a result of injury – noted in

particular that the dentist had spent only ten percent of his time prior to his

disability performing administrative work and concluded that such work was

"incidental to his material and substantial duties as a full-time dentist."[94]

      Although Simon has not provided time sheets to compare the time

---

[93]    *See* 212 F.3d at 124-25.

[94]    *Id.* at 124 (citations omitted).

26

spent on his OB/GYN work with the time spent on his INS work, there were months in 2002, two years prior to his disability, in which he saw no INS patients.[95] In addition, Simon's INS revenue for 2002 was three percent of his total revenue; in 2003 – the year of his disability – it comprised just over eight percent of his total revenue.[96] Furthermore, Simon testified at his deposition that he began working for the INS in order "to help . . . the international community" and only increased such work post-disability to replace the income he lost as a result of his disability.[97]

Defendants make much of the fact that Simon failed to establish a separate corporation for his INS work and also deposited income derived from his INS work into his Park Avenue OB/GYN bank account.[98] However, defendants do not point to any case law indicating that such facts are significant to an analysis of whether incidental work will be considered part of one's occupation. At most, such evidence raises an issue of material fact that prevents this Court from granting summary judgment in favor of Simon.

---

[95]  *See* Gross Revenues - INS, Ex. B to Glen Decl.

[96]  *See* 2002 and 2003 Statement of Annual Revenues and Expenses, Ex. 17, Part II to Def. Mem.

[97]  Simon Dep. at 103:5-9; 110:8-15.

[98]  *See* Def. Mem. at 20.

27

Simon has presented enough evidence to raise an issue of material fact as to whether his INS work is properly considered a part of his occupation for the purposes of determining whether he is entitled to residual disability benefits, and consequently, whether income from his INS work should be included in calculating his loss of Monthly Income. Defendants' motion for summary judgment on the residual disability claim is therefore denied.

**B.     The Consequential Damages Claim**

Defendants also move for summary judgment on Simon's consequential damages claim.[99]  To succeed on his consequential damages claim, Simon must have suffered damages resulting directly from a breach of the implied covenant of good faith and fair dealing.[100]

Simon has failed to offer any evidence to show that defendants acted in bad faith when they denied his claim for benefits.[101]  As I held in my March 30, 2009 Opinion and Order with respect to Simon's consumer fraud claim, the

---

[99]     *See id.* at 2.

[100]     *Panasia Estates*, 856 N.Y.S.2d at 886.

[101]     *See Hunter v. Deutsche Bank AG, New York Branch*, 866 N.Y.S.2d 670, 671 (1st Dep't 2008) (granting summary judgment on the claim of breach of the implied covenant of good faith and fair dealing based on lack of evidence of bad faith).

evidence shows that Provident conducted a thorough investigation into Simon's claim.[102]  With respect to Simon's residual disability claim, Provident made repeated requests for financial information.   It also reassessed Simon's claim each time it received new information.  Any delay in processing due to Provident's assertion that Simon was required to produce monthly income statements according to the Policy was a result of a difference in interpretation of the terms of the Policy and not the result of dealing in bad faith.  Furthermore, although Simon faults Provident for failing to assess his loss of Monthly Income based upon his Books, which show daily revenues from his practice, he failed to produce those Books until February 2009 and only after he was requested to do so by defendants in their Second Request for Production of Documents in this litigation and directed to do so by this Court.[103]  In addition, the Statements of Annual Revenues and Expenses upon which Simon's own calculation of loss of Monthly Income relies were not produced to Provident until June 1, 2009, the discovery deadline in

---

[102]     *See Simon*, 2009 WL 857635, at *6 (noting that Provident hired a number of physicians to review Simon's medical records, engaged an independent auditor to conduct an extensive investigation into Simon's Explanation of Benefits records, and continuously requested more information and reconsidered his claim in light of new documents).

[103]     *See* Def. 56.1 ¶ 46; Pl. Counter. 56.1 ¶ 46.

29

this case.[104] Any delay in processing Simon's claim was caused in part by Simon's own tardiness.

Simon appears to concede that he lacks evidence of bad faith and argues instead that consequential damages are available in breach of contract actions even when there has been no showing of a breach of the implied covenant of good faith and fair dealing.[105] However, there is no support for this view. Simon cites to *Chaffee v. Farmers New Century Insurance Co.* for the proposition that all he needs to demonstrate is that the damages were "'within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting.'"[106] However, *Chaffee* quotes the New York Court of Appeals decision in *Bi-Economy Market v. Harleysville Insurance Co. of New York*, which held that consequential damages are payable for *breach of the implied*

---

[104]    *See* Def. 56.1 ¶ 64; Pl. Counter. 56.1 ¶ 64.

[105]    *See* Pl. Mem. at 21 ("There is no need to enter into an exegesis on the type of misbehavior an insurance company must commit to rise to the level of bad faith.  Under controlling New York law, consequential damages are available in a breach-of-contract action where they are 'brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting.'") (quoting *Chaffee v. Farmers New Century Ins. Co.*, No. 04 Civ. 1493, 2008 WL 4426620, at *4 (N.D.N.Y. Sept. 24, 2008).

[106]    Pl. Mem. at 21 (quoting *Chaffee*, 2008 WL 4426620, at *4).

*covenant of good faith and fair dealing.*[107]   Simon cannot sustain a claim for

consequential damages without showing that defendants lacked good faith in

processing his claim.  Summary judgment is therefore granted to defendants on

Simon's consequential damages claim.[108]

## V.   CONCLUSION

For the reasons stated above, defendants' motion for summary

judgment is granted in part and denied in part.  The Clerk of the Court is directed

to close this motion (Docket No. 50).  A status conference is scheduled for

---

[107]   *See* 10 N.Y.3d at 195 ("Thus, the very purpose of business
interruption coverage would have made Harleysville aware that if it breached its
obligations under the contract to investigate in good faith and pay covered claims
it would have to respond in [consequential] damages to Bi-Economy for the loss
of its business as a result of the breach.").  *Accord Panasia*, 856 N.Y.S.2d at 515.
Courts in this Circuit have interpreted *Bi-Economy* to permit consequential
damages as a result of an insurer's bad faith refusal to pay a policyholder's claim
if such damages were reasonably contemplated by the parties at the time of
execution.  *See, e.g., Woodworth v. Erie Ins. Co.*, No. 05 Civ. 6344,
2009 WL 1652258, at *1 (W.D.N.Y. June 12, 2009) ("In *Bi-Economy*, the Court
held that an insured may recover consequential damages resulting from an
insurer's breach of the policy's covenant of good faith and fair dealing provided
that such damages were within the reasonable contemplation of the parties at or
before the time of contracting as the probable result of a breach.").

[108]   Defendants also contest Simon's entitlement to future benefits.  *See*
Def. Mem. at 25-26.  In Simon's opposition to defendants' motion for summary
judgment, he informed the Court that he was not pursuing a claim for future
benefits.  *See* Pl. Mem. at 22.  Simon also concedes that because he failed to
provide income information for 2008 and 2009, he is not seeking damages for
those years.  *See id.*

31

September 1, 2009 at 4:30 p.m.

                                        SO ORDERED:

                                        _____
                                        Shira A. Scheindlin
                                        U.S.D.J.


Dated:        New York, New York
              August 21, 2009

32

## - Appearances -

**For Plaintiff:**

Eugene R. Anderson, Esq.
James J. Fournier, Esq.
Jeffrey E. Glen, Esq.
Marc Anthony Laquercia, Esq.
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020
(212) 278-1000

**For Defendants:**

Andrew I. Hamelsky, Esq.
White and Williams, LLP
One Penn Plaza
250 W. 34th Street
41st Floor, Suite 4110
New York, NY 10119
(212) 244-9500